UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | |
|---|---|
| GULF MARINE FABRICATORS, LP<br><br>VERSUS<br><br>THE ATP INNOVATOR, bearing IMO No. 742, her tackle, furniture, apparel, appurtenances, etc., *in rem*, AMERINDO SERVICES LTD., *in personam*, and *BLUE SKY LANGSA LTD, in personam* | CIVIL ACTION NO. 2:16-cv-00430<br><br>IN ADMIRALTY, F.R.C.P. 9(h) AND RULE C |

**GULF MARINE FABRICATORS, LP'S OPPOSITION TO CLAIMANT'S MOTION TO VACATE ARREST**

**MAY IT PLEASE THE COURT:**

Plaintiff, Gulf Marine Fabricators, LP ("Gulf Marine"), files this opposition to Amerindo Services, Ltd.'s ("Amerindo") Motion to Vacate Arrest (R. Doc. 21) of the *in rem* defendant vessel ATP INNOVATOR (the "INNOVATOR"). Amerindo's challenge to the INNOVATOR's arrest under Rule E is governed by a "probable cause" standard that is easily satisfied at this early stage of the proceedings. As set forth below, the INNOVATOR is a semi-submersible vessel that qualifies as a vessel under long-established Fifth Circuit precedent, as well as recent Supreme Court precedent. Accordingly, Amerindo's challenge to the INNOVATOR's status as a "vessel" is without merit, and Amerindo's motion should be denied.

I. **RELEVANT FACTUAL BACKGROUND**

1. **Vessel History and Characteristics**

The INNOVATOR was built in 1976 as a semi-submersible vessel and was originally called the ROWAN MIDLAND. (*See* Abstract of Title, attached as Exhibit 1). A semi-

submersible vessel is a specialized marine vessel used in a number of offshore roles, such as an offshore drilling rig, safety vessel, oil production facility, or heavy lift crane.  (*See* Declaration of Todd Ladd, ¶ 2, attached as Exhibit 2).  With its hull structure submerged at a deep draft, a semi-submersible is less affected by wave loadings than a normal ship.  (*Id.*).  With a small water-plane area, however, the semi-submersible is sensitive to load changes, and therefore must be carefully trimmed to maintain stability.  (*Id.*).  Unlike a submersible, a semi-submersible vessel is not supported by resting on the seabed.  (*Id.*).  Semi-submersible vessels are able to transform from a deep to a shallow draft by de-ballasting (removing ballast water from the hull), thereby becoming surface vessels. (*Id.*).  Typically, they are moved from location to location in this configuration.  (*Id.*).

Like a typical semi-submersible, the INNOVATOR was constructed with a steel hull, and twenty-five (25) ballast tanks to insure her ability to float.  (*Id.*, ¶ 4).  She has the typical semi-submersible configuration described above, with a watertight bulkhead and additional tanks for fuel, cement, water, and mud to support her function as a mobile drilling vessel.  (*Id.*).  The INNOVATOR is a United-States flag vessel documented under the laws of the United States, having been registered with the United States Coast Guard's National Vessel Documentation Center and issued Official Number 575567.[1]  The INNOVATOR was issued a "Registry" endorsement with the United States Coast Guard[2] and is an inspected vessel by the United States Coast Guard.  As an inspected vessel, she received a Certificate of Inspection from the United

---

[1] *See* Certified Copy of Certificate of Documentation, attached as Exhibit 3.  Under 46 C.F.R. § 67.111, the National Vessel Documentation Center issues an official number to a vessel upon initial documentation of the vessel with the National Vessel Documentation Center.  The official number must be permanently affixed to the vessel.  46 C.F.R. § 67.121.

[2] *See* Exh. 3.  Under 46 C.F.R. § 67.17, a "registry endorsement entitles to employment in the foreign trade; trade with Guam, American Samoa, Wake, Midway, or Kingman Reef; and any other employment for which a coastwise, or fishery endorsement is not required."

States Coast Guard that expired in February of 2016.  As a documented vessel, she received a Certificate of Documentation from the United States Coast Guard that expired in September of 2016.  (*See* Exh. 3).  The INNOVATOR is classed with the American Bureau of Shipping ("ABS"), which has conducted regular surveys of the vessel.  (Ladd Declaration, ¶ 15, Exh. 2) She also has International Maritime Organization ("IMO") Number 8754633, and Hull Number 742.[3]

The INNOVATOR has a long history in the Gulf of Mexico[4] and the Atlantic Ocean,[5] having worked on several jobs at several different sites.  In 2007, ATP Oil & Gas Corporation ("ATP") bought the semi-submersible, changed her name to the "ATP INNOVATOR," and granted a preferred ship mortgage on the INNOVATOR.  (*See* Abstract of Title, Exh. 1).  ATP converted the INNOVATOR from a semi-submersible drilling rig to a semi-submersible production rig.  (Ladd Declaration, ¶ 5, Exh. 2).  The conversion consisted of removing drilling equipment and replacing it with production equipment.  (*Id.*).  Notably, the hull, superstructure, tanks and vessel qualities of the semi-submersible were not changed or affected in the conversion process.  (*Id.*).  In all respects, the INNOVATOR remained a semi-submersible and continues to be a semi-submersible with inherent capabilities of moving from job site to job site.  (*Id.*).

