UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | |
|---|---|
| GULF MARINE FABRICATORS, LP<br><br>VERSUS<br><br>THE ATP INNOVATOR, bearing IMO No. 742, her tackle, furniture, apparel, appurtenances, etc., *in rem*, AMERINDO SERVICES LTD., *in personam*, and *BLUE SKY LANGSA LTD, in personam* | CIVIL ACTION NO. 2:16-cv-00430<br><br>IN ADMIRALTY, F.R.C.P. 9(h) AND RULE C |

## DECLARATION UNDER 28 U.S.C. § 1746

1.      My name is Todd F. Ladd, Executive V.P. & C.O.O. of Gulf Island Fabrication, Inc, being the parent company of Gulf Marine Fabricators, LP ("Gulf Marine").  I am over the age of 18, a citizen of the United States of America, and am competent to give testimony in this matter.  I am a resident of Cypress, Texas.

2.      Through my capacity as Executive V.P. & C.O.O. of Gulf Island Fabrication, Inc being the parent company of Gulf Marine, I have personal knowledge of the facts contained in this Declaration, all of which are true and correct.

3.      A semi-submersible vessel is a specialized marine vessel used in a number of offshore roles, such as an offshore drilling rig, safety vessel, oil production facility, or heavy lift crane.  With its hull structure submerged at a deep draft, a semi-submersible is less affected by wave loadings than a normal ship.  With a small water-plane area, however, the semi-submersible is sensitive to load changes, and therefore must be carefully trimmed to maintain

{N3331048.1}

EXHIBIT
2

stability.  Unlike a submersible, a semi-submersible vessel is not supported by resting on the seabed.  Semi-submersible vessels are able to transform from a deep to a shallow draft by de-ballasting (removing ballast water from the hull), thereby becoming surface vessels.  Typically, they are moved from location to location in this configuration.

4.    Like a typical semi-submersible, the INNOVATOR was constructed with a steel pontoon hull, and twenty-five (25) ballast tanks to insure her ability to float.  She has the typical semi-submersible configuration described above, with a watertight bulkhead and additional tanks for fuel, cement, water, and mud to support her function as a mobile drilling vessel.

5.    The INNOVATOR was converted from a semi-submersible drilling rig to a semi-submersible production rig.  The conversion consisted of removing drilling equipment and replacing it with production equipment.  The hull, superstructure, tanks and vessel qualities of the semi-submersible were not changed or affected in the conversion process.  In all respects, the INNOVATOR remained a semi-submersible and continues to be a semi-submersible with inherent capabilities of moving from job site to job site.

6.    Among other characteristics, the INNOVATOR has the following:

    a.    Pontoon hull;

    b.    Ballast tanks;

    c.    Tow Bridles;

    d.    Towing lugs;

    e.    Fender frames;

    f.    Navigational lights;

    g.    Automated Identification System (AIS);

      h.      Sleeping quarters and accommodations for 98 people on board;

      i.      Galley;

      j.      Main Control Room;

      k.      Lifeboats;

      l.      Anchors;

      m.      Hull Positions System;

      n.      Ballast System;

      o.      GPS Positioning System;

      p.      Draft marks;

      q.      Anodes;

      r.      Diesel and gas turbine generators

      s.      Mooring system; and

      t.      Winches.

7.      In December of 2013, ATP Infrastructure Partners, L.P. ("ATP Partners"), which owned the INNOVATOR at the time, entered into a Layberth Agreement with Gulf Marine (the "2013 Layberth Agreement) to berth the INNOVATOR at Gulf Marine's dock at the intersection of the Intracoastal Waterway and the Corpus Christi Ship Channel.

8.      The 2013 Layberth Agreement is attached to my Declaration and is a true and correct copy of the Layberth Agreement, dated December 13, 2013.

9.      Following the execution of the 2013 Layberth Agreement, the INNOVATOR was towed to Ingleside, Texas to a berth at Gulf Marine's dock in January of 2014. The INNOVATOR was a "wet tow," meaning that she was seaworthy and capable of floating on her

own during the transport to Gulf Marine's facility.  During the tow, the INNOVATOR had a crew on board which assisted in the tow and berthing at Gulf Marine's facility.  Upon reaching the port of Corpus Christi, a pilot boarded the INNOVATOR to assist in mooring her at Gulf Marine's facility.  The INNOVATOR's crew operated winches onboard the semi-submersible to moor her at Gulf Marine's dock.

10.     After the INNOVATOR was sold to Amerindo Services Ltd. ("Amerindo"), Gulf Marine entered into a Layberth Agreement on December 13, 2015 with Amerindo, and its affiliate Blue Sky Langsa, Ltd to continue berthing the INNOVATOR at Gulf Marine's dock (the "2015 Layberth Agreement") through June 30, 2016 and thereafter on a month-to-month basis not to exceed December 31, 2016.  The 2015 Layberth Agreement is attached to my Declaration and is a true and correct copy of the Layberth Agreement, dated December 13,2015.  The INNOVATOR has remained at Gulf Marine's facility since December of 2015.

11.     In addition to dockage services, Gulf Marine provided the following services and marine equipment to the INNOVATOR: 1) Monthly spacer barge; 2) Shore power; 3) Equipment, including cranes and forklifts; 4) Daily inspection; and 5) Maintenance.

12.     In addition, Amerindo has contracted for daily work to be performed on the INNOVATOR while she has been berthed at Gulf Marine's dock.  This work has included the following maintenance services, among others: miscellaneous valve inspections, testing and part replacement(s) in the product piping systems;  removal of perishable and non-perishable items from the living quarters; mooring winch testing and maintenance; generator system testing and maintenance; electrical system repairs; miscellaneous touch-up painting on rig; and non-destructive testing to determine extent of corrosion to hull overall structure.

13.     The INNOVATOR was recently moved at Gulf Marine's facility.   During the movement of the INNOVATOR, she had line-handling crew on board, who operated the winches on the semi-submersible to assist in moving the INNOVATOR.   In addition, there was a pilot on board the INNOVATOR during the move.

14.     At Amerindo's request, the INNOVATOR was ballasted down to the water's bottom for hurricane season.   Previously, when afloat, the hull ballast system was adjusted on a weekly basis to maintain level and/or draft.

15.     The INNOVATOR is actively classed with the American Bureau of Shipping.

16.     I make this Declaration based on my own personal knowledge and affirmation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on the 29th day of November, 2016, at Gulf Island Fabrication, Inc, Houston, TX.


_____

Todd F. Ladd

# LAYBERTH AGREEMENT

THIS LAYBERTH AGREEMENT (this "**Agreement**") is made and entered into this 13 day of December, 2013 (the "**Effective Date**"), by and between ATP Infrastructure Partners, L.P., a Delaware limited partnership ("**Owner**"), being the owner of the semi-submersible production unit called ATP INNOVATOR with an IMO number 742 (the "**Unit**") and **Gulf Marine Fabricators, LP, 1982 FM Rd. 2725, Aransas Pass, TX, 78336** ("Shipyard") (sometimes herein Owner and Shipyard are individually each referred to as a "**Party**" and collectively as the "**Parties**").

1.   **Reservation of a Layberth**

Shipyard agrees to designate and reserve a Layberth for the Unit at Shipyard's marine terminal facilities (the "**Shipyard Facility**") located at the Port of Corpus Christi (the "**Port**"), at or about the intersection of the Intracoastal Waterway and the Corpus Christi Ship Channel at mile marker 36. (such designated berth, the "**Layberth**") for the expected arrival of the Unit during January 2014 ("**Arrival ETA**").

2.   **Notification**

Owner will notify Shipyard, or cause the Shipyard to be notified, at intervals of 72, 48, 24, 12, six (6), and three (3) hours prior to the arrival of the Unit at the Port.

3.   **Layberth and Mooring Arrangements**

Shipyard will confirm the specific Layberth for the Unit upon the actual arrival of the Unit at the Port.  Shipyard shall arrange and pay for the mooring and line-handling services for the Unit at the Layberth.  Shipyard shall also arrange and pay for any tug assistance required in connection with the Unit's mooring at the Layberth.  The mooring arrangements for the Unit (including any necessary ballasting of the Unit) shall, at all times, be able to maintain a safe mooring of the Unit capable of withstanding prevailing winds, currents, tides, and other forces of nature, without applying undue loads on any shoreside moorings, tackle, or equipment at the Layberth.  Shipyard may provide binding instructions for the mooring arrangements of the Unit at the Layberth, but in no event shall such instructions by Shipyard give rise to any duties, obligations, or liabilities of Shipyard owing to the Unit, the Owner, or any other person or entity, provided the Unit may not be submerged to rest on the bottom without Owner's consent, not to be unreasonably withheld. **EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THERE ARE NO GUARANTEES OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED. SHIPYARD SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF ANY KIND OR NATURE, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OF SUITABILITY, ADEQUACY, OR FITNESS FOR A PARTICULAR PURPOSE OF SHIPYARD'S MOORING OR OTHER FACILITIES, WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE.**

4. **Unit Mooring Equipment**

If, in the sole opinion of the Shipyard, the available mooring equipment on the Unit is insufficient to safely moor the Unit at the Layberth, then Shipyard has the right to place additional mooring equipment onboard the Unit.  Any costs or expenses for the purchase and/or installation of such additional mooring equipment onboard the Unit will be charged to, and payable by, the Owner.  The Unit shall not use its anchors while alongside at the Layberth, and the anchors must be in their raised position while the Unit is moored at the Layberth.

5. **Shifting and Removal**

5.1   *Shifting by Shipyard*.  Subject to the following sentence, Shipyard has the right, at Shipyard's sole risk, cost and expense, to shift the Unit to another berth upon the prior written consent of Owner, such consent not to be unreasonably withheld.  The Owner's withholding of consent in the event moving the Unit is necessary for the protection and safety of the Unit or other units, vessels or property, will be deemed unreasonable.   In the case of Owner's unreasonable failure to consent, Shipyard has the right to cause the Unit to be moved or removed from the Layberth to another location in the Shipyard, at the sole expense of the Unit and Owner.

5.2   *Shifting by Owner*.  Once at the Layberth, the Unit is not permitted to shift within or from the Layberth on its own initiative (by means of its own propulsion, tug assistance, warping, or otherwise) without the prior written consent of Shipyard, such consent not to be unreasonably withheld.

5.3   *Removal*. Notwithstanding Section 5.2, subject to prior payment to the Shipyard of all undisputed amounts accrued to the Shipyard under this Agreement prior to such removal, the absence of any material breach of this Agreement by Owner and the Parties' compliance with Section 9.4 regarding disputed amounts, if applicable, Owner may at any time and for any reason remove the Unit from the Shipyard upon thirty (30) days written notice to the Shipyard. In the event of any such removal in accordance with the terms of this Agreement, the Shipyard will provide the Unit unobstructed access to navigable waters with the Unit free and clear of any liens or encumbrances in favor of Shipyard or its subcontractors.

