Case 2:16-cv-00430 Document 29 Filed in TXSD on 12/14/16 Page 1 of 12

United States District Court
Southern District of Texas
**ENTERED**
December 15, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| GULF MARINE FABRICATORS, LP, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:16-CV-430 |
| | § | |
| THE ATP INNOVATOR, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMENDATION

Gulf Marine Fabricators, LP (Gulf Marine) obtained an arrest warrant for the ATP Innovator, bearing IMO No. 742. Amerindo Services Ltd. challenges the warrant contending that the ATP Innovator is not a vessel and therefore not subject to arrest (D.E. 21), a position that Gulf Marine disputes. D.E. 23. This action is based Gulf Marine's claim for past due fees of over $800,000 that increase daily, not including interest, as well as liquidated damages of $100,000 arising from a layberth contract between the parties.

## BACKGROUND

The ATP Innovator (the Innovator) is a semi-submersible special purpose platform used as an oil and gas production infrastructure. It was originally built in 1976 as a semi-submersible drilling rig and was named the Rowan Midland. In 1980, it was in use off the coast of Louisiana. A worker was injured on the platform and litigation ensued. At that time, the Fifth Circuit noted that Rowan-Midland was "indisputably a vessel." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 n.5 (5th Cir. 1986).[1] In 1982, the

---

[1] The dispute was over whether an indemnity contract involving Rowandrill and Mesa was a maritime contract or

Rowan-Midland was being used off the coast of Rhode Island to drill for oil. *Petroleum Servs Holdings v. Mobil Exploration and Producing Servs, Inc.*, 680 F. Supp. 492, 493 (D.R.I. 1988).

ATP Oil & Gas Corporation purchased the Rowan-Midland in approximately October 2005 while it was being converted from a drilling rig to a floating production facility. *See Case v. Omega Natchiq, Inc.*, No. H-08-0835, 2008 WL 2714124 at *2 (S.D. Tex. July 10, 2008). The conversion was completed on land by January 2006 when the platform was "towed out to the Mississippi Canyon [in the Gulf of Mexico] and moored to the seabed of the Outer Continental Shelf by a pre-installed 12-point taut-leg mooring system fixed to the seabed by suction embedded plate anchors." *Id*. First oil and gas production began in March 2006. In January 2007, the Rowan-Midland's name was changed to the ATP Innovator. *Id*. at *3. The *Omega* litigation arose out of a worker's injury and included a dispute over whether the ATP Innovator was a vessel for purposes of the Jones Act. "While the structure was capable of movement and could potentially be moved in the future, such movement was not part of its primary purpose as a production facility intended to be fixed in one [place] for an extended indefinite period." *Id*. at *7. In 2008, the district court found the ATP Innovator was not a vessel. *Id*.

The ATP Innovator was the subject of an environmental enforcement action in 2013 by the United States. *United States v. ATP Oil & Gas Corporation*, 955 F. Supp.2d 616 (E.D. La. 2013). ATP Oil & Gas was the owner of the ATP Innovator from at least

---

whether state law applied. To decide the question of the maritime nature of the contract, the court had to determine whether the Rowan-Midland was a vessel. *Id*.

2006 until March 2009, at which time ATP Oil & Gas formed a limited partnership to own and operate the Innovator, ATP Infrastructure Partners, LP. *Id*. at 618.  At the time of the litigation, the ATP Innovator was a "floating production platform facility operating at Lease Block 711 of Mississippi Canyon, [is] permanently moored to the sea floor at a location and is not operating as a vessel or other floating craft and has been engaged in the production of oil and natural gas." *Id*.

In April 2013, ATP Oil & Gas Corporation was ordered to shut in operations in the Mississippi Canyon, Block 711.  *See In re ATP Oil & Gas Corporation*, No. H-12-36187 (S.D. Tex. Mar. 18, 2014).  ATP Infrastructure Partners, LP entered into a layberth agreement with Gulf Marine in December 2013 to berth the ATP Innovator at Gulf Marine's dock at the Intracoastal Waterway in Ingleside, Texas, and it was towed to Ingleside in January 2014 as a "wet tow."  D.E. 23-2, ¶¶ 7, 9.  The Innovator was sold to Amerindo Services. Ltd. on or before December 2015.

Amerindo entered into a layberth agreement with Gulf Marine for six months and then a month-to-month agreement to end on December 31, 2016.  *Id*., ¶ 10.  While it was at Gulf Marine, the Innovator was moved once using a line-handling crew and a pilot. *Id*., ¶ 13.

