UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | |
|---|---|
| GULF MARINE FABRICATORS, LP<br><br>VERSUS<br><br>THE ATP INNOVATOR, bearing IMO No. 742, her tackle, furniture, apparel, appurtenances, etc., *in rem*,<br>AMERINDO SERVICES LTD, *in personam*<br>BLUE SKY LANGSA LTD, *in personam* | CIVIL ACTION NO. 2:16-cv-00430<br><br>IN ADMIRALTY,<br>F.R.C.P. 9(h) and Rule C |

**MEMORANDUM IN SUPPORT OF MOTION FOR REVIEW OF MAGISTRATE JUDGE'S MEMORANDUM AND RECOMMENDATION**

**MAY IT PLEASE THE COURT:**

Plaintiff, Gulf Marine Fabricators, LP ("Gulf Marine"), respectfully files this Memorandum in support of its Motion for Review of Magistrate Judge's Memorandum and Recommendation, R. Doc. 29 (the "Recommendation"), on defendant's Motion to Vacate the arrest of the *in rem* defendant ATP INNOVATOR. The Recommendation is a dispositive ruling under Rule 72 and requires *de novo* review before this Court. As set forth below, the Recommendation applied an incorrect standard of review (preponderance of the evidence instead of probable cause). Further, the Recommendation is contrary to a long line of cases in the Fifth Circuit holding that semi-submersible rigs are vessels. Accordingly, Gulf Marine files this

request for review of the Magistrate's Recommendation and respectfully requests that the Court

conduct a *de novo* review and deny the Motion to Vacate.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the failure by defendants Amerindo Services, Ltd. ("Amerindo")

and Blue Sky Langsa Ltd. ("Blue Sky") to pay for dockage and other services provided by Gulf

Marine to the ATP INNOVATOR, a semi-submersible rig berthed at Gulf Marine's dock.   (R.

Doc. 1, ¶¶ VII, XII).   Pursuant to a Layberth Agreement, Amerindo and Blue Sky agreed to pay

Gulf Marine $55,000 per month to dock the ATP INNOVATOR at Gulf Marine's facility.   (*Id.*, ¶

VIII).   In addition, Amerindo and Blue Sky agreed to pay Gulf Marine for services provided to

the INNOVATOR.   (*Id.*).   To date, Gulf Marine is owed over $800,000, which figure continues

to accrue daily.   (*Id.*, ¶ XII).

On October 13, 2016, Gulf Marine filed this lawsuit against the INNOVATOR *in rem*

and Amerindo and Blue Sky *in personam*.   (R. Doc. 1).   Gulf Marine asserted a claim against the

INNOVATOR for a maritime lien for necessaries provided under the Layberth Agreement and

sought to arrest the INNOVATOR under Rule C of the Supplemental Rules for Admiralty and

Maritime ("Rule C").[1]   (*Id.*).   On October 17, 2016, the INNOVATOR was arrested by the

United States Marshal's Service.   (R. Doc. 19).   Subsequently, Amerindo made a limited

appearance on behalf of the INNOVATOR (R. Doc. 20) and filed a Motion to Vacate the arrest

under Rule E(4)(f) of the Supplemental Rules for Admiralty and Maritime Claims, arguing that

the INNOVATOR is not a vessel.   (R. Doc. 21).   Amerindo's Motion to Vacate was referred to

---

[1] Gulf Marine also asserted *in personam* claims against Amerindo and Blue Sky for breach of the Layberth Agreement.   (R. Doc. 1).

Magistrate Judge B. Janice Ellington.  (R. Doc. 21).  Amerindo did not request an evidentiary hearing on its Rule E(4)(f) Motion despite the fact that Rule E expressly provides for the right to a "prompt hearing."  Gulf Marine filed a timely Opposition to the Motion to Vacate along with a supporting declaration and documents.  (R. Doc. 23).  Amerindo submitted a Reply Memorandum, reiterating its request to have its Motion to Vacate decided on the briefs without a hearing. (R. Doc. 27).

On December 14, 2016, Magistrate Judge B. Janice Ellington issued a Memorandum and Recommendation, recommending that the Motion to Vacate be granted and that the orders related to the seizure of the INNOVATOR be vacated.  (R. Doc. 29).  The basis for the Magistrate's Recommendation was the conclusion that the INNOVATOR is not a vessel.  (*Id.*).

## II.    LAW AND ANALYSIS

### A.    Rule 72 Provides for a *De Novo* Standard of Review on Gulf Marine's Request for Review of the Magistrate's Recommendation

Under Rule 72 of the Federal Rules of Civil Procedure, a magistrate judge can make only recommendations as to dispositive motions; and objections to the recommendations are reviewed *de novo* by the district judge.  Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1).  In this case, Amerindo filed a Motion to Vacate the arrest of the *in rem* defendant INNOVATOR, contending that the INNOVATOR is not a vessel.  The INNOVATOR must qualify as a "vessel" for Gulf Marine to be able to assert a maritime lien claim against the INNOVATOR under the Commercial Instatements and Maritime Lien Act (the "CIMLA"), 46 U.S.C. § 31301, *et seq.*, and Supplemental Admiralty Rule C.  If the INNOVATOR is not a vessel, then Gulf Marine has no a maritime lien claim under the CIMLA; and as a result, Amerindo's challenge to the arrest of the INNOVATOR on the grounds of vessel status is a dispositive issue because it goes to the

very heart of Gulf Marine's *in rem* claims against the defendant INNOVATOR.  As such, this Court should conduct a *de novo* review under Rule 72.