Among other characteristics, the INNOVATOR has the following vessel characteristics:

1.  Pontoon hull;

2.  Ballast tanks;

---

[3] Under 33 C.F.R. 181.23, manufacturers of vessels are required to identify each vessel with primary and secondary hull identification numbers permanently affixed to the vessel.

[4] *See e.g.*, Affidavit of Joseph Key, R. Doc. 21-1, ¶ 7, explaining the INNOVATOR's prior work in the Gulf of Mexico for a project for ATP Oil & Gas Corp.

[5] *See Petroleum Services Holdings, Inc. v. Mobil Exploration & Producing Services, Inc.*, 680 F. Supp. 492, 493 (D.R.I. 1988) (involving personal injury when ROWAN MIDLAND was being used for drilling operations in the Atlantic Ocean).

3.      Tow Bridles;

4.      Towing lugs;

5.      Fender frames;

6.      Navigational lights;

7.      Automated Identification System (AIS);

8.      Sleeping quarters and accommodations for 98 people on board;

9.      Galley;

10.     Main Control Room;

11.     Lifeboats;

12.     Anchors;

13.     Hull Positions System;

14.     Ballast System;

15.     GPS Positioning System;

16.     Draft marks;

17.     Anodes;

18.     Diesel and gas turbine generators;

19.     Mooring system; and

20.     Winches

(*Id.*, ¶ 6).

**2.      Layberth Agreement with Gulf Marine and Towage to Gulf Marine's Dock**

In December of 2013, ATP Infrastructure Partners, L.P. ("ATP Partners"), which owned

the INNOVATOR at the time, entered into a Layberth Agreement with Gulf Marine (the "2013

Layberth Agreement) to berth the INNOVATOR at Gulf Marine's dock at the intersection of the

Intracoastal Waterway and the Corpus Christi Ship Channel.  (*See* Layberth Agreement, dated December 13, 2013, which is attached as an exhibit to the Ladd Declaration, Exh. 2).  The INNOVATOR is described as a "semi-submersible production unit" in the 2013 Layberth Agreement.  (*Id.*).

Following the execution of the 2013 Layberth Agreement, the INNOVATOR was towed to Ingleside, Texas to a berth at Gulf Marine's dock in January of 2014.  (Ladd Declaration, ¶ 9, Exh. 2).  The INNOVATOR was a "wet tow," meaning that she was seaworthy and capable of floating on her own during the transport to Gulf Marine's facility.  (*Id.*).  During the tow, the INNOVATOR had a crew on board which assisted in the tow and berthing at Gulf Marine's facility.  (*Id.*).  Upon reaching the port of Corpus Christi, a pilot boarded the INNOVATOR to assist in mooring her at Gulf Marine's facility.  (*Id.*).  The INNOVATOR's crew operated winches onboard the semi-submersible to moor her at Gulf Marine's dock.  (*Id.*).

On September 14, 2015, ATP Partners sold the INNOVATOR to defendant Amerindo.  (*See* Abstract of Title, Exh. 1).  Subsequently, Amerindo documented the INNOVATOR with the United States Coast Guard's National Vessel Documentation Center; and Amerindo granted ATP Partners a Preferred Ship Mortgage on the INNOVATOR.  (*Id.*).  On December 13, 2015, Amerindo, and its affiliate Blue Sky Langsa, Ltd, entered into a Layberth Agreement with Gulf Marine to continue berthing the INNOVATOR at Gulf Marine's dock (the "2015 Layberth Agreement") through June 30, 2016 and thereafter on a month-to-month basis not to exceed December 31, 2016.  (*See* 2015 Layberth Agreement, a copy of which is attached as an exhibit to the Ladd Declaration, Exh. 2).  The INNOVATOR has remained at Gulf Marine's facility since December of 2015, but has been moved at least once at the facility.  (Ladd Declaration, ¶ 10, Exh. 2).  During the recent movement of the INNOVATOR, she had line-handling crew on

board, who operated the winches on the semi-submersible to assist in moving the INNOVATOR. (*Id.*, ¶ 13).  In addition, there was a pilot on board the INNOVATOR during the move.  (*Id.*).  As evidenced by the Declaration of Joseph Key, Amerindo intends to put the INNOVATOR into service abroad, which will require the INNOVATOR to be towed a substantial distance across navigable waters to its intended location in foreign waters.  (*See* R. Doc. 21-1, pp. 2-3, ¶ 3).

### 3.     Services Provided by Gulf Marine to the INNOVATOR under 2015 Layberth Agreement

Under the 2015 Layberth Agreement, Amerindo and Blue Sky agreed to pay Gulf Marine $55,000 per month for dockage fees and additional amounts for other services and equipment provided to the INNOVATOR.  (*See* 2015 Layberth Agreement attached as exhibit to the Ladd Declaration, Exh. 2).  In addition to dockage services, Gulf Marine has provided the following services and marine equipment to the INNOVATOR:

1)     Monthly spacer barge;

2)     Shore power;

3)     Equipment, including cranes and forklifts;

4)     Daily inspection; and

5)     Maintenance.