6. **Unit Safety**

6.1   *Security*.  The Parties acknowledge that the Owner, through contractors, will have staff dedicated to the Unit, but the Unit will not be manned 24 hours/day 7 days/week while docked. Such personnel will not overnight on the Unit or make permanent living arrangements on the Unit but will have access to the Unit pursuant to this Agreement. Shipyard agrees to provide the necessary security personnel to properly safeguard the Unit while at the Shipyard at no additional cost to Owner. Except in an emergency Shipyard personnel will board the Unit only with the consent of Owner or its designee.

6.2   *Protection Against Fire*.  Any cargo holds, tanks, pump rooms, cofferdams and/or pipelines of the Unit, as applicable, shall be clean and gas free before work is performed thereon. Any temporary heating equipment, such as space heaters, dryers or heaters for electrical equipment, shall only be used onboard the Unit with appropriate safety precautions and fire prevention planning undertaken by the Unit's crew and/or Owner's other personnel.  The Unit's

2

fire monitoring and alarm system shall be in good order and in full operating condition at all times while the Unit is at the Layberth.

6.3     *Precautions Against the Unit Taking on Water*.  All of the Unit's overboard valves not in use, and all of the Unit's sea inlet valves not in use, should be closed at all times.  The Unit's bilge alarms shall be in good order and in full operating condition at all times while the Unit is at the Layberth.  Bilge lights to the Unit's holds, pump rooms, cofferdams and engine room spaces shall be kept ready for immediate use at all times.  The Unit shall also maintain sufficient electrical power at all times for its bilge pumps.

6.4     *Availability of Electrical Power*.  Shipyard shall supply shorepower for the operation of the Unit pursuant to the Exhibits.

6.5     *Access*.  The Shipyard shall provide access to the Unit to permit the safe passage of persons to and from the Unit while it is in the Layberth. The Shipyard shall provide access to the Shipyard's facility and the Unit to Owner and its contractors, consultants, brokers, and other representatives; Owner's potential buyers, charterers and other counterparties; and third party inspectors, during working hours. Owner shall require any of its or its affiliates, or its subcontractors' officers, employees, agents or invitees entering Shipyard's and/or upon the Unit while docked at Shipyard to attend Shipyard's safety orientation (unless otherwise agreed by Shipyard), observe all safety, health and security rules of Shipyard and the terms and conditions of this Agreement. Owner shall perform its operations in such a manner as to not impede Shipyard's other operations. Owner agrees to coordinate with Shipyard in keeping Shipyard informed in advance of the identities of Owner's employees, affiliates, agents, invitees or subcontractors authorized to enter the Unit while docked at Shipyard. Owner further agrees not to allow any persons other than those authorized by Owner and approved by Shipyard to enter the Shipyard or the Unit while docked at Shipyard.  Such approval(s) of Shipyard shall not be unreasonably withheld.

6.6     *Hazardous materials.* Owner agrees to provide Shipyard notice of the presence of known hazardous materials onboard the Unit. Should Shipyard encounter conditions on or about the Unit during the performance of the work that indicate the environment or persons working on or about the Unit are potentially exposed to unsafe conditions, hazardous substances or materials, Shipyard will immediately bring this fact to the attention of Owner's representative and shall supply Shipyard's employees, and require its subcontractors to supply their employees, with all necessary personal protective equipment and enforce such operating practices as are necessary to provide a safe place to work. Ownership of all such hazardous material shall remain with Owner, notwithstanding Shipyard's handling of same. Any additional cost of handling hazardous material shall be for Owner's account.

6.7     *Adverse Weather/Bottom Condition.* Shipyard shall provide to Owner its Standard Hurricane Preparedness Plan to include the Innovator. Shipyard warrants that the area under the hull of the Unit at the Shipyard Facility will be free of obstructions and debris that would damage the Unit if it is necessary to deballast the Unit so that it rests on the bottom.

7.     **Layberth Fee and Port Charges**

Attached hereto as Exhibit B is a schedule of fees and charges to be paid by Owner to Shipyard under this Agreement for mooring and laying-up.

8.     **Work on the Unit in the Layberth**

8.1     *Safety Precautions.*   For any work permitted by Shipyard on or around the Unit, Owner shall undertake all necessary environmental and safety precautions for, and before commencing, such work, even if Owner has contracted such work to a third party. At all times while the Unit is at the Layberth, Owner and Shipyard will comply with all applicable laws and regulations relating to the Unit and the Work, including but not limited to, those relating to marine pollution, including the maintenance of insurance or other evidence of financial responsibility as may be required by this Agreement and/or such applicable laws and regulations.

8.2     *Charges for Requested Services.*   Shipyard agrees to provide, for the prices and other charges set forth in Exhibit B, all management, supervision, skilled and unskilled labor, detail engineering, materials, machinery, tools, equipment, plant, consumables, facilities, transportation, loading and offloading, removal, scrapping, breaking, recycling, repairs, renewals, alterations, replacements, modifications, inspections and tests, and any in-yard shiftings of the Unit, scheduling, procurement, fabrication, assembly, disassembly, quality control, inspection, and commissioning, and obtaining and maintaining any necessary classification, licenses, permits or bonds to accomplish the foregoing, as may be requested in writing by Owner from time to time during the term of this Agreement (the "**Requested Services**"). The Requested Services together with the other services provided by Shipyard under this Agreement is herein referred to as the "Work".

8.3     *Comprehensive Specifications.*   The Requested Services shall be performed in full compliance with (a) the scope of work ("**Specifications**") agreed between Shipyard and Owner, and (ii) all applicable classification, flag, governmental, and other certifying bodies' rules, regulations, requirements, standards and recommended practices (the "**Rules and Requirements**"). Without limiting the generality of the foregoing, it is intended that the Rules and Requirements include the rules, regulations, requirements, standards and recommended practices of the American Bureau of Shipping (the "**Classification Society**") that apply to the Unit. The Scope of Work in the Specifications (including all drawings described or referred to in the Scope of Work or the Specifications) are collectively referred to herein as the "**Comprehensive Specifications**" set forth in Exhibit A, if any. The Comprehensive Specifications will define the scope of the Required Services to be performed and the results to be achieved by the Shipyard.   Shipyard agrees not to depart from the requirements of the Comprehensive Specifications unless such departure is consented to in writing by Owner.

8.4     *Owner's Other Contractors.* Subject to Section 8.1 and any applicable Facility Use Fee as defined in Exhibit B, Owner may use other contractors to do work on the Unit while at the Shipyard. In the event Owner uses contractors to do work that the Shipyard is capable of performing, or Shipyard does not perform any scrapping, breaking or refurbishment of the Unit, Owner will not be entitled to any free berthing provided for in this Agreement, except that

4

Owner's use of other contractors for upkeep, routine maintenance, testing and inspection of the Unit will not affect such free berthing.

9.  **Payment and Invoicing; Lien**

9.1    *Berthing Fees*. Applicable charges pursuant to this Agreement for berthing of the Unit will be payable monthly, in advance. Shipyard shall issue an invoice for berthing charges at least 15 days prior to the beginning of each calendar month and such invoice shall be due and payable on the 1st day of such month, provided the Unit remains at the Shipyard Facility on such date. Subject to Section 8.4, Owner shall be granted three (3) months of free Berthing. Notwithstanding any free berthing, Owner shall pay  to Shipyard such form of security as further described in Section 9.7.

9.2    *Unit Rates and Other Charges*. All charges under this Agreement other than charges for berthing will be invoiced monthly in arrears. All such charges with respect to a calendar month shall be invoiced within 15 days after the end of the month in which they are incurred and such invoices shall be payable within thirty (30) days after receipt.

9.3    *Payment of Subcontractors*. Upon request of Owner, prior to Owner's payment of any invoice Shipyard shall provide evidence reasonably satisfactory to Owner that the Shipyard has paid or procured payment terms with all subcontractors, materialmen and other providers of labor, services or equipment, that would have a lien on the Unit or any other property of Owner if not paid. If such subcontractors, materialmen and other providers of labor, services or equipment have not been paid Shipyard shall provide evidence that such persons and entities have released and waived any lien against the Unit or other property of Owner.

9.4    *Disputed Invoices*. In the event Owner disputes any amounts invoiced by Shipyard, within ten (10) days of receipt of the invoice Owner shall give Contractor written notice of the disputed items, including the basis for the disagreement. The Owner shall have the right to withhold payment of the disputed portion of any invoice pending resolution of the dispute, and shall pay the undisputed portion of such invoice in accordance with the other terms of this Agreement. In the event that any such dispute has not been resolved to the satisfaction of the Parties at the time Owner desires to remove the Unit from the Shipyard Facility, then prior to such removal the Owner shall deposit the amount in dispute with an escrow holder, which shall be a national banking association or trust company, in accordance with the terms of an escrow agreement mutually agreed by the Parties. The disputed amount shall be held by the escrow holder in an interest-bearing account and any interest accruing thereon (at the rate paid by the escrow holder), less lawful charges, shall, upon the joint written direction of the Parties, be paid to the Party who prevails in any such dispute. If Owner shall be in default of its payment obligation herein and not remedy such default within fifteen (15) day written notice to Owner, Shipyard may so terminate this Agreement in accordance with Section 12.

9.5    *Interest*. All amounts payable under this Agreement that are not paid when due shall bear interest at the rate of 10% per annum, or the highest rate allowed by applicable law, whichever is lower. Interest on any disputed amounts determined (by agreement or otherwise) to be due shall be payable from the due date of the original invoice for such amount until the date paid.

9.6    *Lien.* Shipyard shall have, and the Owner hereby grants to Shipyard, the right to exercise all applicable liens (whether maritime, possessory (right of retention), or otherwise) over the Unit and its equipment and appurtenances for any amounts due and payable to Shipyard under this Agreement. Notwithstanding the foregoing, if Owner places disputed amounts in escrow pursuant to Section 9.4, there shall be no lien with respect to such amounts, the escrow account being intended to be security replacing the lien.

9.7    *Security.* As a form of security, Owner shall make payment to Shipyard the sum of four (4) months Berthing Fees in the amount of two hundred twenty thousand USD ($220,000.00) on or before the arrival of the Unit at the Shipyard. Such form of security shall be retained and held in trust by Shipyard until completion or termination of this Agreement. Shipyard may, in addition to any other rights under this Agreement or at law, deduct or offset from this form of security, any amount due and payable from Owner to Shipyard under or in connection with Owners obligations or default of this Agreement, except with respect to funds placed in escrow pursuant to section 9.4. Shipyard shall remit all or any portion of such retained amount, not deducted in accordance with this Section 9.7, within sixty (60) days of completion or termination of this Agreement.