## MOTION TO VACATE ARREST WARRANT

**A.     Standard**

Supplemental Rule E provides for release of a vessel from arrest or attachment in a maritime proceeding:  "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be

required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Although the plaintiff carries the burden of showing why the arrest should not be vacated, the procedure "is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant." *Salazar v. Atlantic Sun*, 881 F.2d 73, 79 (3d Cir. 1989); *Mujajad v. M/V Hector*, 948 F.2d 1282 (4th Cir. Dec. 4, 1991) (Table) (unpublished). Accordingly, a plaintiff can only survive a motion to vacate by showing by a preponderance of evidence that it is entitled to attachment. *Vinmar Int'l Ltd. v. M/T Clipper MAKISHIO*, No. H–09–3829, 2009 WL 6567104, at *1 (S.D. Tex. Dec. 9, 2009); *Seatrade Grp. N.V. v. 6,785.5, 2005 WL Metric Tons of Cement,* No. H-05-2771, 2005 WL 3878026 at *2 (S.D. Tex. Dec. 7, 2005). Amerindo only challenges the warrant on the ground that the Innovator is not a vessel.

### B.    Is the ATP Innovator a Vessel?

#### 1.  *Standard for decision*

The history of the ATP Innovator was provided as backdrop of the current analysis. Although during its lifetime, the ATP Innovator (and its previous incarnation the Rowan-Midland) was determined to be both a vessel and not a vessel, those decisions do not have preclusive effect. The cases were decided based upon different facts than those before this Court.

The Rules of Construction Act defines a "vessel" as including "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. In *Lozman v. City of Riviera Beach*, 133 S.Ct. 735 (2013), the Supreme Court reviewed the definition of "vessel." The Court focused on the phrase, "capable of being used . . . as a means of transportation on water." *Id*. at 740. In the Court's view, "a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to [the structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id*. at 741. The Court distinguished other floating objects that are clearly not vessels, including a swimming platform on pontoons.

Lozman's home had no rudder or other steering mechanism, its hull was unraked, and it had a rectangular bottom 10 inches below the water. It had no ability to generate electricity or to propel itself, and was able to travel over water only by being towed. The Court found it important that prior to its arrest, Lozman's house was towed on only four occasions over a period of seven years. The Court recognized that § 3 "does not require that a watercraft be used primarily for [transportation] purpose[s], that a watercraft need not be in motion to qualify as a vessel, and that a structure may qualify as a vessel even if attached—but not 'permanently' attached—to the land or ocean floor." *Id*. at 742 (quoting from *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 494 (2005))[2] (internal citations

---

[2] *Stewart* involved the Super Scoop, a large dredge that routinely carried machinery and a crew over water, albeit for short distances. "It navigates short distances by manipulating its anchors and cables. When dredging the Boston Harbor trench, it typically moved in this way once every couple of hours, covering a distance of 30–to–50 feet each time." *Id*. at 484-85.

omitted). The Court also disapproved of those cases that adopted the "anything that floats" approach. *Id*. at 743.

    2. *Application of <u>Lozman</u> to the ATP Innovator*

Similar to the floating home in *Lozman*, the ATP Innovator has been moved (other than within the layberth at Gulf Marine) twice in the past eleven years. It was towed to the Gulf of Mexico in 2005 where it was attached to the seabed floor and remained in the same location until it was towed to the layberth in January 2014 where it has remained for nearly two years. In contrast, while it was in operation as a drilling rig before the Innovator was redesigned as a floating production platform, it was used in both the Atlantic Ocean and in the Gulf of Mexico. The parties have provided the Court with no evidence of the use of the Innovator (after its 2005 conversion) to transport cargo or persons, other than Gulf Marine's affidavit evidence that while under tow to the layberth, the platform had a crew that assisted in the tow and berthing. Additionally, when Gulf Marine moved the platform at layberth it used a pilot and line-men to maneuver the platform. There is no evidence regarding the platform's use to move crew or cargo to or from the Gulf of Mexico when it was moved to handle production or after production was shut in.

The Innovator has a pontoon hull, no engines or thrusters, no rudder or steering mechanism, no raked bow, although it has navigation lights, life boats and anchors. It was originally issued a Certificate of Documentation pursuant to 46 C.F.R. § 67.111.[3] It

---

[3] (a) The owner of a vessel must submit an Application for Initial Issue, Exchange, or Replacement of Certificate of Documentation; or Redocumentation (form CG–1258) to the

has been docked for two years with the stated intent to move it to a semi-permanent location where the Innovator will be affixed to the ocean floor as a production platform, as it was from 2006 to 2013, when the economics of oil production improve. The Innovator is currently berthed for economic reasons.