**B.      The Magistrate's Recommendation Improperly Applied a "Preponderance of the Evidence" Standard Instead of a "Probable Cause" Standard to the Motion to Vacate under Supplemental Admiralty Rule E(4)(f)**

In the Recommendation, the Magistrate Judge erroneously used a preponderance of the evidence standard, requiring Gulf Marine to show by a preponderance of the evidence that the INNOVATOR is a vessel.  The Magistrate's Recommendation discussed the standard under Supplemental Rule E for a challenge to the seizure of a vessel.  (R. Doc. 29, pp. 3-4).  After quoting the language of Rule E(4)(f),[2] the Recommendation correctly stated that "Although the plaintiff carries the burden of showing why the arrest should not be vacated, the procedure 'is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant.'"  (*Id.*, p. 4) (quoting *Salazar v. Atlantic Sun*, 881 F.2d 73, 79 (3d Cir. 1989)).  The Recommendation then proclaimed that "a plaintiff can only survive a motion to vacate by showing by a preponderance of evidence that it is entitled to attachment."  (*Id.*).  It is a non-sequitur to state that the plaintiff's burden of proof is "reasonable grounds" and then to equate that standard to a "preponderance of the evidence" standard.    Gulf Marine respectfully suggests that the Magistrate's

---

[2] Rule E(4)(f) of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure provides in pertinent part:

> Procedure for Release from Arrest or Attachment. Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

Suppl. Adm. R. E(4)(f).

Recommendation conflated the standard of "reasonable grounds" or "probable cause" with "preponderance of the evidence," requiring Gulf Marine to bear the same burden at this preliminary stage that it will at trial.

"Probable cause is less than a preponderance of the evidence; and it has been described as a practical, common sense determination whether, given the totality of the circumstances, there is a 'fair probability' that a claim is valid." *Olendorff Carriers GMBH & Co., KG v. Grand China Shipping (Hong Kong) Co.*, Ltd., No. 12-00074, 2013 WL 3937450, at *5 (S.D. Tex. July 30, 2012) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  Simply put, "probable cause" is a different, and less onerous, standard than "preponderance of the evidence."  Indeed, a "probable cause" standard of Rule E(4)(f) is only "slightly more onerous" than the standard under Rule 12(c), which requires a court to accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *White Rosebay Shipping S.A. v. HNA Group Co. Ltd.*, No. 12-00096, 2013 WL 441014, at *3 (S.D. Tex. Feb. 5, 2013) (citation omitted); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 509 n.1 (2002).  Overall, it is clear that the standard that governs Amerindo's Motion to Vacate is much less onerous than the preponderance of the evidence standard adopted by the Magistrate's Recommendation.

As legal support for the "preponderance of the evidence" standard on a Rule E(4)(f) motion, the Magistrate's Recommendation cited to two district court cases: *Vinmar Int'l Ltd. v. M/T Clipper MAKISHIO*, No. H–09–3829, 2009 WL 6567104, at *1 (S.D. Tex. Dec. 9, 2009); *Seatrade Grp. N.V. v. 6,785.5, 2005 WL Metric Tons of Cement,* No. H-05-2771, 2005 WL 3878026 at *2 (S.D. Tex. Dec. 7, 2005).  In *Vinmar*, the district court cited to *Seatrade* as legal support for the "preponderance of the evidence" standard.  2009 WL 6567104, at *1.  In turn,

*Seatrade* cited to *Ocean Marine Mutual Insurance Association Europe O.V. v. M/V LIA*, No. 99-2515, 1999 WL 679671 (E.D. La. Aug. 27, 1999);[3] however, the court in *Ocean Marine* merely applied a "probable cause" standard to a party's challenge to the seizure of a vessel.  *Id.* at *1-2 ("The plaintiff must come forward with evidence sufficient to show probable cause for the arrest.").  The *Ocean Marine* case does not stand for the proposition that preponderance of the evidence is the proper standard on a Rule E(4)(f) motion to vacate.

In *Hawknet Ltd. v. Overseas Shipping Agencies*, No. 07-5912, 2009 WL 1309854, at *1-2 (S.D.N.Y. May 6, 2009), *aff'd and remanded*, 590 F.3d 87 (2d Cir. 2009), the district court discussed the standard of review on a Rule E(4)(f) motion, noting that the standard differs depending on where the parties are in the stage of the proceedings when the challenge to the arrest is decided.  The court analogized the issue to varying standards of proof for personal jurisdiction.  If the court does not hold an evidentiary hearing and the challenge to seizure is decided pre-discovery, then the plaintiff must establish only a *prima facie* case.  However, if a hearing is held post-discovery, then the plaintiff must establish by a preponderance of the evidence that seizure is appropriate.  *Id.* at *1-*2.