(Ladd Declaration, ¶ 11, Exh. 2).  In addition, Amerindo contracted for various services to be performed on the INNOVATOR while she has been berthed at Gulf Marine's dock.  These services include the following maintenance services, among others: miscellaneous valve inspections, testing and part replacement(s) in the product piping systems;  removal of perishable and non-perishable items from the living quarters; mooring winch testing and maintenance; generator system testing and maintenance; electrical system repairs; miscellaneous touch-up

painting on rig; and non-destructive testing to determine extent of corrosion to hull overall structure.  (*Id.*, ¶ 12).

From November 2015 through mid-October of 2016, in accordance with the terms of the 2015 Layberth Agreement, Gulf Marine invoiced Blue Sky and Amerindo for layberth fees as well as other services and equipment provided to the INNOVATOR.  (R. Doc. 1, ¶ XII).  In total, as of the time that Gulf Marine filed suit in October of 2016, Blue Sky and Amerindo owed Gulf Marine approximately $811,901.93 in unpaid layberth fees and for other services and equipment provided, which amount Blue Sky and Amerindo failed to pay.  (*Id.*).  The above figure, which continues to accrue daily, does not include interest to which Gulf Marine is entitled under the 2015 Layberth Agreement and by law.  (*Id.*).

## II.   PROCEDURAL BACKGROUND

On October 13, 2016, Gulf Marine filed this lawsuit against the INNOVATOR *in rem* and Amerindo and Blue Sky *in personam*.  (R. Doc. 1).  Gulf Marine asserted a claim against the INNOVATOR for a maritime lien for necessaries provided under the 2015 Layberth Agreement and sought to arrest the INNOVATOR under Rule C of the Supplemental Rules for Admiralty and Maritime ("Rule C").[6]  (*Id.*).  On October 17, 2016, the INNOVATOR was arrested by the United States Marshal's Service.  (R. Doc. 19).  Subsequently, Amerindo made a limited appearance on behalf of the INNOVATOR (R. Doc. 20) and filed a motion to vacate the arrest, arguing that the INNOVATOR is not a vessel.  (R. Doc. 21).

---

[6] Gulf Marine also asserted *in personam* claims against Amerindo and Blue Sky for breach of the 2015 Layberth Agreement.  (R. Doc. 1).

### III.    LAW AND ANALYSIS

**1.    Standard of Review Under a Rule E(4)(f) Motion Is "Probable Cause"**

Rule E(4)(f) of the Supplemental Admiralty Rules of the Federal Rules of Civil

Procedure provides in pertinent part:

> Procedure for Release from Arrest or Attachment. Whenever property is arrested
> or attached, any person claiming an interest in it shall be entitled to a prompt
> hearing at which the plaintiff shall be required to show why the arrest or
> attachment should not be vacated or other relief granted consistent with these
> rules.

Suppl. Adm. R. E(4)(f).  Although Rule E provides vessel interests such as Amerindo with the

right to a "prompt hearing" on a motion to vacate, Amerindo has not sought any hearing on its

current motion nor has it sought to expedite consideration of its request to vacate the arrest of the

INNOVATOR.  Moreover, Amerindo does not address the applicable standard of review on a

Rule E motion to vacate arrest.

"Courts have held that at a Rule E(4)(f) hearing, a plaintiff must show reasonable

grounds for the arrest and attachment and that it should be maintained."  *Seatrade Group N.V. v.*

*6,785.5 Tons of Cement*, No. 05-2771, 2005 WL 3878026 (S.D. Tex. Dec. 7, 2005) (citing

*Salazar v. Atlantic Sun*, 881 F .2d 73, 79 (3d Cir. 1989); *Amstar Corp. v. S/S Alexandros T.*, 664

F.2d 904, 912 (4th Cir. 1981)).  As another court in this district has explained, a "Rule E(4)(f)

hearing is not intended definitely to resolve the dispute between the parties, but only to make a

preliminary determination of whether there are reasonable grounds for issuance of the arrest

warrant."  *Id.*; *see also Salazar*, 881 F.2d at 79 ("The post arrest hearing is not intended to

resolve definitively the dispute between the parties, but only to make a preliminary determination

whether there were reasonable grounds for issuing the arrest warrant ...");  *Naftomar Shipping &*

*Trading Co. v. KMA Int'l S.A.*, No. V–11–2, 2011 WL 888951, at *3 (S.D. Tex. Mar. 10, 2011).

Thus, in deciding Rule E(4)(f) motions, courts do not make binding determinations of fact, but

rather are "merely holding that it is likely that alleged facts are true." *Naftomar*, 2011 WL 888951, at *3 (quoting *Walijam Exports Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 280 (S.D.N.Y. 2006)).