10.    **Insurance**

10.1    *Owner Insurance.* To support the indemnification provisions in this Agreement, but as a separate and independent obligation, Owner, at its sole cost and expense, shall procure and maintain throughout at all times relevant to this Agreement the following insurance coverages:

(a) General Liability Insurance with a limit of not less than Ten Million Dollars ($10,000,000).

(b)    Protection and Indemnity
- Limit not less than $10,000,000.00
- SP-23 clauses or equivalent
- Excess Collision
- Tower's Liability
- Contractual Liability
- Removal of Wreck and Debris
- Third Party Pollution Liability
- Cleanup per Water Quality Improvement Act as amended.

10.2    *Contractor Insurance.* To support the indemnification provisions in this Agreement, but as a separate and independent obligation, Shipyard, at its sole cost and expense, shall procure and maintain throughout at all times relevant to this Agreement the following insurance coverages:

(a) Workers' Compensation and Employer's Liability

Insurance coverage for all exposures under the Workers' Compensation and Occupational Disease laws in all States where work is to be performed under this Agreement; coverage for all exposures under the United States Longshore and Harbor Workers' Compensation Act (including coverage for that Act as extended by the Outer Continental Shelf Lands

6

Act); and Employer's liability coverage, including liability under the Jones Act, General Maritime Law, Voluntary Compensation with coverage being provided for masters and members of a crew of any vessel, and coverage for transportation, wages, maintenance and cure, with limits of $1,000,000.

(b) Comprehensive General Liability

Comprehensive General Liability insurance, including products, completed operations and broad form blanket contractual coverage, with watercraft exclusion deleted, with limits of not less than $1,000,000 each occurrence for bodily injury liability and $1,000,000 each occurrence for property damage and with no deductible or self insured retention.

(c) Automobile Liability

Automobile Liability insurance covering owned, non-owned, and hired automotive equipment in compliance with the law of the State where the Work is performed and with minimum limits of $1,000,000 for injury to or death of any one person and $1,000,000 any one accident and $1,000,000 property.

(d) Ship Repairer's Legal Liability

Ship Repairer's Legal Liability Insurance with minimum limits of $1,000,000. It is agreed that items (b) and (d) may be provided in a single insurance policy.

(e) Hull and Machinery

If Contractor furnishes any vessels in connection with this Agreement, All Risk Hull and Machinery insurance for the replacement value of such vessel(s), including any equipment thereon.

(f) Protection and Indemnity

If Contractor furnishes any vessels in connection with this Agreement, Protection and Indemnity insurance with a limit of $1,000,000, including a 4/4ths Running Down Clause (Collision), Seepage and Pollution.

(g) Aircraft

If Contractor furnishes any helicopters or other aircraft in connection with this Agreement, Non-Owned and hired Aviation Liability Insurance with a minimum limit of $10,000,000

(h) Excess Liability

Excess Liability insurance in the amount of $10,000,000 scheduled as excess above the coverage specified in (a) through (f) except Workers' Compensation.

(i) Longshoreman's and Harbor Worker's Act Coverage

Shipyard shall maintain coverage under its Comprehensive General Liability insurance and its Excess Liability insurance on behalf of Owner and the Owner Group as Named

7

Insureds against any liability Owner or the Owner Group may have under the U.S. Longshore & Harbor Workers' Compensation Act for the injury or death of any shipyard worker or other person covered by such Act and employed by Shipyard or its subcontractors.

10.3  *Subcontractors.* Shipyard and Owner will cause all of their respective subcontractors to maintain the policies of insurance described in (a), (b), and (c) above and shall cause those subcontractors providing ship repair services to maintain the policy of insurance described in (d) above.

10.4  *Waiver of Subrogation.* All policies provided by Shipyard shall be endorsed to waive subrogation against the Owner Group to the extent Shipyard has assumed liability under this Agreement.  All policies provided by Owner shall be endorsed to waive subrogation against the Shipyard Group to the extent Owner has assumed liability under this Agreement.

10.5  *Additional Insured.* All policies provided by Shipyard except Workers' Compensation (but including Employer's Liability) shall name Owner Group as additional insured to the extent Shipyard has assumed liability under this Agreement. All policies provided by Owner shall name Shipyard Group as additional insured to the extent Owner has assumed liability under this Agreement.

10.6  *Primary Insurance.* All policies provided by Shipyard shall be endorsed to provide that they are primary insurance with respect to any insurance carried by the Owner Group to the extent the Shipyard has assumed liability under this Agreement, and shall be endorsed to provide that any "Other Insurance Clause" contained in such policies shall be void and inoperative as to the Owner Group. All policies provided by Owner shall be endorsed to provide that they are primary insurance with respect to any insurance carried by the Shipyard Group to the extent the Shipyard has assumed liability under this Agreement, and shall be endorsed to provide that any "Other Insurance Clause" contained in such policies shall be void and inoperative as to the Shipyard Group.

10.7  *Claims in Rem.* Claims in rem against the Unit or any vessel shall be treated as claims against the Owner or the owner of the vessel, as applicable, for all purposes.

10.8  *Evidence of Coverage; Endorsements.* Promptly upon request of the other Party, Owner and Shipyard, respectively, shall provide the other Party with evidence (satisfactory to the other Party) of the insurance coverages required hereunder.

10.9  *Failure to Maintain Required Insurance.* In the event that (i) a Party does not procure and maintain the insurance coverages required by this Agreement, or (ii) the Party's insurers deny coverage due to the acts, fault, or other breach of such Party, its employees, or agents, then such Party shall notify such other Party within two (2) days of the Party becoming aware of such fact and hold harmless and indemnify the other Party and its respective Group, as applicable against all Claims that otherwise would have been covered by such insurance. In the event either Party fails to maintain the insurance required hereunder, the non-breaching Party may terminate this agreement upon fifteen (15) days written notice to the non-breaching Party.

8

10.10 *Owner's Insurance Credit.* Upon submittal and approval of a broker's certificate evidencing that Owner has in effect the required insurance policies herein, Shipyard shall credit Owner's account the amount of one months' Berthing Fee in the amount of fifty five thousand USD ($55,000.00) to supplement Owner's cost of supplying such insurance.

11. **Liability; Indemnity**

11.1 *No Bailment.* Pursuant to this Agreement, Shipyard only lets a Layberth, for the "lay-up" of the Unit, or otherwise, for the Unit to lay at or alongside for the period of twelve (12) months from the execution of this Agreement. In no respect shall this Agreement be construed in any way as a contract for bailment and/or custody, and the Owner hereby agrees that Shipyard shall have no wharfinger liability to the Owner or the Unit.

11.2 *OWNER'S INDEMNITY.* **OWNER HEREBY AGREES FULLY TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS SHIPYARD** (including its parents, affiliates, contractors, subcontractors of any tier and each of its and their respective officers, directors, shareholders, agents, employees, successors-in-interest, invitees and assignees) (collectively the "**Shipyard Group**") from and against any and all demands, claims, losses, costs, suits, or causes of action (including, but not limited to, any judgments, losses, liabilities, expenses, interest, legal fees, costs of suit, and damages, whether in law, equity, or admiralty, and whether in contract, tort or otherwise) ("**Claims**") arising out of or in any way related to (a) injuries (or death) of any member of Owner Group (b) a breach by Owner under the terms of this Agreement or (c) damage to the property of any member of the Owner Group. **THE RELEASE, PROTECTION, DEFENSE, INDEMNITY, AND HOLD HARMLESS RIGHTS AFFORDED UNDER THIS SECTION 11.2 SHALL PROTECT AND INDEMNIFY THE MEMBERS OF THE SHIPYARD GROUP AGAINST THE CONSEQUENCES OF THEIR SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER BREACH OF LEGAL DUTY AND THE UNSEAWORTHINESS OF ANY VESSEL.**

11.3 **OWNER SHALL ASSUME ALL RESPONSIBILITY FOR, INCLUDING CONTROL AND REMOVAL OF, AND SHALL RELEASE, DEFEND, INDEMNIFY AND HOLD SHIPYARD GROUP HARMLESS AGAINST AND FROM LOSS, COST OR DAMAGE ARISING FROM POLLUTION OR CONTAMINATION EMANATING FROM OWNER GROUP PROPERTY, INCLUDING BUT NOT LIMITED TO THE UNIT, REGARDLESS OF HOW CAUSED, INCLUDING THAT CAUSED BY SHIPYARD GROUP SOLE OR CONCURRENT NEGLIGENCE.**

11.4 *SHIPYARD'S INDEMNITY.* **SHIPYARD HEREBY AGREES FULLY TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS OWNER** (including its parents, affiliates, contractors, subcontractors of any tier (excluding the members of the Shipyard Group) and each of its and their respective officers, directors, shareholders, agents, employees, successors-in-interest, invitees and assignees (collectively the "**Owner Group**") from and against any and all Claims arising out of or in any way related to (a) injuries (or death) of any member of Shipyard Group or (b) a breach by Shipyard under the terms of this Agreement, or (c) damage to the property of any member of the Shipyard Group. **THE RELEASE, PROTECTION, DEFENSE, INDEMNITY, AND HOLD HARMLESS**

9

RIGHTS AFFORDED UNDER THIS SECTION 11.4 SHALL PROTECT AND INDEMNIFY THE MEMBERS OF THE OWNER GROUP AGAINST THE CONSEQUENCES OF THEIR SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER BREACH OF LEGAL DUTY AND THE UNSEAWORTHINESS OF THE UNIT OR ANY VESSEL.

11.5   Shipyard shall assume all responsibility for, including control and removal of, and shall release, defend, indemnify and hold the Owner Group harmless against and from loss, cost or damage arising from pollution or contamination emanating from Shipyard Group's property, REGARDLESS OF HOW CAUSED, INCLUDING THAT CAUSED BY OWNER GROUP SOLE OR CONCURRENT NEGLIGENCE.