Since *Lozman*, the Fifth Circuit has decided few cases regarding vessel status. In *Warrior Energy Servs Corp. v. ATP Titan M/V*, 551 Fed. App'x. 749 (Jan. 6, 2014) (per curiam) (unpublished), the court affirmed the district court's decision that the ATP Titan was not a vessel. The Titan is a floating oil and gas production facility that was moored to the floor of the Outer Continental Shelf with 12 anchor piles that weighed 170 tons each. The issue of vessel status arose when the plaintiff sought to enforce a maritime lien on the Titan, but ATP asserted that the platform was not a vessel and the court did not have admiralty jurisdiction. The Fifth Circuit held that the Titan was not a vessel on the grounds that it was not capable of being used for maritime transport in a meaningful sense because it was permanently moored or otherwise rendered practically incapable of transportation. *Id*. at 752.

The district court's opinion provides further detail on the structure and use of the Titan. It was a triple column, deep draft floating production platform. *Warrior Energy*

---

Director, National Vessel Documentation Center, to apply for an official number for the vessel when:
    (1) Application is made for initial documentation of the vessel; or
    (2) An existing vessel has been severed, with two or more vessels resulting. In this case, the official number of the original vessel is retired and the owner of each resulting vessel must apply for designation of a new official number.
(b) Upon receipt of form CG–1258, the Director, National Vessel Documentation Center will have an official number assigned to the vessel and furnish it to the vessel owner.

*Id*.

*Servs. Corp. v. ATP Titan*, 941 F. Supp.2d 699, 701 (E.D. La. 2013). The Titan was floated and wet towed to the Gulf and was fully installed in March 2010. It has a wave rider hull, navigational lights, life boats, crew quarters, an onboard generator, and drinking water plant. *Id*. It is classified as an Industrial Vessel by the Coast Guard and is described in its patent as a "deep draft partially submersible and buoyant floating vessel comprised of at least three independent vertical columns." The platform was stationary and moored to the seabed from 2010 until 2013 and was not intended to be moved until the oilfields around it were no longer productive. *Id*. The court described the Titan as a hybrid semi-submersible spar. Although the relocation manual for the Titan reflected that the crew would be present on the Titan's eventual tow, the district court found that factor was insufficient to show that the Titan would "perform marine transport functions in any practical sense." *Id*. at 707; *see also Baker v. Dir., Office of Workers' Compensation Programs*, 834 F.3d 542 (5th Cir. 2016) (Big Foot, a tension leg offshore platform, not a vessel).

In *Baker*, a worker employed by Gulf Marine was injured while building a housing module for use on Big Foot. The parties agreed that Big Foot was not built to regularly transport goods or people. Big Foot's various components were built in Louisiana, Korea, Aransas Pass, Texas, and transported to Ingleside, Texas for assembly. *Id*. at 544.

> Although Big Foot can float, it is not capable of self-propulsion, has no steering mechanism, does not have a raked bow, and has no thrusters for positioning once on location. Once completed, Big Foot was scheduled to be towed to a location approximately two hundred miles off the coast of Louisiana and anchored to the sea floor by over sixteen miles of tendons. Anytime it is under tow, Big Foot will be tended to by a crew that is employed to control Big Foot during the voyage. Once anchored, Big Foot

> will serve as a work platform for the life of the oil field, which is estimated to be twenty years.

*Id*. at 545. The Coast Guard classified Big Foot as a "Floating Outer Continental Shelf (OCS) facility." *Id*.

> we conclude that Big Foot is not a vessel. Like the floating home in *Lozman*, Big Foot has no means of self-propulsion, has no steering mechanism or rudder, and has an unraked bow. Big Foot can only be moved by being towed through the water, and when towed to its permanent location, Big Foot will not carry "items being transported from place to place (e.g., cargo)," but only "mere appurtenances." While required to carry a captain and crew when towed, the crew will only be present to ensure Big Foot's transport to its permanent location on the OCS. And unlike the Super Scoop, Big Foot will not be used to transport equipment and workers over water in the course of its regular use. In fact, Big Foot is only intended to travel over water once in the next twenty years—the voyage to its operational location on the OCS. Given these undisputed facts, "a reasonable observer, looking to [Big Foot's] physical characteristics and activities, would [not] consider it designed to a practical degree for carrying people or things over water."