In *Olendorff Carriers GMBH & Co., KG v. Grand China Shipping (Hong Kong) Co.*, Ltd., No. 12-00074, 2013 WL 3937450, at *2 (S.D. Tex. July 30, 2012), the district court discussed the standard under Rule E(4)(f), citing favorably to *Hawknet*, *supra*.  The court stated that "a plaintiff initially need only make a *prima facie* showing that a defendant is amenable to suit"; however, "when a district court permits jurisdictional discovery and conducts a full

---

[3] *See Seatrade Grp. N.V.*, 2005 WL 3878026 at *2 (citing *Ocean Marine Mut. Insur. Ass'n (Europe) O.V.*, 1999 WL 679671).

evidentiary hearing on the issue of jurisdiction, the plaintiff must then prove its jurisdictional facts by a preponderance of the evidence." *Id.* at *2. Because the motion to vacate in *Olendorff* was decided post-discovery and post-evidentiary hearing, the court applied a "preponderance of the evidence standard." Conversely, in *White Rosebay Shipping S.A. v. HNA Group Co. Ltd.*, No. 12-00096, 2013 WL 441014, at *3 (S.D. Tex. Feb. 5, 2013), the defendant did not request an evidentiary hearing on its motion to vacate under Rule E(4)(f); and as a result, the court applied the lesser standard of whether the plaintiff's claim set forth a "valid *prima facie* admiralty claim," which the court described as only "slightly more onerous" than the plaintiff's burden under Rule 12.

In this case, the Magistrate Judge did not hold an evidentiary hearing, and the Magistrate Judge issued its Recommendation prior to the parties engaging in discovery. Yet, the Magistrate Judge applied a "preponderance of the evidence standard" and required Gulf Marine to show by a preponderance of the evidence that the INNOVATOR is a vessel. Gulf Marine respectfully suggests that, as in *White Rosebay Shipping S.A.*, a probable cause standard should be applied to Gulf Marine's burden of proof at this preliminary stage of the proceedings. 2013 WL 441014, at *3; *see also Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374 (5th Cir. 2002) (stating that in the personal jurisdiction context, a plaintiff must make only a *prima facie* showing of the facts on which jurisdiction is predicated where the district court decides a motion to dismiss without an evidentiary hearing); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir. 2000) (stating that the court must accept as true the plaintiff's "uncontroverted allegations, and resolve in [its] favor all conflicts between the facts contained in the parties' affidavits and other documentation."); *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1271 n.12 (5th Cir. 1983)

("'Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a *prima facie* showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion.'") (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). Applying a probable cause standard at this preliminary stage of the proceedings, Gulf Marine respectfully requests that Amerindo's Motion to Vacate should be denied as Gulf Marine has shown that, at the very least, there is a "fair probability" that the INNOVATOR was a vessel.

### C. The Magistrate's Recommendation That the INNOVATOR Is Not a Vessel Is Contrary to the General Maritime Law Regarding Vessel Status

Irrespective of the standard applied by the Magistrate Judge, Gulf Marine shows in the alternative that the Magistrate's vessel-status conclusion is facially contrary to well-established principles of the General Maritime Law on the issue of what is a vessel.

### 1. The Magistrate's Recommendation Erroneously Focused on the INNOVATOR's Prior Use and Potential Use in the Future Instead of Her Present Capability to Perform Maritime Transportation

The Supreme Court has explained that the statutory definition of "vessel" includes "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 497 (2005). The Magistrate's Recommendation did not focus on the practical capability of the INNOVATOR to be used for maritime transport in her present state as required by *Stewart, supra*. Instead, the Magistrate's Recommendation focused on the use of the INNOVATOR prior to her arrival at Gulf Marine's dock and the stated intent of the INNOVATOR's owner regarding her use once she leaves Gulf Marine dock. (R. Doc. 29, pp. 6-7, 11). The Magistrate's

Recommendation erroneously placed weight on the purported intent of the INNOVATOR's owner to move the INNOVATOR to job site and "semi-permanently" attach her to the seabed for work. (*Id.*, p. 7, stating that the INNOVATOR's owner has a "stated intent to move it to a semi-permanent location where the Innovator will be affixed to the ocean floor as a production platform"; p. 11, stating that "the Innovator is ultimately designed to be moored to the seabed in its future location").

In doing so, the Magistrate's Recommendation did not address the mobile characteristics of the INNOVATOR or her mobile design. As set forth in Gulf Marine's Opposition to the Motion to Vacate, the INNOVATOR is a semi-submersible vessel designed to transform from a deep to a shallow draft by de-ballasting. (*See* Declaration of Todd Ladd, R. Doc. 23-2, ¶¶ 3-4). The INNOVATOR has a typical semi-submersible configuration with watertight bulkhead and additional tanks for fuel, cement, water, and mud to support her function as a mobile drilling vessel. (*Id.*, ¶ 4). Although she was converted from a drilling rig to a production rig, the INNOVATOR remained a semi-submersible and continues to be a semi-submersible with inherent capabilities of moving from job site to job site. (*Id.*, ¶ 5).