### 2.      The Elements of a Maritime Lien for Necessaries

"[A] maritime lien is a rough security device invented in the nineteenth century to keep ships moving in commerce while preventing them from escaping their debts by sailing away." THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 9-1 (5th ed.) (Updated Nov. 2016).  The overarching goal of the maritime lien system is to keep "the channels of maritime commerce open—by ensuring that people who service vessels have an efficient way of demanding reimbursement for their labor and are thus willing to perform the services necessary to keep vessels in operation." *Mullane v. Chambers*, 438 F.3d 132, 138 (1st Cir. 2006). Thus, under Rule C of the Supplemental Rules for Admiralty and Maritime Claims, a party may bring an action *in rem* to enforce a maritime lien by seizing the vessel itself until the lien is satisfied. Supp. Adm. R. C(1)(a).  A court may order the sale of an arrested vessel, and that sale then extinguishes all liens against the vessel. *See Newpark Shipbuilding & Repair, Inc. v. M/V Trinton Brute*, 2 F.3d 572, 573 (5th Cir. 1993) ("a marshal's sale discharges all liens against the ship and grants the purchaser title free and clear of liens").

The Commercial Instruments and Maritime Lien Act, 46 U.S.C. § 31301, *et seq.* (the "CIMLA"), defines the circumstances in which a party is entitled to a maritime lien for necessaries.  The statute provides that:

> [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>
> > (1)      has a maritime lien on the vessel;
> >
> > (2)      may bring a civil action in rem to enforce the lien; and

(3)     is not required to allege or prove in the action that credit was given
to the vessel.

46 U.S.C. § 31342.  In sum, to establish a maritime lien for necessaries, the lien claimant must

show that it (1) furnished repairs, supplies, or other necessaries (2) to a vessel (3) on the order of

the owner or a person authorized by the owner. 46 U.S.C. § 31342(a)(1); *see also Galehead Inc.

v. M/V ANGLIA*, 183 F.3d 1242, 1244 (11th Cir. 1999).  For present purposes, the only element

in dispute is the second element- whether the INNOVATOR is a "vessel" for purposes of the

CIMLA.  Amerindo does not contest the other two elements of a necessaries lien, *i.e.* the fact

that the services and equipment provided by Gulf Marine constitute necessaries[7] or the fact that

the services were provided on the order of the owner of the INNOVATOR.

### 3.     The INNOVATOR Constitutes a Vessel under the General Maritime Law

A "vessel" is defined by statute as "every description of watercraft or other artificial

contrivance used, or capable of being used, as a means of transportation on water."  1 U.S.C. § 3.

The Supreme Court has explained that the statutory definition of "vessel" includes "any

watercraft practically capable of maritime transportation, regardless of its primary purpose or

state of transit at a particular moment."  *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 497

(2005).[8]  Therefore, for a thing to be classified as a vessel, its primary purpose does not have to

be navigation or transportation.  *Id.* at 495–96.  In *Dutra*, the Supreme Court described the

---

[7] It is well-settled that dockage or wharfage constitute necessaries.  *See* SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 9-3 (citing *The Western Wave*, 77 F.2d 695 (5th Cir. 1935)).

[8] In *Stewart*, the Supreme Court explained that the Rules of Construction Act, 1 U.S.C. § 3, supplies the default definition of "vessel" throughout the United States Code "'unless the context indicates otherwise.'"  543 U.S. at 489-90.  "Section 3 merely codified the meaning that the term 'vessel' had acquired in general maritime law. See 1 S. Friedell, Benedict on Admiralty § 165 (rev. 7th ed. 2004).  In the decades following its enactment, § 3 was regularly used to define the term 'vessel' in maritime jurisprudence."  *Id.* at 490.  Section 3 has supplied the definition of "vessel" for purposes of the Jones Act and the Longshore and Harbor Workers' Compensation Act.  *Id.* at 491.  Likewise, Section 3 has supplied the definition of "vessel" for purposes of the CIMLA.  *Louisiana Int'l Marine, L.L.C.*, 2012 WL 4718558, at *4; *see also Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621, 623 (5th Cir. 1955) (applying Section 3's definition of "vessel" to enforcement of a necessaries lien).

relevant inquiry in determining vessel status as "whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one." *Id.* at 496. "[A] watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." 543 U.S. at 494.

In *Dutra*, the Supreme Court considered whether a massive dredge known as the Super Scoop qualified as a vessel. The Court noted that the Super Scoop had limited means of self-propulsion, but that she was able to move short distances. The structure also had "a captain and crew, navigational lights, ballast tanks, and a crew dining area." 543 U.S. at 484. Although maritime transportation was not the primary purpose of the Super Scoop and the structure was not in navigation at the time of the incident giving rise to dispute, the Court held that the structure was still a vessel because the Super Scoop was engaged in maritime transportation while traversing a navigable waterway with equipment and workers. The Court further stated that "[b]y including special-purpose vessels like dredges, § 3 sweeps broadly . . ." *Id.* at 494.

The Supreme Court recently provided further guidance for courts to consider in "borderline cases where 'capacity' to transport over water is in doubt."[9]  *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735, 745 (2013). The Supreme Court held that a thing is not a vessel "unless a reasonable observer, looking to the [thing's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id.* at 741, 744–45. The *Lozman* Court stated that while lack of self-propulsion may be a "relevant" factor to consider in determining vessel status, it "is not dispositive." 133 S. Ct. at 741 (citing *The Robert W. Parsons*, 191 U.S. 17, 31 (1903)).