11.6   *LEGAL LIABILITY.* EXCEPT TO THE EXTENT OWNER HAS AGREED TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS SHIPYARD IN SECTION 11.2, SHIPYARD HEREBY AGREES TO RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE OWNER GROUP FROM AND AGAINST EACH AND EVERY CLAIM ARISING IN FAVOR OF ANY PERSON OR ENTITY ON ACCOUNT OF PERSONAL INJURY OR DEATH OR DAMAGE TO PROPERTY IN ANY WAY INCIDENT TO OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT AND RESULTING FROM THE JOINT OR CONCURRENT NEGLIGENCE, NEGLIGENCE *PER SE,* STATUTORY FAULT, OR STRICT LIABILITY OF ANY MEMBER OF THE SHIPYARD GROUP OR THE UNSEAWORTHINESS OF ANY VESSEL OWNED, CHARTERED OR OPERATED BY ANY MEMBER OF THE CONTRACTOR GROUP, TO THE EXTENT SUCH CLAIM WAS CAUSED BY THE NEGLIGENCE OR OTHER LEGAL LIABILITY OF ANY MEMBER OF THE SHIPYARD GROUP. EXCEPT TO THE EXTENT SHIPYARD HAS AGREED TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS OWNER IN SECTION 11.4, OWNER HEREBY AGREES TO RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE SHIPYARD GROUP FROM AND AGAINST EACH AND EVERY CLAIM ARISING IN FAVOR OF ANY PERSON OR ENTITY ON ACCOUNT OF PERSONAL INJURY OR DEATH OR DAMAGE TO PROPERTY IN ANY WAY INCIDENT TO OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT AND RESULTING FROM THE JOINT OR CONCURRENT NEGLIGENCE, NEGLIGENCE *PER SE,* STATUTORY FAULT, OR STRICT LIABILITY OF ANY MEMBER OF THE OWNER GROUP OR THE UNSEAWORTHINESS OF THE UIT OR ANY VESSEL OWNED, CHARTERED OR OPERATED BY ANY MEMBER OF THE OWNER GROUP, TO THE EXTENT SUCH CLAIM WAS CAUSED BY THE NEGLIGENCE OR OTHER LEGAL LIABILITY OF ANY MEMBER OF THE OWNER GROUP.

11.7   *No Consequential Damages.* IN NO EVENT SHALL ANY PARTY BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE, CONSEQUENTIAL, EXEMPLARY OR SPECIAL DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, REGARDLESS OF HOWEVER SAME MAY HAVE BEEN CAUSED.

12.   **Termination**

This Agreement shall terminate:

(a) as of the departure date and time (the **"Departure Time"**) when the Unit departs the Shipyard Facility, provided such Departure Date is no later than twelve (12) months from execution of this Agreement;

(b) at such date and time beyond the Departure Time that may be mutually agreed by the Parties;

(c) upon Owner's sale or other disposition of the Unit;

(d) if within five (5) days of the date hereof Owner has not entered into a written agreement with Anadarko for delivery of the Unit;

(e) if Owner has not made payment, in accordance with this Agreement, within fifteen (15) days written notice from Shipyard of such non-payment; or

(f) if a Party shall file bankruptcy, become insolvent, have a receiver appointed, or make a general assignment for the benefit of its creditors

In the event of termination, Owner shall be liable to pay to Shipyard as full and final recompense for such termination the compensation for materials, work or services satisfactorily performed prior to termination, interest due for late payment and any such costs as Shipyard demonstrates as having been reasonably and directly incurred as a result of such termination.

In any case of termination or completion of this Agreement, the Unit shall be removed from the Shipyard within thirty (30) days of such termination or completion, unless otherwise agreed to by the Parties.

13.   **Governing Law; Dispute Resolution**

13.1   *The construction, validity and performance of this Agreement and all matters pertaining thereto shall in all respects be governed by the General Maritime Law of the United States, without regard to or application of its conflicts of law provisions that would refer to the application of the laws of another jurisdiction. In any event that the General Maritime Law of the United States does not apply or is held to be inapplicable by a court of competent jurisdiction, then the construction, validity and performance of this Agreement and all matters pertaining thereto shall in all respects be governed by the laws of the State of Texas, without regard to or application of its conflicts of law provisions that would refer to the application of the laws of another jurisdiction.*

13.2   Each of the Parties hereto hereby submits to the exclusive jurisdiction of the United States District Court for the Southern District of Texas *(Houston Division)*, or in the event that there is no applicable federal jurisdiction, to the exclusive jurisdiction of any state court of competent jurisdiction located in Houston, Texas, for the purposes of all legal proceedings

arising out of or relating to this Agreement. Each of the Parties hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

13.3 *Dispute Resolution*. In the event of a dispute, including but not limited to a commercial dispute, between the Parties or a dispute connected with a personal injury or property damage claim, arising out of or relating to this Agreement, or the breach thereof, then:

    13.3.1 the Parties agree that the Owner's designated representative and Shipyard's designated representative will promptly consult and negotiate with each other in good faith and, recognizing their mutual interests, attempt to reach a prompt, just and equitable resolution satisfactory to the Parties;

    13.3.2 if, after negotiating in good faith as provided in Section 13.3.1 no resolution satisfactory to the Parties has been reached within three (3) business days, either Party may make a written demand to submit the dispute to non-binding mediation. Such mediation shall be conducted at Houston, Texas in an expedited manner by a mediator jointly appointed and agreed to by the Parties; and

    13.3.3 in the event that the Parties are unable to resolve their dispute through mediation pursuant to Section 13.3.2 within twenty two (22) business days, such dispute shall be settled exclusively and finally by the applicable federal or state court of competent jurisdiction located in Houston, Texas, as set forth above.

13.4 *Waiver of Jury Trial*. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS CONTRACT.

14. **Miscellaneous**

    14.1 *No Public Marine Terminal*. Owner acknowledges and agrees that Shipyard's facility, including the Layberth, is a private terminal facility and that Shipyard is not a "marine terminal operator" as defined by the U.S. Shipping Act of 1984, as same may be amended from time to time. Only Facilities engaged in private or contract carriage pursuant to private commercial arrangements will be accepted by Shipyard.

    14.2 *Sub-leasing*. Subleasing of a Layberth by Owner to any third party is strictly prohibited unless specifically approved in writing in advance by Shipyard, and such approval of Shipyard shall be in its sole discretion. If, subject to this Section 14.2, any sublease to a third party does occur, the third party must execute a Layberth Agreement with Shipyard, and Owner must remain bound by the terms, representations, warranties, covenants and obligations contained in this Agreement during the term of any sublease.

14.3   *Notice*.  Any notice, excluding legal notices, required by this Agreement shall be given by depositing such notice in the United States mail, addressed to the Party to be notified, postpaid, and registered or certified with return receipt requested, or by delivering such notice in person to such Party, or via electronic mail. Notice given by personal delivery, electronic mail or United States mail shall be effective upon actual receipt.  All notices to be sent to a Party pursuant to this Agreement shall be sent or made at the address of the contact person as identified below, or at such other address as such Party may stipulate to the other Party in writing prior to such notice.

To Shipyard:   Gulf Marine Fabricators, LP
1982 FM Rd. 2725
Aransas Pass, TX 78336
Attn: Ricky Escalante
361-775-4600
rescalante@gmftx.com

To Owner:   ATP Infrastructure Partners, L.P.
c/o PE - ATP Innovator, Inc.
4488 Onondaga Bldv.
Syracuse, NY 13219

14.4   *Representatives of the Parties*.  Owner's representative for purposes of this Agreement on behalf of Owner shall be John Hanlon, or any other person that Owner may from time to time designate by written notice.   Shipyard's representative for purposes of this Agreement shall be Ricky Escalante or any other person that Shipyard may from time to time designate by notice.

14.5   *Severability*.  If any provision of this Agreement is determined to be invalid or unenforceable, such invalidity or unenforceability will not affect any other provision of this Agreement.  In that event, the Parties agree that this Agreement will be amended or reformed so as to effect as closely as possible the original intent of the Parties with respect to those provisions that were held to be invalid or unenforceable.

14.6   *Amendment or Waiver*.  The terms and conditions of this Agreement may not be amended, modified or waived except by written instrument executed by officers or duly authorized representatives of the respective Parties.  No purported oral amendment or waiver of any provision of this Agreement shall be effective or enforceable; and no amendment or waiver of any provision of this Agreement based on course of conduct, course of dealing, or course of performance shall be effective or enforceable.

14.7   *Survival*. Notwithstanding any completion of work hereunder  or termination of this Agreement, for any reason, all provisions in this Agreement containing representations, warranties, releases, defense obligations and indemnities, and all provisions related to audit, confidentiality, insurance, disclaimer of certain

remedies, limitations of liability, dispute resolution and governing law, and all causes of action which arose prior to completion or termination, survive indefinitely or as expressly stated in this Agreement, or until they are no longer operative or otherwise limited by an applicable statute of limitations.

14.8   *Signatures*.  This Agreement may be executed in any number of counterparts, all of which when taken together shall constitute one and the same instrument and any of the Parties hereto may execute this Agreement by signing any such counterpart.  Electronic or facsimile signatures and copies of this Agreement shall be valid evidence of this Agreement and shall be given the same force and effect as originals.  Each Party represents and warrants that the respective individual signing below for and on behalf of such Party has the necessary approval and authority to bind such Party to this Agreement.  This Agreement shall not be effective and binding unless and until it has been signed by a representative for each Party.

## 15.   Changes

15.1   No additional work beyond that described in this Agreement shall be performed by Shipyard unless preceded by a written change order "Change Order" signed by the Owner.

15.2   Owner may alter, enlarge, reduce, modify or otherwise change the work or services to be provided under this Agreement at the unit rates provided in this Agreement at any time by issuance of a Change Order to Shipyard.

15.3   If the Shipyard considers that any oral or written request or direction from the Owner, Owner's Representative or any other person or entity that Shipyard believes to be acting for Owner, will result in any additional amount being payable to Shipyard that would not have been payable absent such request or direction then Shipyard shall submit a Change Order request to Owner and shall not follow such direction or request until such Change Order has been agreed to in writing by Owner.

## 16.   **Entire Agreement**

This Agreement contains the entire agreement of the Parties with respect to the subject matter hereof, and supersedes any and all prior representations, warranties, and/or inducements, written or oral, made by Owner or Shipyard.

## 17.   **Conflicts**

In the event of conflict between the terms contained in the body of this Agreement and those in an exhibit, the terms in the body of this Agreement will prevail.

*[Signature Page Follows.]*

14

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives, in multiple counterparts, as of the day and year first above written.