*Id*. at 547 (internal citations omitted).

In 2012, the Fifth Circuit held that a floating gas production platform was not a vessel because it was permanently moored to the seabed and as such was only theoretically capable to maritime transportation. *Mendez v. Anadarko Petroleum Corp.*, 466 Fed. App'x. 326 (5th Cir. Mar. 26, 2012) (per curiam) (unpublished). The Red Hawk was a spar platform that was placed in 2004 and not moved by the time of the district court's decision in 2012. The spar had tow bollards, and a shaped hull to facilitate movement from one location to another, but the spar was designed to remain permanently moored to the seabed for the life of the oil and gas field.

Gulf Marine relies in part on *In re Oil Spill by the Oil Rig "Deep Water Horizon" in the Gulf of Mexico*, 808 F. Supp.2d 943 (E.D. La. 2011), aff'd sub nom., *In re Deep Water Horizon*, 745 F.3d 157 (5th Cir. 2014). All of the parties but one agreed that the mobil off-shore drilling platform was a vessel in navigation. At the time of the oil spill, the Deep Water Horizon "was stationary and physically attached to the seabed by means of 5,000 feet of drill pipe." The district court found the platform to be a vessel. 808 F. Supp.2d at 949. The district court relied in part on a 1959 case, *Offshore v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959), that held that a special purpose vessel, a floating drilling platform could be considered a vessel, even though it was not self-propelled and [was] secured to the seabed while drilling." *In re Oil Spill*, 808 F. Supp.2d at 949. The Fifth Circuit affirmed. In its opinion it noted that on appeal the appellants conceded that the Deep Water Horizon was a vessel. 745 F.3d at 164. The issue on appeal was removal jurisdiction. The circuit court found that it had jurisdiction over actions on the Outer Continental Shelf, but "[a]lternatively, maritime law applies here because the DEEPWATER HORIZON is a vessel. A strong argument exists for the proposition that the disaster occurred while the vessel was engaged in the maritime activity of conducting offshore drilling operations, and the disaster had a significant effect on maritime commerce." *Id*. at 166. Notably, the circuit court did not consider *Lozman*.

Gulf Marine does not discuss any Fifth Circuit cases decided after *Lozman* other than *Deep Water Horizon* in support of its position that the Innovator is a vessel, but relies in part on the historical classification of semi-submersible drilling rigs as vessels. Additionally, Gulf Marine argues that like the Super Scoop dredge in *Stewart*, the

10 / 12

Innovator is a vessel. However, the distinction between the Super Scoop and the Innovator is that "the Super Scoop was not only 'capable of being used' to transport equipment and workers over water—*it was used to transport those things*. Indeed, it could not have dug the Ted Williams Tunnel had it been unable to traverse the Boston Harbor, carrying with it workers like Stewart." *Stewart*, 543 U.S. at 495 (emphasis added). Although like the Super Scoop the Innovator can be moved by line-men, when it is not berthed, as it is now, it does not reposition itself, but is stationary unlike the Super Scoop which routinely moved to dig the trench with a crew and transporting equipment.

The Innovator is more similar to Big Foot than to the Super Scoop in some respects. Like Big Foot, although it is currently moored for repair or assembly, the Innovator is ultimately designed to be moored to the seabed in its future location. The Innovator was built as a semi-submersible with a steel pontoon type hull and ballast tanks, tow bridles, towing lugs, sleeping quarters, a galley, a control room, winches, a mooring system, a hull positions system, but it is not self-propelled. *See* D.E. 21-1, D.E. 23-2. Despite its semi-submersible design, the Innovator does not appear to have characteristics that make it a transporter of people or cargo other than incidentally when a crew is needed to move it under tow. As a result, although it has some characteristics of floating structures that have been considered vessels, the undersigned recommends that the Court find that the Innovator is more like Big Foot and less like the Super Scoop. The undersigned further recommends that the Court find that Gulf Marine has not established by a preponderance of the evidence that the Innovator is a vessel.

## CONCLUSION

Based on the foregoing, it is respectfully recommended that the Motion to Vacate Arrest (D.E. 21) be GRANTED and the Orders of October 14, 2016, (D.E. 6, 7, 8, and 10) be VACATED.

Respectfully submitted this 14th day of December, 2016.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).