In her present state, the INNOVATOR is a semi-submersible capable of moving from Gulf Marine's dock to a job site, and from there to other job sites as needed. Like a typical semi-submersible, the INNOVATOR was constructed with a steel hull, and twenty-five (25) ballast tanks to insure her ability to float. (R. Doc. 23-1, ¶ 4). "Longstanding precedent in this circuit establishes that mobile offshore drilling units are vessels under general maritime law." *BW Offshore USA, LLC v. TVT Offshore AS*, 145 F. Supp. 3d 658, 662 (E.D. La. 2015) (citing *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp.

2d 943, 949 (E.D. La. 2011), *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014)).  Like the numerous other semi-submersible rigs that have been held to be vessels in this circuit, the INNOVATOR is a vessel for purposes of the General Maritime Law.  *See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. at 949, *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d at 166 (affirming district court's finding that mobile-offshore-drilling-unit that was temporarily attached to the seabed was a vessel); *Demette v. Falcon Drilling Co, Inc.*, 280 F.3d 492, 498, n.18 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (finding it "beyond dispute" that a jack-up rig was a vessel under maritime law); *Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393, 394 n.1 (5th Cir. 1991) ("We have consistently applied general maritime law and the Jones Act . . . to accidents aboard special-purpose watercraft such as . . . semi-submersible . . . rigs."), *cert. denied*, 502 U.S. 1033 (1992); *Manuel v. P.A.W. Drilling & Well Serv., Inc.*, 135 F.3d 344, 348 (5th Cir. 1998) ("In a long line of cases, we have held a variety of special purpose structures, far removed from the conventional notion of ships and seagoing barges, to be vessels."); *Houston Oil & Minerals Corp. v. American Int'l Tool Co.*, 827 F.2d 1049, 1052–53 (5th Cir. 1987) ("Our cases applying the Jones Act and general maritime law to accidents aboard . . . semi-submersible . . . and other movable rigs . . . are legion.") (collecting cases), *cert. denied*, 484 U.S. 1067 (1988); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 n.5 (5th Cir. 1986) (concluding that the INNOVATOR's predecessor, the ROWAN MIDLAND, was "indisputably a vessel"); *Hicks v. ODECO*, 512 F.2d 817 (5th Cir. 1975) (holding that oil storage facility was a vessel because it was designed and constructed so that it could be moved to another site in the Gulf of Mexico);

*Producers Drilling Co. v. Gray*, 361 F.2d 432 (5th Cir. 1966) (holding that semisubmersible barge that was designed to be towed to well location and submerged on-site with its own gear was a vessel); *Offshore Co. v. Robinson*, 266 F.2d 769 (5th Cir. 1959) (holding that a drilling barge with retractable legs that dropped to the ocean floor when drilling for oil was a vessel despite not having any engines of its own and requiring the assistance of tugs to move from one location to the next); *see also Herb's Welding v. Gray*, 470 U.S. 414, 417 n.2 (1985) ("Offshore oil rigs are of two general sorts: fixed and floating. Floating structures have been treated as vessels by the lower courts." (citations omitted)); *Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 545 (5th Cir. 2002) ("because the Ocean Concorde is a semi-submersible drilling rig, which is undisputably a vessel . . . ."), *overruled in part, on other grounds by, Grand Isle Shipyard, Inc.*, 589 F.3d at 788 & n.8.

There is nothing that substantively distinguishes the INNOVATOR from the numerous other semi-submersible rigs that the Fifth Circuit has found to be vessels.  Yet, the Magistrate's Recommendation did not follow this wealth of precedent in recommending that the INNOVATOR is not a vessel.  Contrary to the Magistrate's Recommendation, Gulf Marine respectfully submits that through the evidence submitted and case law cited in its Opposition to the Motion to Vacate, Gulf Marine established more than reasonable grounds to support the finding that the INNOVATOR is a vessel under the General Maritime Law.

Moreover, by relying on the "stated intent" of the INNOVATOR's owner as a basis to find the INNOVATOR to be a non-vessel, the Magistrate's Recommendation effectively allows a rig owner to avoid maritime liens attaching to the rig by stating that the rig will be permanently attached to the seabed at some unknown time in the future for some indefinite, unknown period

of time.  Such a subjective test is contrary to the Supreme Court's statement that the test for vessel status looks at objective manifestations, not the subjective intent of the owner.  *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735, 744 (2013) (agreeing that owner's intent is often "'unverifiable'" and "too easily manipulated" such that it would "invite gamesmanship.").

In *Lozman*, the Supreme Court recently provided guidance for courts to consider in "borderline cases where 'capacity' to transport over water is in doubt."  *Id.*  The Supreme Court held that a thing is not a vessel "unless a reasonable observer, looking to the [thing's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water."  *Id.* at 741, 744–45.  The *Lozman* Court stated that while lack of self-propulsion may be a "relevant" factor to consider in determining vessel status, it "is not dispositive."  *Id.* at 741 (citing *The Robert W. Parsons*, 191 U.S. 17, 31 (1903)).