---

[9] Semi-submersibles have never been "borderline cases" unless they are permanently attached to the seabed, casting their capacity to transport over water in doubt.

Before and after the Supreme Court pronouncements on vessel status in *Dutra* and *Lozman*, the Fifth Circuit, and courts within the Fifth Circuit, have repeatedly held that mobile offshore drilling units like the INNOVATOR are vessels under the General Maritime Law <u>unless they are permanently attached to the seabed</u>. *Compare In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d 943, 949 (E.D. La. 2011), *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014) *with Scroggs v. Bis Salamis, Inc.*, No. 09-1007, 2010 WL 3910563 (E.D. Tex. 2010) (holding that floating production semi-submersible that was permanently moored to the seabed through 16 chain mooring lines and that would cost $400 to $500 million to move was not a vessel).[10]  In *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959), the Fifth Circuit held that a floating drilling platform is a vessel, despite the fact that it was not self-propelled and that its primary purpose was to drill for oil.

More recently, in *Demette v. Falcon Drilling Co, Inc.*, 280 F.3d 492, 498, n.18 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009), the Fifth Circuit found it "beyond dispute" that a jack-up rig was a vessel under maritime law.[11]  Likewise, a district court recently found that the DEEPWATER HORIZON, a semi-submersible, deep-water drilling platform, was a vessel.  *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d at 950; *see*

---

[10] *See also Dominigue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393, 394 n.1 (5th Cir. 1991) ("We have consistently applied general maritime law and the Jones Act . . . to accidents aboard special-purpose watercraft such as . . . semi-submersible . . . rigs."), *cert. denied*, 502 U.S. 1033 (1992); *Houston Oil & Minerals Corp. v. American Int'l Tool Co.*, 827 F.2d 1049, 1052–53 (5th Cir. 1987) ("Our cases applying the Jones Act and general maritime law to accidents aboard . . . semi-submersible . . . and other movable rigs . . . are legion.") (collecting cases), *cert. denied*, 484 U.S. 1067 (1988); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 n.5 (5th Cir. 1986) (concluding that the INNOVATOR's predecessor, the ROWAN MIDLAND, was "indisputably a vessel").

[11] A jack-up rig has legs that can be lowered and secured to the seabed.  Once the legs are secured, the rig is "jacked-up" out of the water to create a drilling platform. The process is reversible, and a jack-up rig can be towed to new sites.  *Id.* at 495.

*also Manuel v. P.A.W. Drilling & Well Serv., Inc.*, 135 F.3d 344, 348 (5th Cir. 1998) ("In a long line of cases, we have held a variety of special purpose structures, far removed from the conventional notion of ships and seagoing barges, to be vessels.").

The recent case of *Louisiana International Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*,[12] is instructive on the issue of vessel status in this case.  In *Louisiana International Marine, L.L.C.*, several parties asserted maritime lien claims against a semi-submersible drilling rig for the provision of various services, including towage of the rig as a "wet tow."  The rig was seized, and the seizure was challenged on a motion to vacate the arrest of the rig.  Although the issue in *Louisiana International Marine, L.L.C.* was framed as whether the rig was a "dead ship," the case is instructive because it addressed whether a semi-submersible similar in structure to the INNOVATOR was "practically capable of maritime transportation," as is required for a structure to be a vessel.[13]  The court cited to the fact that the rig was recently towed as a "wet tow" as evidence that the rig was indeed practically capable of such maritime transportation.  Based primarily on the recent towage of the rig as a "wet tow," the court found the rig to be "practically capable of maritime transportation" and thus a vessel.  *Id.* at *7.

Similarly, in this case, the INNOVATOR was recently towed as a "wet tow" to Gulf Marine's dock.  (Ladd Declaration, ¶ 9, Exh. 2).  Like the rig in *Louisiana International Marine, L.L.C.*, the INNOVATOR also had line-handling crew and a pilot on board for portions of the tow to Gulf Marine's facility.  (*Id.*).  In addition, the INNOVATOR was recently moved and

---

[12] *See La. Int'l Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*, No. 11-186, 2012 WL 1029934 (S.D. Tex. Mar. 9, 2012), *adopted La. Int'l Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*, No. 11-186, 2012 WL 1029703 (S.D. Tex. Mar. 26, 2012).

[13] Unlike the INNOVATOR, the semi-submersible drilling rig in *Louisiana International Marine, L.L.C.* had been cold-stacked for a decade and was partially dismantled with an equivocal intention to be scrapped. Generators had been removed from the rig, and it lacked lifeboats, navigational aids, and operational bilge pumps. It also was scheduled to undergo repairs before it could be placed back into operation.  It had less vessel features than the INNOVATOR, and yet was still determined to be a vessel.  2012 WL 1029934, at *7.

shifted, using line-handling crew on board the semi-submersible and a pilot as well. (*Id.*, ¶ 13). Like the rig in *Louisiana International Marine, L.L.C.*, the INNOVATOR was and is practically capable of maritime transportation.