**ATP INFRASTRUCTURE PARTNERS, L.P.**

By: PE - ATP Innovator, Inc., its general partner

By: _____

Printed Name: _____

Title: _____

**Gulf Marine Fabricators, LP**

By: _____

Printed Name: Ricky Escalante

Title:  President

US 2202787v.3

# EXHIBIT A

## Comprehensive Specifications

*Exhibit A to Layberth Agreement*

*V&E Draft – 03/30/12*
*For Discussion Purposes Only*
**CONFIDENTIAL**

# EXHIBIT B

## COMPENSATION

**Gulf Marine Fabricators, L.P.**
**Pricing for ATP Infrastructure Partners, LP - Innovator Platform**

| Item | Description | Unit | Unit Rate (USD $ / Unit) | NOTES |
|---|---|---|---|---|
| **Labor** | | | | |
| 1 | Craft Labor | Per Hour | $ 70.00 | See Note 1 |
| 2 | Staff Labor | Per Hour | $ 80.00 | See Note 1 |
| **Customs / Fees / Taxes / Etc...** | | | | |
| 3 | Customs / Fees / Taxes / Etc... | - | - | Not Included |
| **Storage Fee: Hull Alongside Bulkhead** | | | | |
| 4 | Storage Fee | Per Month | $ 55,000.00 | See Notes 2, 3 |
| **Graving Dock Costs: Hull Inside Graving Dock** | | | | |
| 5 | Graving Dock Fee | Lump Sum | $ 1,936,000.00 | See Note 4 |
| 6 | Graving Dock Day Rate | Per Day | $ 9,800.00 | |

**Notes:**
1) All GMF Owned Construction Equipment is included in the Composite Craft Labor rate with the exception of
   crawler cranes, transporters, and marine equipment.  This Equipment will be charged at the Hourly Rates listed below.
2) First 3 months of storage will be offered free of charge.  However if after the storage period Company contracts other parties for the work
   then GMF will invoice for the first 3 months of storage.
3) Cost for spacer barges, Yokohama buoys, mooring spread, shore power, waste disposal, and potable water
   will be billed at Invoiced Cost Plus 20%.  Should it become necessary to relocate the Innovator then that will be billed at Cost Plus 20%.
4) One time charge; Includes preparation for Hull Entry, flooding, water excavation and clean up of Graving Dock after Hull disposal complete.
5) All Materials requested to be supplied by GMF will be billed at Cost Plus 20%.
6) Any Third-Party Services will be billed at Invoiced Cost Plus 20%.
7) Company will pay GMF an hourly rate of $8.00 for a Facility Use Fee for labor performed within GMF's facilities
   by Company's other contractors other than the crew to support the Unit.  Such Facility Use Fee excludes the cost of utilities or other services, which might be requested.

| Item | Description | Unit | Unit Rate (USD $ / Unit) |
|---|---|---|---|
| **Equipment Rates** | | | |
| 1 | Crawler Crane 2800 (660 tons) | Per Hour | $ 600.00 |
| 2 | Crawler Crane 2500 (500 tons) | Per Hour | $ 600.00 |
| 3 | Crawler Crane 2400 (500 tons) | Per Hour | $ 600.00 |
| 4 | Crawler Crane 888 (230 tons) | Per Hour | $ 350.00 |
| 5 | Transporters | Per Hour | $ 125.00 |
| 6 | Power Pack | Per Hour | $ 25.00 |
| 7 | 45-ton Hydraulic Crane | Per Hour | $ 100.00 |
| 8 | 28-ton Hydraulic Crane | Per Hour | $ 75.00 |
| 9 | Gantry Bridge Crane | Per Hour | $ 75.00 |
| 10 | Jib Crane | Per Hour | $ 25.00 |

17

US 2202787v.3

<u>L A Y B E R T H   A G R E E M E N T</u>

THIS LAYBERTH AGREEMENT (this "Agreement") is made and entered into this 18 day of December, 2015 (the "Effective Date"), by and between Amerindo Services, LTD and Blue Sky Langsa Ltd ("Owner"), being the owner of the semi-submersible production unit called ATP INNOVATOR with an IMO number 742 (the "Unit") and Gulf Marine Fabricators, LP, 1982 FM Rd. 2725, Aransas Pass, TX, 78336 ("Shipyard") (sometimes herein Owner and Shipyard are individually each referred to as a "Party" and collectively as the "Parties").

1.  <u>Reservation of a Layberth</u>

Shipyard agrees to designate and reserve a Layberth for the Unit at Shipyard's facilities (the "Shipyard Facility") located at the Port of Corpus Christi (the "Port"), at or about the intersection of the Intracoastal Waterway and the Corpus Christi Ship Channel at mile marker 36. (such designated berth, the "Layberth") for the period ending on June 30, 2016 (the "Term"). Owner shall have the option to extend the Term on a month to month basis not to exceed December 31, 2016 under the current terms and conditions of this Agreement.

2.  <u>Layberth and Mooring Arrangements</u>

The mooring arrangements for the Unit (including any necessary ballasting of the Unit) shall, at all times, be able to maintain a safe mooring of the Unit capable of withstanding prevailing winds, currents, tides, and other forces of nature, without applying undue loads on any shore side moorings, tackle, or equipment at the Layberth. Shipyard may provide binding instructions for the mooring arrangements of the Unit at the Layberth, but in no event shall such instructions by Shipyard give rise to any duties, obligations, or liabilities of Shipyard owing to the Unit, the Owner, or any other person or entity, provided the Unit may not be submerged to rest on the bottom without Owner's consent, not to be unreasonably withheld. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THERE ARE NO GUARANTEES OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED. SHIPYARD SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF ANY KIND OR NATURE, INCLUDING BUT NOT LIMITED TO, ANY WHAFINGER LIABILITY, WARRANTIES OF SUITABILITY, ADEQUACY, OR FITNESS FOR A PARTICULAR PURPOSE OF SHIPYARD'S MOORING OR OTHER FACILITIES, WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE.

3.     Unit Mooring Equipment

If, in the sole opinion of the Shipyard, the available mooring equipment on the Unit is insufficient to safely moor the Unit at the Layberth, then Shipyard has the right to place additional mooring equipment onboard the Unit. Any costs or expenses for the purchase and/or installation of such additional mooring equipment onboard the Unit will be charged to, and payable by, the Owner. The Unit shall not use its anchors while alongside at the Layberth, and the anchors must be in their raised position while the Unit is moored at the Layberth.

4.     Shifting and Removal

4.1  *Shifting by Shipyard.* Subject to the following sentence, Shipyard has the right, at Shipyard's sole risk, cost and expense, to shift the Unit to another berth upon the prior written consent of Owner, such consent not to be unreasonably withheld. The Owner's withholding of consent in the event moving the Unit is necessary for the protection and safety of the Unit or other units, vessels or property, will be deemed unreasonable. In the case of Owner's unreasonable failure to consent, Shipyard has the right to cause the Unit to be moved or removed from the Layberth to another location in the Shipyard, at the sole expense of the Unit and Owner.

4.2  *Shifting by Owner.* Once at the Layberth, the Unit is not permitted to shift within or from the Layberth on its own initiative (by means of its own propulsion, tug assistance, warping, or otherwise) without the prior written consent of Shipyard, such consent not to be unreasonably withheld. Such shifting by Owner shall be at its sole cost and risk.

4.3  *Removal.* Notwithstanding Section 4.2, subject to prior payment to the Shipyard of all undisputed amounts accrued to the Shipyard under this Agreement prior to such removal, the absence of any material breach of this Agreement by Owner and the Parties' compliance with Section 8.4 regarding disputed amounts, if applicable, Owner may at any time and for any reason remove the Unit from the Shipyard upon thirty (30) days written notice to the Shipyard. In the event of any such removal in accordance with the terms of this Agreement, the Shipyard will provide the Unit unobstructed access to navigable waters with the Unit free and clear of any liens or encumbrances in favor of Shipyard or its subcontractors.

5.     Unit Safety

5.1  *Security.* The Parties acknowledge that the Owner, through contractors, will have staff dedicated to the Unit, but the Unit will not be manned 24 hours/day 7 days/week while moored at the Shipyard Facility. Such personnel will not overnight on the Unit or make permanent living arrangements on the Unit but will have access to the Unit pursuant to this Agreement. Shipyard agrees to provide the necessary security personnel to properly safeguard the Unit while at the Shipyard at no additional cost to Owner. Except in an emergency Shipyard personnel will board the Unit only with the consent of Owner or its designee.

5.2  *Protection against Fire.* Any cargo holds, tanks, pump rooms, cofferdams and/or pipelines of the Unit, as applicable, shall be clean and gas free before work is performed thereon. Any temporary heating equipment, such as space heaters, dryers or heaters for electrical equipment, shall only be used onboard the Unit with appropriate safety precautions and fire prevention planning undertaken by the Unit's crew and/or Owner's other personnel. The Unit's

fire monitoring and alarm system shall be in good order and in full operating condition at all times while the Unit is at the Layberth.

5.3    *Precautions Against the Unit Taking on Water.* All of the Unit's overboard valves not in use, and all of the Unit's sea inlet valves not in use, should be closed at all times. The Unit's bilge alarms shall be in good order and in full operating condition at all times while the Unit is at the Layberth. Bilge lights to the Unit's holds, pump rooms, cofferdams and engine room spaces shall be kept ready for immediate use at all times. The Unit shall also maintain sufficient electrical power at all times for its bilge pumps.

5.4    *Availability of Electrical Power.* Shipyard shall supply shore power for the operation of the Unit pursuant to Exhibit A.

5.5    *Access.* The Shipyard shall provide access to the Unit to permit the safe passage of persons to and from the Unit while it is in the Layberth. The Shipyard shall provide access to the Shipyard's facility and the Unit to Owner and its contractors, consultants, brokers, and other representatives; Owner's potential buyers, charterers, other counterparties; and third party inspectors, during working hours. Owner shall require any of its or its affiliates, or its subcontractors' officers, employees, agents or invitees entering Shipyard's facility and/or upon the Unit while docked at Shipyard to attend Shipyard's safety orientation (unless otherwise agreed by Shipyard), observe all safety, health and security rules of Shipyard and the terms and conditions of this Agreement. Owner shall perform its operations in such a manner as to not impede Shipyard's other operations. Owner agrees to coordinate with Shipyard in keeping Shipyard informed in advance of the identities of Owner's employees, affiliates, agents, invitees or subcontractors authorized to enter the Unit while docked at Shipyard. Owner further agrees not to allow any persons other than those authorized by Owner and approved by Shipyard to enter the Shipyard or the Unit while docked at Shipyard. Such approval(s) of Shipyard shall not be unreasonably withheld.

5.6    *Hazardous materials.* Owner agrees to provide Shipyard notice of the presence of known hazardous materials onboard the Unit. Should Shipyard encounter conditions on or about the Unit while at the Shipyard that indicate the environment or persons working on or about the Unit are potentially exposed to unsafe conditions, hazardous substances or materials, Shipyard will immediately bring this fact to the attention of Owner's representative and shall supply Shipyard's employees, and require its subcontractors to supply their employees, with all necessary personal protective equipment and enforce such operating practices as are necessary to provide a safe place to work. Ownership of all such hazardous material shall remain with Owner, notwithstanding Shipyard's handling of same. Any additional cost of the presence of or the handling of hazardous material shall be for Owner's account.