By not following the long-line of Fifth Circuit cases cited above, the Magistrate's Recommendation effectively found that *Lozman* abrogated the Fifth Circuit jurisprudence on semi-submersible rigs; and it is questionable whether any semi-submersible rig could qualify as a vessel under the vessel-status analysis applied in the Magistrate's Recommendation, which focused on prior transportation by the INNOVATOR (R. Doc. 29, p. 6) and the stated intent to moor the structure on a semi-permanent basis in the future (*Id.*, pp. 6-7, 11).  All semi-submersible rigs require the assistance of tugs to move long distances and all semi-submersible rigs are attached to the seabed when on location.  In addition, semi-submersible rigs do not have a primary function of transporting people or cargo.  Yet, even with these characteristics, semi-submersible rigs like the INNOVATOR have always been classified as vessels unless they are (1) permanently attached to the seabed and (2) require an exorbitant cost to move to another

location.  For these reasons, and those set forth in more detail below, Gulf Marine respectfully suggests that the Magistrate's Recommendation is contrary to well-established law.

The Magistrate's Recommendation recognized the fact that the INNOVATOR has a "semi-submersible design," but concluded that "the Innovator does not appear to have characteristics that make it a transporter of people or cargo other than incidentally when a crew is needed to move it under tow."  Not only is this statement unsupported, but Gulf Marine respectfully suggests that this recommendation is contrary to the "[l]ongstanding precedent in this circuit [that] establishes that mobile offshore drilling units are vessels under general maritime law."  *BW Offshore USA, LLC*, 145 F. Supp. 3d at 662 (citing *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d at 949, *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d at 166).

<ol start="2" style="list-style-type: decimal;">
<li>The Magistrate's Recommendation on Vessel Status Made Factual Findings Not Based on the Evidence Submitted and Improperly Resolved Conflicting Evidence in Favor of Amerindo</li>
</ol>

The Magistrate's Recommendation cited to and discussed several Fifth Circuit cases on vessel status, as well as the Supreme Court's recent decisions in *Stewart*, *supra*, and *Lozman*, *supra*.  In reaching its recommendation on vessel status, though, the Recommendation ultimately relied upon two cases, the Supreme Court's decision in *Stewart* and the Fifth Circuit's recent decision in *Baker v. Director, Office of Workers' Compensation Programs*, 834 F.3d 542 (5th Cir. 2016).

In *Stewart*, the Supreme Court considered whether a massive dredge known as the Super Scoop qualified as a vessel.  The Supreme Court noted that the Super Scoop had limited means of self-propulsion, and was "moved long distances by tugboat."  543 U.S. at 484.  The structure

also had "a captain and crew, navigational lights, ballast tanks, and a crew dining area." *Id.* at 484. Although maritime transportation was not the primary purpose of the Super Scoop and the structure was not in navigation at the time of the incident giving rise to dispute, the Supreme Court held that the structure was still a vessel because the dredge was engaged in maritime transportation while traversing a navigable waterway with equipment and workers. *Id.* at 497.

In *Baker*, the Fifth Circuit addressed whether a tension-leg platform called Big Foot was a vessel. 834 F.3d at 544-48. The Fifth Circuit discussed the characteristics of Big Foot, noting several undisputed facts in the case. The appellate court stressed that the tension-leg platform was "only intended to travel over water once in the next twenty years" to a field where it will be permanently attached to the seabed. *Id.* at 547. In addition, the parties conceded that Big Foot was not built to regularly transport goods or people, and the Fifth Circuit noted that the tension-leg platform lacked means of self-propulsion, requiring it to be towed to move over water. *Id.* at 544. Based on these undisputed facts, the Fifth Circuit held that a reasonable observer would not consider Big Foot to be designed to a practical degree for carrying people or things over water. *Id.* at 547.

After discussing *Stewart* and *Baker*, the Magistrate's Recommendation stated that the INNOVATOR is more like Big Foot than the Super Scoop, and thus, the Magistrate recommended that the INNOVATOR be classified as a non-vessel. In reaching this conclusion, the Recommendation proclaimed that the INNOVATOR was like Big Foot because, "although it is currently moored for repair or assembly, the Innovator is ultimately designed to be moored to the seabed in its future location." (R. Doc. 29, p. 11). The Magistrate's Recommendation also described the future use of the INNOVATOR, referring to a "stated intent to move it to a semi-

permanent location where the Innovator will be affixed to the ocean floor as a production platform." (R. Doc. 29, pp. 6-7). Contrary to the Magistrate's statement regarding the current mooring of the INNOVATOR, the INNOVATOR is not moored for repair or assembly except for minimal repairs and maintenance to preserve her condition. (R. Doc. 23-2, ¶¶ 10-11). She is docked on a month-to-month basis until the owner finds work for the INNOVATOR. (*Id.*, ¶ 10). Thus, the INNOVATOR is quite unlike Big Foot.

Moreover, the Recommendation's statement regarding the design of the INNOVATOR and future mooring on a "semi-permanent" basis does not give any credence to the evidence submitted by Gulf Marine on the semi-submersible and mobile design of the INNOVATOR nor does the Recommendation give any credence on the wealth of vessel-status jurisprudence on these issues. The Magistrate's Recommendation also focused on the stated intent of the owner instead of the practical capabilities of the INNOVATOR to perform maritime transportation or the fact that the INNOVATOR is not presently attached the seabed. In effect, the Recommendation accepted the design evidence submitted by Amerindo and the stated intent of Amerindo over conflicting evidence submitted by Gulf Marine. In its Opposition to the Motion to Vacate, Gulf Marine submitted a declaration which set forth the fact that the INNOVATOR is designed to be mobile so that it can move from job site to job site. (*Id.*, ¶¶ 3-5). This evidence is contrary to the Recommendation's statement that the Innovator "will be moored on a semi-permanent location." Because the Recommendation was issued pre-discovery, "all conflicts between facts contained in the parties' affidavits and other documentation" should have been resolved in Gulf Marine's favor. *Kelly*, 213 F.3d at 854. Unlike in *Baker*, Gulf Marine submitted evidence establishing the mobile nature and design of the INNOVATOR. (*See* R.