Moreover, the INNOVATOR is indisputably a semi-submersible with all of the hallmarks of a vessel under established Fifth Circuit jurisprudence. She has a steel hull with twenty-five (25) ballast tanks to insure its ability to float. (*Id.*, ¶ 4). She has the typical semi-submersible configuration with a watertight bulkhead and additional tanks for fuel, cement, water, and mud to support her function as a mobile drilling vessel. (*Id.*). Moreover, the INNOVATOR has the following objective vessel characteristics: Pontoon hull; Ballast tanks; Tow Bridles; Towing lugs; Fender frames; Navigational lights; Automated Identification System (AIS); Sleeping quarters and accommodations for 98 people on board; Galley; Main Control Room; Lifeboats; Anchors; Hull Positions System; Ballast System; GPS Positioning System; Draft marks; Anodes; Diesel and gas turbine generators; Mooring system; and Winches. (*Id.*, ¶ 6). Amerindo documented the INNOVATOR with the National Vessel Documentation Center (*See* Exh. 3), and the INNOVATOR is currently classed with the American Bureau of Shipping. (Ladd Declaration, ¶ 9, Exh. 2). The United States Coast Guard inspected the INNOVATOR and issued a Certificate of Inspection for the INNOVATOR.

Indeed, the Fifth Circuit stated that the ROWAN MIDLAND, the INNOVATOR's predecessor, was "indisputably a vessel." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214, n.5 (5th Cir. 1986). While the Fifth Circuit's express statement on vessel status in *Fontenot* pre-dated the ROWAN MIDLAND's conversion to a floating production facility, none of the INNOVATOR's vessel characteristics were removed when the conversion occurred; rather, the drilling equipment was simply replaced with production equipment. (Ladd

Declaration, ¶ 5, Exh. 2).  Accordingly, the Fifth Circuit's reference to the ROWAN MIDLAND as "indisputably a vessel" is also highly instructive in this case.[14]

Undeterred by the above jurisprudence, Amerindo cites to a list of eight (8) items in its motion as support for its position on vessel-status.  (R. Doc. 21, pp. 2-3).  Four of the eight items relate to the lack of self-propulsion (i.e. lack of engines, thrusters, automated positioning of thrusters, or steering mechanism) and a fifth relates to the absence of a "raked bow."[15]  (*Id.*).  In *Lozman*, the Supreme Court made clear that while lack of self-propulsion "may be a relevant factor" to consider in determining vessel status, it "is not dispositive."  133 S. Ct. at 741 (citing *The Robert W. Parsons*, 191 U.S. 17, 31 (1903)).  In *Louisiana International Marine, L.L.C.*, the district court found a semi-submersible rig to be a vessel despite the lack of self-propulsion, thrusters or steering mechanism.  2012 WL 1029934, at *4, *7.  Moreover, Amerindo's reliance on lack of self-propulsion ignores the plethora of objective vessel-characteristics cited above.  Like the dredge in *Stewart*, the INNOVATOR's primary purpose is not navigation or commerce; yet, like the dredge in *Stewart*, she has a hull, ballast tanks, navigational lights, crew quarters and a galley.  (Ladd Declaration, ¶¶ 4-6, Exh. 2).  Similar to the dredge in *Stewart*, the INNOVATOR is a vessel.

---

[14] While a district court has also held that the ROWAN MIDLAND did not qualify as a vessel back in 2006 while it was being converted to a floating production facility, the district court's holding was premised on the fact that the ROWAN MIDLAND was attached to the seabed at all material times and the fact that there was no intention to move it.  *Case v. Omega Natchiq, Inc.*, No. 08-0835, 2008 WL 2714124 (S.D. Tex. July 10, 2008).  The district court also stressed that the ROWAN MIDLAND was not in navigation and thus could not be a vessel because it was "under construction."  *Id.* at *6-*8.  Conversely, in the present case, the INNOVATOR has been berthed at Gulf Marine's dock and not permanently attached to the seabed at all times material.  The relevant time period for vessel status is the time that Gulf Marine entered into the 2015 Layberth Agreement with Amerindo and subsequently provided services to the semi-submersible.  Moreover, ownership of the INNOVATOR has changed several times since the 2006 injury in *Case*; and unlike the owner in *Case*, the current owner, Amerindo, has expressly stated its intent to move the INNOVATOR a substantial distance over navigable waters to work abroad.  Accordingly, the facts of *Case* are distinguishable, and the instant case is more akin to *Louisiana International Marine, L.L.C.* which held that a structure similar to the INNOVATOR was a vessel.

[15] The final three (3) items relate to the INNOVATOR's design and intended use, and they are discussed below.