5.7    *Adverse Weather/Bottom Condition.* Shipyard shall provide to Owner its Standard Hurricane Preparedness Plan to include the Unit. Shipyard warrants that the area under the hull of the Unit at the Shipyard Facility will be free of obstructions and debris if it is necessary to de ballast the Unit so that it rests on the bottom.

6.      **Layberth Fee and Port Charges**

Attached hereto as Exhibit A is a schedule of fees and charges to be paid by Owner to Shipyard under this Agreement for mooring and services.

7.      **Work on the Unit in the Layberth**

7.1     *Safety Precautions.*   For any work by Owner permitted by Shipyard on or around the Unit, Owner shall undertake all necessary environmental and safety precautions for, and before commencing, such work, even if Owner has contracted such work to a third party. At all times while the Unit is at the Layberth, Owner and Shipyard will comply with all applicable laws and regulations relating to the Unit and the Work, including but not limited to, those relating to marine pollution, including the maintenance of insurance or other evidence of financial responsibility as may be required by this Agreement and/or such applicable laws and regulations.

7.2     *Charges for Requested Services.* Shipyard agrees to provide, for the prices and other charges set forth in Exhibit A, all management, supervision, skilled and unskilled labor, detail engineering, materials, machinery, tools, equipment, plant, consumables, facilities, transportation, loading and offloading, removal, scrapping, breaking, recycling, repairs, renewals, alterations, replacements, modifications, inspections and tests, and any in-yard shifting of the Unit, scheduling, procurement, fabrication, assembly, disassembly, quality control, inspection, and commissioning, and obtaining and maintaining any necessary classification, licenses, permits or bonds to accomplish the foregoing, as may be requested in writing by Owner from time to time during the term of this Agreement (the "Requested Services").

7.3     *Comprehensive Specifications.* The Requested Services shall be performed in full compliance with (a) the scope of work ("Specifications") agreed between Shipyard and Owner, and (ii) all applicable classification, flag, governmental, and other certifying bodies' rules, regulations, requirements, standards and recommended practices (the "Rules and Requirements"). Without limiting the generality of the foregoing, it is intended that the Rules and Requirements include the rules, regulations, requirements, standards and recommended practices of the American Bureau of Shipping (the "Classification Society") that apply to the Unit. The Comprehensive Specifications will define the scope of the Required Services to be performed and the results to be achieved by the Shipyard. Shipyard agrees not to depart from the requirements of the Comprehensive Specifications unless such departure is consented to in writing by Owner.

7.4     *Owner's Other Contractors.* In the event Owner uses other contractors to do work that the Shipyard is capable of performing, save for Owner's use of other contractors for upkeep, routine maintenance, testing and inspection of the Unit, a Facility Use Fee as defined in Exhibit A, shall be charged to Owner.

8.      **Payment and Invoicing; Lien**

8.1     *Berthing Fees.* Applicable charges pursuant to this Agreement for berthing of the Unit will be payable monthly, in advance. Shipyard shall issue an invoice for berthing charges at least 15 days prior to the beginning of each calendar month and such invoice shall be due and payable on the 1st day of such month, provided the Unit remains at the Shipyard Facility on such date. Owner shall pay to Shipyard such form of security as further described in Section 8.7.

8.2     *Unit Rates and Other Charges.* All charges under this Agreement other than charges for

berthing will be invoiced monthly in arrears. All such charges with respect to a calendar month shall be invoiced within 15 days after the end of the month in which they are incurred and such invoices shall be payable within thirty (30) days after receipt.

8.3     *Payment of Subcontractors.* Upon request of Owner, prior to Owner's payment of any invoice Shipyard shall provide evidence reasonably satisfactory to Owner that the Shipyard has paid or procured payment terms with all subcontractors, materialmen and other providers of labor, services or equipment, that would have a lien on the Unit or any other property of Owner if not paid.

8.4     *Disputed Invoices.* In the event Owner disputes any amounts invoiced by Shipyard, within ten (10) days of receipt of the invoice Owner shall give Shipyard written notice of the disputed items, including the basis for the disagreement. The Owner shall have the right to withhold payment of the disputed portion of any invoice pending resolution of the dispute, and shall pay the undisputed portion of such invoice in accordance with the other terms of this Agreement. In the event that any such dispute has not been resolved to the satisfaction of the Parties at the time Owner desires to remove the Unit from the Shipyard Facility, then prior to such removal the Owner shall deposit the amount in dispute with an escrow holder, which shall be a national banking association or trust company, in accordance with the terms of an escrow agreement mutually agreed by the Parties. The disputed amount shall be held by the escrow holder in an interest-bearing account and any interest accruing thereon (at the rate paid by the escrow holder), less lawful charges, shall, upon the joint written direction of the Patties, be paid to the Party who prevails in any such dispute. If Owner shall be in default of its payment obligation herein and not remedy such default within fifteen (15) day written notice to Owner, Shipyard may so terminate this Agreement in accordance with Section 11.

8.5     *Interest.* All amounts payable under this Agreement that are not paid when due shall bear interest at the rate of 10% per annum, or the highest rate allowed by applicable law, whichever is lower. Interest on any disputed amounts determined (by agreement or otherwise) to be due shall be payable from the due date of the original invoice for such amount until the date paid.

8.6     *Lien.* Shipyard shall have, and the Owner hereby grants to Shipyard, the right to exercise all applicable liens (whether maritime, possessory right of retention, or otherwise) over the Unit and its equipment and appurtenances for any amounts due and payable to Shipyard under this Agreement. Notwithstanding the foregoing, if Owner places disputed amounts in escrow pursuant to Section 8.4, there shall be no lien with respect to such amounts, the escrow account being intended to be security replacing the lien.

8.7     *Security.* Owner shall obtain and deliver to Shipyard, on or before the Effective Date of this Agreement, the sum of one hundred sixty five thousand USD ($165,000.00) in the form of cash, bond or irrevocable letter of credit to secure its obligations under this Agreement. Such form of security shall be retained and maintained in full force until completion or termination and satisfaction of all obligations of Owner under this Agreement. Shipyard may, in addition to any other rights under this Agreement or at law, deduct or offset from this form of security, any amount due and payable from Owner to Shipyard under or in connection with Owners obligations or default of this Agreement, except with respect to funds placed in escrow pursuant to Section 8.4. Shipyard shall remit all or any portion of such retained amount, or release such bond or letter of credit (as applicable) not deducted in accordance with this Section 8.7, within sixty (60) days of completion



or termination and satisfaction of all obligations of Owner under this Agreement.

9.    **Insurance**

9.1    *Owner Insurance.* To support the indemnification provisions in this Agreement, but as a separate and independent obligation, Owner, at its sole cost and expense, shall procure and maintain throughout at all times relevant to this Agreement the following insurance coverages:

> (a) *Worker's Compensation (as applicable):*
> - limits of not less than $1,000,000 per occurrence
> - Statutory Benefits for State of Hire
> - Employer's Liability Including Disease
> - U.S. Longshore and Harbor Workers' Compensation Act Coverage
> - Outer Continental Shelf Lands Act
> - All States Endorsement
> - Voluntary Compensation
> - Alternate Employer

> (b) *Maritime Employers Liability (as applicable):*
> - limits of not less than $1,000,000 per occurrence
> - Transportation, Wages, Maintenance and Cure
> - In Rem
> - Gulf of Mexico Extension
> - Death on the High Seas Act
> - Including Crew if not included under P&I
> - Voluntary Compensation
> - Alternate Employer

> (b) *General Liability Insurance:*
> - limits of not less than Ten Million Dollars ($10,000,000).
> - Fire Legal Liability
> - Independent Contractors
> - In Rem
> - Personal Injury
> - Broad Form
> - Sudden and Accidental Pollution
> - Contractual Liability
> - Gulf of Mexico Extension
> - Non-Owned Watercraft
> - Ship Repairers Legal Liability (if Owner performs any dockside repair)

> (b) *Hull and Machinery Insurance*
> - the value of the vessel

> (c) *Protection and Indemnity Insurance:*
> - the value of the vessel

- SP-23 clauses or equivalent
- Crew Coverage
- Excess Collision
- Tower's Liability
- Cargo Legal Liability
- Contractual Liability
- Removal of Wreck and Debris
- Hazardous Waste Removal & Disposal
- Third Party Pollution Liability
- Cleanup per Water Quality Improvement Act as amended

9.2    *Shipyard Insurance.* To support the indemnification provisions in this Agreement, but as a separate and independent obligation, Shipyard, at its sole cost and expense, shall procure and maintain throughout at all times relevant to this Agreement the following insurance coverages:

(a)  Workers' Compensation and Employer's Liability

Insurance coverage for all exposures under the Workers' Compensation and Occupational Disease laws in all States where work is to be performed under this Agreement; coverage for all exposures under the United States Longshore and Harbor Workers' Compensation Act (including coverage for that Act as extended by the Outer Continental Shelf Lands Act); and Employer's liability coverage, including liability under the Jones Act, General Maritime Law, Voluntary Compensation with coverage being provided for masters and members of a crew of any vessel, and coverage for transportation, wages, maintenance and cure, with limits of $1,000,000.

(b)  Comprehensive General Liability

Comprehensive General Liability insurance, including products, completed operations and broad form blanket contractual coverage, with watercraft exclusion deleted, with limits of not less than $1,000,000 each occurrence for bodily injury liability and $1,000,000 each occurrence for property damage and with no deductible or self-insured retention.

(c)  Automobile Liability

Automobile Liability insurance covering owned, non-owned, and hired automotive equipment in compliance with the law of the State where the Work is performed and with minimum limits of $1,000,000 for injury to or death of any one person and $1,000,000 any one accident and $1,000,000 property.

(d)  Ship Repairer's Legal Liability

Ship Repairer's Legal Liability Insurance with minimum limits of $1,000,000. It is agreed that items (b) and (d) may be provided in a single insurance policy.

(e)  Hull and Machinery

If Shipyard furnishes any vessels in connection with this Agreement, All Risk Hull and Machinery insurance for the replacement value of such vessel(s), including any equipment thereon.

(f)  Protection and Indemnity

If Shipyard furnishes any vessels in connection with this Agreement, Protection and Indemnity insurance with a limit of $1,000,000, including a 4/4ths Running Down Clause (Collision), Seepage and Pollution.

(g)  Excess Liability

Excess Liability insurance in the amount of $10,000,000 scheduled as excess above the coverage specified in (a) through (f) except Workers' Compensation.

(h)  Longshoreman's and Harbor Worker's Act Coverage

Shipyard shall maintain coverage under its Comprehensive General Liability insurance and its Excess Liability insurance on behalf of Owner and the Owner Group as Named Insureds against any liability Owner or the Owner Group may have under the U.S. Longshore & Harbor Workers' Compensation Act for the injury or death of any Shipyard worker or other person covered by such Act and employed by Shipyard or its subcontractors.