Doc. 23-2, ¶¶ 3-5).  This evidence is critical to distinguishing Big Foot from the INNOVATOR.

Gulf Marine respectfully suggests that the Magistrate's Recommendation improperly weighed

evidence and/or failed to properly address evidence of the mobile nature of the semi-submersible

design of the INNOVATOR.

In finding that the INNOVATOR was more like Big Foot than the Super Scoop, the

Magistrate's Recommendation also sought to distinguish the Super Scoop in *Stewart* from the

INNOVATOR by stating that the INNOVATOR "does not reposition itself" and "is stationary."

(R. Doc. 29, p. 11).  There was no evidence submitted by the parties to support these two

conclusions by the Magistrate.  In fact, the Magistrate's Recommendation does not discuss the

ballast tanks or hull ballast system of the INNOVATOR, which are features regularly position

the INNOVATOR.  The evidence submitted by Gulf Marine in its Opposition to the Motion to

Vacate established that the INNOVATOR has twenty-five (25) ballast tanks and a hull ballast

system that was adjusted on a weekly basis prior to hurricane season to maintain the level and/or

draft of the INNOVATOR.  (R. Doc. 23-2, ¶¶ 3-4, 14).  This hull ballast system maintained the

position of the INNOVATOR.  While the INNOVATOR may not reposition itself by moving

any significant distance, it nonetheless has inherent vessel features that have been used regularly

to maintain its position while afloat in navigable waters.  (*Id.*).

The Magistrate's Recommendation also attempted to distinguish the use of the

INNOVATOR as a drilling rig from her use post-conversion to a production rig. (R. Doc. 29, p.

6).  The Recommendation, however, did not mention the evidence submitted by Gulf Marine

regarding the conversion, namely that the conversion simply "consisted of removing drilling

equipment and replacing it with production equipment."  (R. Doc. 23-2, ¶ 5).  As stated in the

Declaration submitted by Gulf Marine in its Opposition to the Motion to Vacate, "[t]he hull, superstructure, tanks and vessel qualities of the semis-submersible were not changed or affected in the conversion process. In all respects, the INNOVATOR remained a semi-submersible and continues to be a semi-submersible with inherent capabilities of moving from job site to job site." (*Id.*). As a result, the conversion did not affect or change vessel status, and the Recommendation's reliance on the conversion as part of its basis for finding the INNOVATOR to be a non-vessel is erroneous.

The Recommendation stated that the INNOVATOR was moved twice in the past eleven years after her conversion, compared to its use in the Atlantic Ocean and the Gulf of Mexico pre-conversion. (R. Doc. 29, p. 6). By this statement, the Recommendation implied that the INNOVATOR was more mobile before her conversion to a production rig and that the movement, or lack thereof, of the rig from job to job affects vessel status. However, there was no evidence presented to the Court of the INNOVATOR's movements pre-conversion other than citation to two reported cases discussing the INNOVATOR's use in the Atlantic Ocean in 1982[4] and the INNOVATOR's use in the Gulf of Mexico in 1980.[5] Gulf Marine respectfully suggests that, because of the lack of evidence regarding material pre-conversion movement, the Magistrate's Recommendation improperly distinguished the movements of the INNOVATOR as a drilling rig from her movements as a production rig. The INNOVATOR remained a vessel before and after her conversion to a production rig, and her movements, or lack thereof, are not

---

[4] *See Petroleum Services Holdings, Inc. v. Mobil Exploration & Producing Services, Inc.*, 680 F. Supp. 492, 493 (D.R.I. 1988) (involving personal injury when the INNOVATOR's predecessor, the ROWAN MIDLAND, was being used for drilling operations in the Atlantic Ocean).

[5] *See Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214, n.5 (5th Cir. 1986) (stating that the ROWAN MIDLAND, the INNOVATOR's predecessor, was "indisputably a vessel.").

dispositive of the issue of vessel status.  The Magistrate's Recommendation stated that there was no evidence of the use of the INNOVATOR after her conversion to transport cargo or persons other than when the INNOVATOR had a crew and pilot on board while towed to Gulf Marine's dock and when the INNOVATOR had a line-handling crew and pilot on board when moving within Gulf Marine's facility.  Yet, there was also no evidence of such transportation pre-conversion; and Gulf Marine submits that it was erroneous for the Magistrate's Recommendation to rely on the purported lack of transportation as a basis to find the INNOVATOR was not a vessel.