Further, the Fifth Circuit has cautioned against rigid reliance on certain factors, including certain items cited by Amerindo, to determine vessel status. *Manuel*, 135 F.3d at 351-52 (citation omitted). In *Manuel*, the Fifth Circuit found a floating workover rig to be a vessel, stating that characteristics like a "raked bow" are not to be applied mathematically and are only useful guides. 135 F.3d at 351-52 (citation omitted).[16] Similarly, like the rig in *Manuel* and the rig in *Louisiana International Marine, L.L.C.*, the INNOVATOR is a vessel under the General Maritime Law despite the absence of self-propulsion or a "rake bow." As set forth herein, the INNOVATOR is designed to be towed from site to site with equipment and crew. (Ladd Declaration, ¶¶ 3-5, Exh. 2). As a semi-submersible, the INNOVATOR is not supported by resting on the seabed. (*Id.*, ¶ 3). Semi-submersible vessels like the INNOVATOR are able to transform from a deep to a shallow draft by de-ballasting (removing ballast water from the hull), thereby becoming surface vessels. (*Id.*). When the INNOVATOR was towed to Gulf Marine's facility, she was moved from location to location in this configuration. (*Id.*, ¶¶ 5-6, 9). When she will be towed to another site, she will also be moved in this configuration. The INNOVATOR is clearly capable of transporting crew and equipment over water sufficient to qualify as a vessel for purposes of the CIMLA and General Maritime Law. Accordingly, there is "probable cause" under Rule E to justify the sustained seizure of the INNOVATOR.

---

[16] *See also Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621, 623 (5th Cir. 1955) ("The 'Carol Ann' was an artificial contrivance capable of being used as a means of water transportation. It was afloat. Before repairs, it was towed across the Gulf of Mexico; after repairs, it was towed from Port Arthur to Port Isabel, Texas. It had a deck; it had cabins, it had superstructure. It had no motive power of its own; no steering mechanism; but it definitely was capable of being used as a means of transportation under tow. Under the doctrine laid down in The Scorpio, supra, and many other cases, it is plain to us that the 'Carol Ann' was a 'vessel' subject to a maritime lien, enforceable by suit in rem.").

    **4.**     **The Cases Cited by Amerindo Involve *Permanently Moored* Structures That Were Practically Incapable of Maritime Transportation and Thus Inapposite to the Temporarily Berthed INNOVATOR**

In its motion, Amerindo cites to several cases in which courts have held that floating production platforms that were permanently attached to the seabed were not vessels. The owners of the platforms in the cases cited by Amerindo had no intention to move them and the cost to do so was exorbitantly expensive, ranging from $42 million to $500 million. Several of the cases cited by Amerindo even involved the same production facility, the THUNDER HORSE, which was permanently attached to the seabed for the anticipated life of the facility and would cost $400-$500 million to move. The THUNDER HORSE stands in stark contrast to the INNOVATOR, which was recently towed to Gulf Marine's dock as a wet tow with crew and pilot on board and was recently moved with the assistance of the INNOVATOR's crew and a pilot on board.

Despite the fact that the INNOVATOR was never permanently attached to the seabed at any time that Gulf Marine provided necessaries to the vessel,[17] Amerindo argues that the INNOVATOR's design and future at a job-side "for a number of years" make her similar to the structures that are permanently attached to the seabed. In *Louisiana International Marine, L.L.C.*, *supra*, the district court addressed the same line of cases relied upon by Amerindo in its motion to vacate. The district court expressly rejected the applicability of various cases which have held that certain floating structures were not vessels. The court stated: "In each of these cases, however, it was determined that the fact that the structures at issue were permanently

---

[17] At Amerindo's request, Gulf Marine temporarily ballasted down the INNOVATOR at the water's bottom at Gulf Marine's dock during this year's hurricane season to provide further safety and security with respect to a potential breakaway of the INNOVATOR. (Ladd Declaration, ¶ 14, Exh. 2). Previously, when afloat, the hull ballast system was adjusted on a weekly basis to maintain level and/or draft. (*Id.*). The need to submerge the INNOVATOR during hurricane season further demonstrates the practical capability of the INNOVATOR to perform maritime transportation, both with respect to the INNOVATOR's capability to ballast down as necessary and with respect to the INNOVATOR's threatened movement over navigable water during heavy weather.

{N3325058.2}         17

moored to the ocean floor rendered them *practically incapable* of maritime transportation by the time of the incidents giving rise to the respective causes of action." *Id.* at *7 (emphasis in original). As a result, the court found the cases to be "readily distinguishable."

Likewise, the cases relied upon by Amerindo are "readily distinguishable" from the INNOVATOR, which is not attached to the seabed and instead is berthed at Gulf Marine's dock where she towed as a wet tow and has remained berthed since Amerindo entered into the 2015 Layberth Agreement. Amerindo's allegations regarding the intended use of the INNOVATOR at an unknown location in the future for a "number of years" is simply theoretical and is refuted by the recent towage of the INNOVATOR to Gulf Marine's dock, the continued dockage at Gulf Marine's facility, and the intent of Amerindo to tow the INNOVATOR a substantial distance over navigable waters to work abroad.

The Fifth Circuit has recognized that a vessel owner's intent may play a significant role in determining whether a structure was "permanently moored" and therefore not practically capable of use as a means of transportation on water. *See De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185, 187 (5th Cir. 2006). Under the law, Amerindo's intent to move the INNOVATOR in the near future directly refutes Aermindo's reliance on cases involving permanently moored structures because Amerindo's intent is evidence that the INNOVATOR is *not* permanently moored, thus distinguishing the cases relied upon by Amerindo.