9.3     *Subcontractors.* Shipyard and Owner will cause all of their respective subcontractors to maintain the policies of insurance described in (a), (b), and (c) above and shall cause those subcontractors providing ship repair services to maintain the policy of insurance described in (d) above.

9.4     *Waiver of Subrogation.* All policies provided by Shipyard shall be endorsed to waive subrogation against the Owner Group to the extent Shipyard has assumed liability under this Agreement. All policies provided by Owner shall be endorsed to waive subrogation against the Shipyard Group to the extent Owner has assumed liability under this Agreement.

9.5     *Additional Insured.* All policies provided by Shipyard except Workers' Compensation (but including Employer's Liability) shall name Owner Group as additional insured to the extent Shipyard has assumed liability under this Agreement. All policies provided by Owner shall name Shipyard Group as additional insured to the extent Owner has assumed liability under this Agreement.

9.6     *Primary Insurance.* All policies provided by Shipyard shall be endorsed to provide that they are primary insurance with respect to any insurance carried by the Owner Group to the extent the Shipyard has assumed liability under this Agreement, and shall be endorsed to provide that any "Other Insurance Clause" contained in such policies shall be void and inoperative as to the Owner Group. All policies provided by Owner shall be endorsed to provide that they are primary insurance with respect to any insurance carried by the Shipyard Group to the extent the Shipyard has assumed liability under this Agreement, and shall be endorsed to provide that any "Other Insurance Clause" contained in such policies shall be void and inoperative as to the Shipyard Group.

9.7     *Claims in Rem.* Claims in rem against the Unit or any vessel shall be treated as claims against the Owner or the owner of the vessel, as applicable, for all purposes.

9.8     *Evidence of Coverage; Endorsements.* Promptly upon request of the other Party, Owner and Shipyard, respectively, shall provide the other Party with evidence (satisfactory to the other Party) of the insurance coverages required hereunder.

9.9    *Failure to Maintain Required Insurance.* In the event that (i) a Party does not procure and maintain the insurance coverages required by this Agreement, or (ii) the Party's insurers deny coverage due to the acts, fault, or other breach of such Party its employees, or agents, then such Party shall notify such other Party within two (2) days of the Party becoming aware of such fact and hold harmless and indemnify the other Party and its respective Group, as applicable against all Claims that otherwise would have been covered by such insurance. In the event either Party fails to maintain the insurance required hereunder, the non-breaching Party may terminate this agreement upon fifteen (15) days written notice to the non-breaching Party.

10.    Liability, Indemnity

10.1    *No Bailment.* Pursuant to this Agreement, Shipyard only lets a Layberth, for the "lay-up" of the Unit, or otherwise, for the Unit to lay at or alongside the quayside at the Shipyard during the Term. In no respect shall this Agreement be construed in any way as a contract for bailment and/or custody, and the Owner hereby agrees that Shipyard shall have no wharfinger liability to the Owner, the Unit or any other vessel owned, chartered or hired by Owner.

10.2    *OWNER'S INDEMNITY.* OWNER HEREBY AGREES FULLY TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS SHIPYARD (including its parents, affiliates, contractors, subcontractors of any tier and each of its and their respective officers, directors, shareholders, agents, employees, successors-in-interest, invitees and assignees) (collectively the "Shipyard Group") from and against any and all demands, claims, losses, costs, suits, or causes of action (including, but not limited to, any judgments, losses, liabilities, expenses, interest, legal fees, costs of suit, and damages, whether in law, equity, or admiralty, and whether in contract, tort or otherwise) ("Claims") arising out of or in any way related to (a) injuries (or death) of any member of Owner Group (b) a breach by Owner under the terms of this Agreement or (c) damage to the property of any member of the Owner Group. THE RELEASE, PROTECTION, DEFENSE, INDEMNITY, AND HOLD HARMLESS RIGHTS AFFORDED UNDER THIS SECTION 10.2 SHALL PROTECT AND INDEMNIFY THE MEMBERS OF THE SHIPYARD GROUP AGAINST THE CONSEQUENCES OF THEIR SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER BREACH OF LEGAL DUTY AND THE UNSEAWORTHINESS OF ANY VESSEL.

10.3    OWNER SHALL ASSUME ALL RESPONSIBILITY FOR, INCLUDING CONTROL AND REMOVAL OF, AND SHALL RELEASE, DEFEND, INDEMNIFY AND HOLD SHIPYARD GROUP HARMLESS AGAINST AND FROM LOSS, COST OR DAMAGE ARISING FROM POLLUTION OR CONTAMINATION EMANATING FROM OWNER GROUP PROPERTY, INCLUDING BUT NOT LIMITED TO THE UNIT, REGARDLESS OF HOW CAUSED, INCLUDING THAT CAUSED BY SHIPYARD GROUP SOLE OR CONCURRENT NEGLIGENCE.

10.4    *SHIPYARD'S INDEMNITY.* SHIPYARD HEREBY AGREES FULLY TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS OWNER (including its parents, affiliates, contractors, subcontractors of any tier (excluding the members of the Shipyard Group) and each of its and their respective officers, directors, shareholders, agents, employees, successors-in-interest, invitees and assignees (collectively

the "Owner Group") from and against any and all Claims arising out of or in any way related to (a) injuries (or death) of any member of Shipyard Group or (b) a breach by Shipyard under the terms of this Agreement, or (c) damage to the property of any member of the Shipyard Group. THE RELEASE, PROTECTION, DEFENSE, INDEMNITY, AND HOLD HARMLESS RIGHTS AFFORDED UNDER THIS SECTION 10.4 SHALL PROTECT AND INDEMNIFY THE MEMBERS OF THE OWNER GROUP AGAINST THE CONSEQUENCES OF THEIR SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER BREACH OF LEGAL DUTY AND THE UNSEAWORTHINESS OF THE UNIT OR ANY VESSEL.

10.5    SHIPYARD SHALL ASSUME ALL RESPONSIBILITY FOR, INCLUDING CONTROL AND REMOVAL OF, AND SHALL RELEASE, DEFEND, INDEMNIFY AND HOLD THE OWNER GROUP HARMLESS AGAINST AND FROM LOSS, COST OR DAMAGE ARISING FROM POLLUTION OR CONTAMINATION EMANATING FROM SHIPYARD GROUP'S PROPERTY, REGARDLESS OF HOW CAUSED, INCLUDING THAT CAUSED BY OWNER GROUP SOLE OR CONCURRENT NEGLIGENCE.

10.6    *LEGAL LIABILITY.* EXCEPT TO THE EXTENT OWNER HAS AGREED TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS SHIPYARD UNDER THIS AGREEMENT, SHIPYARD HEREBY AGREES TO RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE OWNER GROUP FROM AND AGAINST EACH AND EVERY CLAIM ARISING IN FAVOR OF ANY PERSON OR ENTITY ON ACCOUNT OF PERSONAL INJURY OR DEATH OR DAMAGE TO PROPERTY IN ANY WAY INCIDENT TO OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT AND RESULTING FROM THE JOINT OR CONCURRENT NEGLIGENCE, NEGLIGENCE *PER SE,* STATUTORY FAULT, OR STRICT LIABILITY OF ANY MEMBER OF THE SHIPYARD GROUP OR THE UNSEAWORTHINESS OF ANY VESSEL OWNED, CHARTERED OR OPERATED BY ANY MEMBER OF THE SHIPYARD GROUP, TO THE EXTENT SUCH CLAIM WAS CAUSED BY THE NEGLIGENCE OR OTHER LEGAL LIABILITY OF ANY MEMBER OF THE SHIPYARD GROUP. EXCEPT TO THE EXTENT SHIPYARD HAS AGREED TO RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS OWNER UNDER THIS AGREEMENT, OWNER HEREBY AGREES TO RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE SHIPYARD GROUP FROM AND AGAINST EACH AND EVERY CLAIM ARISING IN FAVOR OF ANY PERSON OR ENTITY ON ACCOUNT OF PERSONAL INJURY OR DEATH OR DAMAGE TO PROPERTY IN ANY WAY INCIDENT TO OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT AND RESULTING FROM THE JOINT OR CONCURRENT NEGLIGENCE, NEGLIGENCE *PER SE,* STATUTORY FAULT, OR STRICT LIABILITY OF ANY MEMBER OF THE OWNER GROUP OR THE UNSEAWORTHINESS OF THE UIT OR ANY VESSEL OWNED, CHARTERED OR OPERATED BY ANY MEMBER OF THE OWNER GROUP, TO THE EXTENT SUCH CLAIM WAS CAUSED BY THE NEGLIGENCE OR OTHER LEGAL LIABILITY OF ANY MEMBER OF THE OWNER GROUP.

10.7    *No Consequential Damages.*  In no event shall any Party be liable to the other Party for special, incidental, indirect, punitive, consequential, exemplary or special damages resulting from or arising out of this Agreement, REGARDLESS OF HOWEVER SAME MAY HAVE BEEN CAUSED. NOTWITHSTANDING THE FOREGOING, IN THE EVENT THIS

AGREEMENT IS TERMINATED PURSUANT TO SECTION 11(A) AND OWNER FAILS TO REMOVE THE UNIT FROM THE FACILITY ON OR BEFORE THE END OF THE TERM, OWNER SHALL BE ASSESSED LIQUIDATED DAMAGES PURSUANT TO SECTION 11.3.

11.    **Termination**

11.1   This Agreement shall terminate:

     (a) June 30, 2016, or December 31, 2016 if Owner exercises the option to extend the Term;

     (b) as of the departure date and time (the **"Departure Time"**) when the Unit departs the Shipyard Facility, provided Owner has paid Shipyard all amounts due under the terms of this Agreement;

     (c) at such date and time beyond the Departure Time that may be mutually agreed by the Parties;

     (d) if Owner has not made payment, in accordance with this Agreement, within fifteen (15) days of written notice from Shipyard of such non-payment; or

     (f) if a Party shall file bankruptcy, become insolvent, have a receiver appointed, or make a general assignment for the benefit of its creditors

11.2   In the event of termination, Owner shall be liable to pay Shipyard as full and final recompense for such termination: 1) Any outstanding Lay berth Fees, 2) the compensation for materials, work or services satisfactorily performed prior to termination, 3) interest due for late payment, 4) any such costs as Shipyard demonstrates as having been reasonably and directly incurred as a result of such termination.