Moreover, as one post-*Lozman* court properly held, the mere fact that a mobile offshore unit does not move for a number of years does not remove it from vessel status.  *See BW Offshore USA, LLC*, 145 F. Supp. 3d at 663-64 (finding that floating offshore production platform was a vessel despite the fact that it had not moved from location in four years).  Additionally, as the Magistrate's Recommendation noted, the INNOVATOR's minimal movement since she was first berthed at Gulf Marine's facility is a function of her owner's financial difficulties.  (*See* R. Doc. 23, p. 7) ("The Innovator is currently berthed for economic reasons.").  It is not a result of the INNOVATOR's lack of mobility; and as a result, it is improper to use the INNOVATOR's lack of movement since being towed to Gulf Marine as a basis to find the INNOVATOR not to be a vessel.  Likewise, the lack of significant movement prior to being towed to the Gulf Marine facility was partially due to the bankruptcy of her former owner.  The financial difficulties of the INNOVATOR's present and past owners should not affect the issue of vessel status.

3.   The Magistrate's Recommendation Does Not Address Nor Discuss the Recent Decision from a Sister Court in This District Finding a Similar Structure to Be a Vessel

In Gulf Marine's Opposition to the Motion to Vacate, Gulf Marine cited to and discussed at length the decision in *Louisiana International Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*,[6] in which the district court found a semi-submersible similar in structure to the INNOVATOR "practically capable of maritime transportation" despite the lack of self-propulsion, thrusters, steering mechanism, or raked bow.  2012 WL 1029934, at *4, *7.  Like the INNOVATOR, the rig in *Louisiana International Marine, L.L.C.* was arrested while the rig was berthed at a facility and while the rig was not attached, permanently or otherwise, to the seabed. Despite the similar characteristics of the rig in *Louisiana International Marine, L.L.C.* and the INNOVATOR, the Magistrate's Recommendation did not discuss the decision in *Louisiana International Marine, L.L.C.*, nor did the Recommendation attempt to distinguish the rig therein from the INNOVATOR.   Gulf Marine respectfully suggests that the decision in *Louisiana International Marine, L.L.C.* is particularly instructive on the question of vessel status in this case given the similarity of structures involved and that, as a result, the decision in *Louisiana International Marine, L.L.C.* supports a finding in this case that the INNOVATOR is a vessel. Unlike the Magistrate's Recommendation, the decision in *Louisiana International Marine, L.L.C.* follows the legion of Fifth Circuit precedent regularly finding semi-submersible rigs to be vessels.  Gulf Marine respectfully suggests that the Magistrate should have done the same.

---

[6] *See La. Int'l Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*, No. 11-186, 2012 WL 1029934 (S.D. Tex. Mar. 9, 2012), *adopted La. Int'l Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*, No. 11-186, 2012 WL 1029703 (S.D. Tex. Mar. 26, 2012).

Case 2:16-cv-00430   Document 30-1   Filed in TXSD on 12/28/16   Page 20 of 24

4.     The Magistrate's Recommendation Diminished the Import of the Fifth Circuit's Affirmation of Vessel Status in the *Deepwater Horizon* Litigation But Cited Favorably to Inapposite Cases Involving Permanently Moored Structures Found Not to Be Vessels

The Magistrate's Recommendation acknowledged that the Fifth Circuit has decided few cases regarding vessel status post-*Lozman*.  Gulf Marine did cite, though, to one post-*Lozman* opinion by the Fifth Circuit that the Magistrate's Recommendation discussed but declined to follow.  In *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d 943, 949 (E.D. La. 2011), *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014), the Fifth Circuit affirmed the district court's finding that the Mobile-Offshore-Drilling-Unit DEEPWATER HORIZON was a vessel.   The Magistrate's Recommendation appears to diminish the significance of the Fifth Circuit's affirmation of vessel status in the *Deepwater Horizon* litigation because only one party in that litigation contested vessel status.  (R. Doc. 29, p. 10).  It is well-settled, though, that parties cannot consent to subject matter jurisdiction;[7]  and as a result, the fact that the vast majority of the parties in the *Deepwater Horizon* litigation agreed that the DEEPWATER HORIZON rig was a vessel is of no moment. The Magistrate's Recommendation also appeared to criticize the Fifth Circuit's opinion because it did not discuss the Supreme Court's recent decision in *Lozman*.  (R. Doc. 29, p. 10).  The Fifth Circuit's lack of discussion of *Lozman* is readily explained by the fact that by its own terms, *Lozman* was intended to apply to only "borderline cases" in which vessel status is at issue. *Lozman*, 133 S. Ct. at 745.  Semi-submersible rigs have never been "borderline cases."  *See BW*

---

[7] *See Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999) (stating that "a party may neither consent to nor waive federal subject matter jurisdiction.").

{N3342831.1}                                        20

*Offshore USA, LLC*, 145 F. Supp. at 662 ("Longstanding precedent in this circuit establishes that mobile offshore drilling units are vessels under general maritime law.") (citation omitted).