Finally, as shown from the brief descriptions of the cases cited by Amerindo, they are inapposite to and easily distinguishable from the INNOVATOR:[18]

---

[18] In addition to citing to cases involving floating production platforms permanently attached to the seabed, Amerindo also erroneously relies on two cases case involving permanently moored barges serving as floating hotels. *See Martin v. Fab-Con, Inc.*, 9 F. Supp. 3d 642, 644-45 (E.D. La. 2014) (involving personal injury on quartersbarge used as floating hotel and spudded in place at a job site); *Higginbotham v. Drake Towing, L.L.C.*, 2016 A.M.C. 227, 233 (E.D. La. 2015) (involving personal injury on spud barge spudded in place and serving as dormitory for job site). Unlike the permanently attached barges in *Martin* and *Higginbotham*, the INNOVATOR is temporarily

- *Mendez v. Anadarko Petroleum Corp.*, 466 Fed. Appx. 316 (5th Cir. 2012)

  o Personal injury in 2008 on floating gas-production spar permanently moored to the seabed since 2004, would cost $42 million and take 50 days to move it, and no intent to move the spar in the future.  *Id.* at 317

- *Mooney v. W&T Offshore, Inc.*, 2013 A.M.C. 1480 (E.D. La. 2013)

  o Personal injury on tension leg platform that was permanently attached to the seabed by steel tubes and that had not been moved since it was installed and anchored to the sea floor.  *Id.* at   1487-89.

- *Warrior Energy Services Corp. v. ATP Titan*, 2014 A.M.C. 2514 (5th Cir. 2014)

  o Involving Floating production facility moored to the outer continental shelf by twelve chain mooring lines connected to twelve anchor piles that had not been moved since installed in the seabed and that would require 12 months to move at a cost of $70 to $80 million.  *Id.* at 2517-18.

- *Washington v. BP Am., Inc.*, No. 10-1486, 2012 WL 5831800 (W.D. LA. 2012)

  o Personal injury on floating production drilling quarters that was permanently moored by 16 cables to the seabed, that would cost of $400 million to relocate the drilling quarters, and that was intended to remain in place during the duration of its useful life.  *Id.* at *2-*5.

- *Moore v. Bis Salamis, Inc.*, 748 F. Supp. 2d 598 (S.D. Tex. 2010)

  o Personal injury on floating production facility that was permanently moored to the seabed through 16 chain mooring lines and that would cost $400 to $500 million to move, and stating that "[B]ecause of its extensive attachment to the ocean floor and long-term commitment to a single location, ... the THUNDER HORSE is a work platform that is permanently attached to the seabed and not a Jones Act vessel."  *Id.* at 608.

- *Rushing v. Pride Intern., Inc.*, No. 11-0294, 2011 WL 3021043 (S.D. Tex. 2011);

  o Personal injury on same floating production facility that was the subject of *Moore*, *supra*, that was permanently moored to the seabed through 16 chain mooring lines and that would cost $400 to $500 million to move.  *Id.* at *5-*7.

---

berthed at Gulf Marine's dock and will be moved to foreign waters.  Neither case involves structures that are factually similar to the INNOVATOR.

- *Scroggs v. Bis Salamis, Inc.*, No. 09-1007, 2010 WL 3910563 (E.D. Tex. 2010);

  - Personal injury on same floating production facility that was the subject of *Moore*, *supra*, that was permanently moored to the seabed through 16 chain mooring lines and that would cost $400 to $500 million to move. *Id.* at *4-*8.

- *Abram v. Nabors Offshore Corp.*, No. 09-4091, 2010 WL 3433056 (S.D. Tex. 2010);

  - Personal injury on rig mounted on platform that was permanently attached to the seabed with no intention of being moved to another site. *Id.* at *3-*4.

## IV.    CONCLUSION

For the foregoing reasons, the INNOVATOR qualifies as a vessel for purposes of the Commercial Instruments and Maritime Liens Act; and there is probable cause under Supplemental Admiralty Rule E to maintain the arrest of the INNOVATOR.   Accordingly, Amerindo's motion to vacate, which challenges only the vessel status of the INNOVATOR, should be denied.

Respectfully submitted,

*/s/ William C. Baldwin*

Lara D. Pringle (Texas Bar No. 24056164)
JONES WALKER LLP
First City Tower
1001 Fannin Street, Suite 2450
Houston, Texas 77002
Telephone: (713) 437-1800
Facsimile: (713) 437-1810
Email: Lpringle@joneswalker.com

*Of Counsel:*

WILLIAM C. BALDWIN (#31613)
HANSFORD P. WOGAN (#34825)
Jones Walker LLP
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:     (504) 582-8315
Facsimile:     (504) 589-8315
Email:  wbaldwin@joneswalker.com
            fwogan@joneswalker.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of November, 2016, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.  I also certify that I have mailed this filing by United States Postal Service to any non-CM/ECF participants.

*/s/  William C. Baldwin*