11.3   Owner hereby acknowledges that its failure to remove the Unit from the Shipyard on or before the end of the Term may result in damages to the Shipyard. In the event this Agreement is terminated, and Owner fails to remove the Unit on or before such date stipulated in Section 11.1 or Section 11.4, Owner shall be assessed a liquidated damage in the amount of one hundred thousand dollars ($100,000.00) payable in full no later than thirty (30) days after such termination. The Parties acknowledge and agree that it is difficult or impossible to determine with precision the amount of damages that would or might be incurred by Shipyard as a result of Owner's failure remove the Unit by the end of the Term.  It is understood and agreed by the Parties that: (i) Shipyard shall be damaged by failure of Owner to meet such obligations; (ii) it would be impracticable or extremely difficult to fix the actual damages resulting there from; (iii) any sums that would be payable under this Section 11.3 are in the nature of liquidated damages, and not a penalty, and are fair and reasonable; and (iv) such payment represents a reasonable estimate of fair compensation for the losses that may reasonably be anticipated from such failure. Additionally, for each day the Unit remains at Shipyard's Facility beyond the Term, Owner shall be responsible for such unit rates and other charges as Shipyard may, in its sole and absolute discretion, charge.

11.4   In any case of termination or completion of this Agreement, the Unit shall be removed from the Shipyard within thirty (30) days of such termination or completion, unless otherwise agreed to by the Parties.

12.     **Governing Law; Dispute Resolution**

12.1    *The construction, validity and performance of this Agreement and all matters pertaining thereto shall in all respects be governed by the General Maritime Law of the United States, without regard to or application of its conflicts of law provisions that would refer to the application of the laws of another jurisdiction. In any event that the General Maritime Law of the United States does not apply or is held to be inapplicable by a court of competent jurisdiction, then the construction, validity and performance of this Agreement and all matters pertaining thereto shall in all respects be governed by the laws of the State of Texas, without regard to or application of its conflicts of law provisions that would refer to the application of the laws of another jurisdiction.*

12.2    Each of the Parties hereto hereby submits to the exclusive jurisdiction of the United States District Court for the Southern District of Texas *(Houston Division),* or in the event that there is no applicable federal jurisdiction, to the exclusive jurisdiction of any state court of competent jurisdiction located in Houston, Texas, for the purposes of all legal proceedings arising out of or relating to this Agreement. Each of the Parties hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

12.3    *Dispute Resolution.* In the event of a dispute, including but not limited to a commercial dispute, between the Parties or a dispute connected with a personal injury or property damage claim, arising out of or relating to this Agreement, or the breach thereof, then:

   (a)     the Parties agree that the Owner's designated representative and Shipyard's designated representative will promptly consult and negotiate with each other in good faith and, recognizing their mutual interests, attempt to reach a prompt, just and equitable resolution satisfactory to the Parties;

   (b)     if, after negotiating in good faith as provided in <u>Section 12.3 (a)</u> no resolution satisfactory to the Parties has been reached within three (3) business days, either Party may make a written demand to submit the dispute to non-binding mediation. Such mediation shall be conducted at Houston, Texas in an expedited manner by a mediator jointly appointed and agreed to by the Parties; and

   (c)     in the event that the Parties are unable to resolve their dispute through mediation pursuant to Section 12.3 (b) within twenty two (22) business days, such dispute shall be settled exclusively and finally by the applicable federal or state court of competent jurisdiction located in Houston, Texas, as set forth above.

12.4    *Waiver of Jury Trial.* EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS CONTRACT.

13.     **Miscellaneous**

13.1    *No Public Marine Terminal.* Owner acknowledges and agrees that Shipyard's facility,

including the Layberth, is a private facility and that Shipyard is not a "marine terminal operator" as defined by the U.S. Shipping Act of 1984, as same may be amended from time to time. Only facilities engaged in private or contract carriage pursuant to private commercial a r r a ngements will be accepted by Shipyard.

13.2   *Sub-leasing.* Subleasing of the Layberth by Owner to any third party is strictly prohibited unless specifically approved in writing in advance by Shipyard, and such approval of Shipyard shall be in its sole discretion. If, subject to this Section 13.2, any sublease to a third party does occur, the third party must execute a Layberth Agreement with Shipyard, and Owner must remain bound by the terms, representations, warranties, covenants and obligations contained in this Agreement during the term of any sublease.

13.3   *Notice.* Any notice, excluding legal notices, required by this Agreement shall be given by depositing such notice in the United States mail, addressed to the Party to be notified, postpaid, and registered or certified with return receipt requested, or by delivering such notice in person to such Party, or via electronic mail. Notice given by personal delivery, electronic mail or United States mail shall be effective upon actual receipt. All notices to be sent to a Party pursuant to this Agreement shall be sent or made at the address of the contact person as identified below, or at such other address as such Party may stipulate to the other Party in writing prior to such notice.

<div style="margin-left:2em">

To Shipyard:   Gulf Marine Fabricators, LP
     16225 Park Ten Place – suite 280
     Houston, TX 77084
     Attn: Todd Ladd
     713-714-6100
     tladd@gifinc.com

To Owner:   Amerindo Services Ltd.
    7941 Katy Freeway, #522
    Houston, TX 77024
    Attn: Aqeel Virk
    858-888-3770
    Aqeel@blueskyep.com

</div>

13.4   *Representatives of the Parties.* Owner's representative for purposes of this Agreement on behalf of Owner shall be Aqeel Virk, or any other person that Owner may from time to time designate by written notice. Shipyard's representative for purposes of this Agreement shall be Todd Ladd or any other person that Shipyard may from time to time designate by notice.

13.5   *Severability.* If any provision of this Agreement is determined to be invalid or unenforceable, such invalidity or unenforceability will not affect any other provision of this Agreement. In that event, the Parties agree that this Agreement will be amended or reformed so as to effect as closely as possible the original intent of the Parties with respect to those provisions that were held to be invalid or unenforceable.

13.6   *Amendment or Waiver.* The terms and conditions of this Agreement may not be amended, modified or waived except by written instrument executed by officers or duly authorized representatives of the respective Parties. No purported oral amendment or waiver of any provision

of this Agreement shall be effective or enforceable; and no amendment or waiver of any provision of this Agreement based on course of conduct, course of dealing, or course of performance shall be effective or enforceable.

13.7 *Survival.* Notwithstanding any completion of work hereunder or termination of this Agreement, for any reason, all provisions in this Agreement containing representations, warranties, releases, defense obligations and indemnities, and all provisions related to audit, confidentiality, insurance, disclaimer of certain remedies, limitations of liability, dispute resolution and governing law, and all causes of action which arose prior to completion or termination, survive indefinitely or as expressly stated in this Agreement, or until they are no longer operative or otherwise limited by an applicable statute of limitations.

13.8 *Signatures.* This Agreement may be executed in any number of counterparts, all of which when taken together shall constitute one and the same instrument and any of the Parties hereto may execute this Agreement by signing any such counterpart. Electronic or facsimile signatures and copies of this Agreement shall be valid evidence of this Agreement and shall be given the same force and effect as originals. Each Party represents and warrants that the respective individual signing below for and on behalf of such Party has the necessary approval and authority to bind such Party to this Agreement. This Agreement shall not be effective and binding unless and until it has been signed by a representative for each Party.

15. Changes

   (a) No additional work beyond that described in this Agreement shall be performed by Shipyard unless preceded by a written change order "Change Order" signed by the Owner.

   (b) Owner may alter, enlarge, reduce, modify or otherwise change the work or services to be provided under this Agreement at the unit rates provided in this Agreement at any time by issuance of a Change Order to Shipyard.

   (c) If the Shipyard considers that any oral or written request or direction from the Owner, Owner's Representative or any other person or entity that Shipyard believes to be acting for Owner, will result in any additional amount being payable to Shipyard that would not have been payable absent such request or direction then Shipyard shall submit a Change Order request to Owner and shall not follow such direction or request until such Change Order has been agreed to in writing by Owner.

16. Entire Agreement

This Agreement contains the entire agreement of the Parties with respect to the subject matter hereof, and supersedes any and all prior representations, warranties, and/or inducements, written or oral, made by Owner or Shipyard.

17. Conflicts

In the event of conflict between the terms contained in the body of this Agreement and those in an exhibit, the terms in the body of this Agreement will prevail.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives, in multiple counterparts, as of the day and year first above written.

OWNER:

**BLUE SKYS LANGSA, LTD**
**AMERINDO SERVICES, LTD**

Signature: *Aqeel Virk*

**Name:**   Aqeel Virk

**Title:**   Amerindo Services Ltd.
        Secretary & Treasurer

SHIPYARD:

**GULF MARINE FABRICATORS, L.P.**

Signature: *Todd Ladd*

**Name:**   Todd Ladd

**Title:**   Gulf Island Fabrication, Inc.
        Vice President, COO
        (parent company of Shipyard)

**EXHIBIT A**
**COMPENSATION**

| | | | (USD $/Unit) | | |
|---|---|---|---|---|---|
| Labor | | | | | |
| 1 | Craft Labor | Per hour | $75.00 | | See note 1 |
| 2 | Staff Labor | Per hour | $85.00 | | See note 1 |
| | | | | | |
| 3 | Customs/Fees/Tax/etc. | - | | | Not included |
| | | | | | |
| 4 | Lay berth Fee | Per month | $55,000.00 | | See note 2 |

Notes:

1) All Shipyard owned construction equipment is included in the composite Craft Labor rate with the exception of crawler cranes, transporters, and marine equipment. This equipment will be charged at the equipment rate listed below.

2) Cost for spacer barges, Yokohama buoys, mooring spread, shore power, waste disposal, and potable water will be billed at invoiced cost plus 20% mark up. Should it become necessary to shift the Unit then such shifting will be billed at cost plus 20% mark up.

3) All materials requested to be supplied by Shipyard will be billed at cost plus 20% mark up.

4) Any third-party services will be billed at invoiced cost plus 20% mark up.

5) Owner will pay Shipyard an hourly rate of $8.00 for a Facility Use Fee for labor performed within Shipyard facilities by Owner's other contractors other than the crew to support the Unit. Such Facility Use Fee exclude the cost of utilities or other services, which might be requested.

EQUIPMENT RATES

| Item | Description | Unit | Unit Rate (USD$/Unit) |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 2 | Crawler Crane 2500 (500 ton) | Per hour | 600.00 |
| 3 | Crawler Crane 2400 (500 ton) | Per hour | 600.00 |
| 4 | Crawler Crane 888 (230 ton) | Per hour | 350.00 |
| 5 | Transporters | Per hour | 125.00 |
| 6 | Power Pack | Per hour | 25.00 |
| 7 | 45-ton Hydraulic Crane | Per hour | 100.00 |
| 8 | 28-ton Hydraulic Crane | Per hour | 75.00 |
| 9 | Gantry Bridge Crane | Per hour | 75.00 |
| 10 | Jib Crane | Per hour | 25.00 |

US 2202787v.3