The important takeaway from the *Deepwater Horizon* opinion is that it is a Fifth Circuit decision post-*Lozman* which held that a MODU similar to the INNOVATOR was a vessel. In fact, the MODU in the *Deepwater Horizon* matter was attached to the seabed by 5,000 feet of pipe. The district court's opinion stressed that the rig was mobile and that the Fifth Circuit has consistently found mobile rigs like the DEEPWATER HORIZON to be vessels. 808 F. Supp. 2d at 949-50 (citing *Robinson*, 266 F.2d at 779; *Demette*, 280 F.2d at 498 n.18; *Stewart*, 543 U.S. at 497). The DEEPWATER HORIZON rig had dynamic positioning capabilities that served the same function as the INNOVATOR's mooring on location, *i.e.* to ensure that the rig remained stationary during operations. *See U.S. v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 491 (5th Cir. 2014) (holding that the DEEPWATER HORIZON was a "stationary source" when on-site because the DEEPWATER HORIZON's thrusters and propulsion capabilities were used to hold the rig in place when on-site). Gulf Marine respectfully suggests that the Magistrate's Recommendation erred in failing to compare (or discuss) the similarities of the INNOVATOR and the DEEPWATER HORIZON.

Although the Magistrate's Recommendation diminished the import of the *Deepwater Horizon* opinion, the Recommendation cited favorably to two Fifth Circuit cases that are inapposite to the case at hand. First, the Magistrate's Recommendation discussed the Fifth Circuit's decision in *Warrior Energy Servs Corp. v. ATP Titan M/V*, 551 Fed. App'x. 749 (Jan. 6, 2014) (per curiam) (unpublished), in which the Fifth Circuit held that a hybrid oil and gas production facility was not a vessel because it was permanently moored to the seabed, lacked

self-propulsion, and would cost over $70 million to move, thus rending it practically incapable of transportation.[8]  Unlike the structure in *Warrior Energy*, the INNOVATOR is presently berthed at Gulf Marine's dock where it has been for several months.  Moreover, since the INNOVATOR is presently berthed at Gulf Marine's dock, there is no exorbitant cost to move it to another location; and there was no evidence submitted by Amerindo of any such cost.  Indeed, the INNOVATOR has moved at least once while at Gulf Marine's dock, and her ballast was previously adjusted on a weekly basis prior to hurricane season to maintain level and/or draft.  Since the INNOVATOR is not permanently attached to the seabed like the structure in *Warrior Energy* and there is no evidence of any substantial cost to move the INNOVATOR to another location, the Fifth Circuit's decision in *Warrior Energy* is not instructive on the issue of vessel status in the instant case.

In addition to discussing *Warrior Energy*, the Magistrate's Recommendation also cited to *Mendez v. Anadarko Petroleum Corp.*, 466 Fed. App'x 316 (5th Cir. 2012), in which the Fifth Circuit held that a spar barge was not a vessel because it was permanently attached to the seabed without any intention to move it.  In addition, it would cost $42 million to move the barge to another location.  The court focused on the permanent nature of the spar barge's attachment to the seabed and the exorbitant cost to move it to another location as the primary bases for finding that the barge was not practically capable of maritime transportation (and thus not a vessel).  *Id.* at 318-19.  The spar barge in *Mendez* is clearly distinguishable from the INNOVATOR, which is presently berthed at Gulf Marine's dock and not attached to the seabed, either temporarily or

---

[8] It is well-settled that a "permanently moored" vessel like the structure in *Warrior Energy* is not a vessel. *See Stewart*, 543 U.S. at 494, ("[A] watercraft is not capable of being used for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement.") (internal quotations omitted).

permanently.  Moreover, unlike the spar barge in *Mendez*, the INNOVATOR has a design that makes it mobile and capable of moving from field to field without exorbitant expense. Accordingly, the Fifth Circuit's decision in *Mendez* does not support the Magistrate's Recommendation.

## III.    CONCLUSION

The INNOVATOR is a semi-submersible production rig with vessel characteristics that are indistinguishable from the litany of similar structures found to be vessels under long-established Fifth Circuit precedent.  Furthermore, under the relaxed standard of "reasonable grounds" or "probable cause," Gulf Marine has established at this preliminary stage of the proceedings that there exists probable cause for the arrest of the INNOVATOR based on the vessel status of the structure.  Accordingly, Gulf Marine respectfully objects to the Magistrate's Recommendation finding to the contrary, and Gulf Marine requests that the Court find that the Motion to Vacate the arrest be denied.  Alternatively, Gulf Marine respectfully requests the opportunity to conduct jurisdictional discovery before the issue of vessel status is determined by a preponderance of the evidence standard.

Respectfully submitted,

*/s/ William C. Baldwin*

Lara D. Pringle (Texas Bar No. 24056164)
Jones Walker LLP
First City Tower
1001 Fannin Street, Suite 2450
Houston, Texas 77002
Telephone: (713) 437-1800
Facsimile: (713) 437-1810
Email: Lpringle@joneswalker.com

*Of Counsel:*
WILLIAM C. BALDWIN (#31613)
HANSFORD P. WOGAN (#34825)
Jones Walker LLP
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:     (504) 582-8315
Facsimile:      (504) 589-8315
Email:  wbaldwin@joneswalker.com
          fwogan@joneswalker.com

**Attorneys for Gulf Marine Fabricators, LP**

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of December, 2016, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.  I also certify that I have mailed this filing by United States Postal Service to any non-CM/ECF participants.

*/s/ William C. Baldwin*
_____