UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | |
|---|---|
| GULF MARINE FABRICATORS, LP<br><br>VERSUS<br><br>THE ATP INNOVATOR, bearing IMO No.<br>742, her tackle, furniture, apparel,<br>appurtenances, etc., *in rem*,<br>AMERINDO SERVICES LTD, *in personam*<br>BLUE SKY LANGSA LTD, *in personam* | CIVIL ACTION NO. 2:16-cv-00430<br><br>IN ADMIRALTY,<br>F.R.C.P. 9(h) and Rule C |

**MEMORANDUM IN OPPOSITION
TO CLAIMANT, AMERINDO SERVICES LTD'S, MOTION TO DISMISS ARREST**

**NOW INTO COURT**, through undersigned counsel, comes complainant, Gulf Marine Fabricators, LP ("Gulf Marine"), who respectfully submits this Memorandum in Opposition to the Motion to Dismiss Arrest filed by defendant Amerindo Services, Ltd. ("Amerindo") (R. Doc. 62). Amerindo's Motion to Dismiss addresses the issue of whether the *in rem* defendant the ATP INNOVATOR (the "INNOVATOR") is a vessel. The issue of vessel status was previously before the Magistrate Judge on Amerindo's Motion to Vacate but without any jurisdictional discovery. Now that the parties have had the benefit of jurisdictional discovery, the evidence is clear that the INNOVATOR is a vessel because it is practically capable of transporting both people and equipment across navigable waters. Accordingly, Amerindo's Motion to Dismiss should be denied.

{N3438659.1}

## I.     FACTUAL BACKGROUND

### A.     The Parties' 2015 Layberth Agreement

This case arises out of the failure by defendants Amerindo Services, Ltd. ("Amerindo") and Blue Sky Langsa Ltd. ("Blue Sky") to pay Gulf Marine over $1,000,000.00 in dockage and other services provided by Gulf Marine to the ATP INNOVATOR, a semi-submersible rig berthed at Gulf Marine's dock.  (R. Doc. 1, ¶¶ VII, XII).  Pursuant to a Layberth Agreement, Amerindo and Blue Sky agreed to pay Gulf Marine $55,000 per month to dock the ATP INNOVATOR at Gulf Marine's facility.  (*Id.*, ¶ VIII).  In addition, Amerindo and Blue Sky agreed to pay Gulf Marine for services provided to the INNOVATOR.  (*Id.*).  To date, Gulf Marine is owed well over $1,200,000, which figure continues to accrue daily.  (*Id.*, ¶ XII).

### B.     The INNOVATOR

The INNOVATOR was built in 1976 as a semi-submersible vessel[1] and was originally called the ROWAN MIDLAND.  (*See* Abstract of Title, attached as Exhibit 1).  Jurisdictional discovery on the issue of vessel status has confirmed that, as a mobile offshore vessel, the INNOVATOR is practically capable of transporting people and equipment over navigable water.  Specifically, Amerindo's Joseph Key testified as follows:

> Q     You would agree with me that the ATP Innovator has design capabilities to actually transport people from one location to another because it, in fact, did transport on that instance correct?
>
> * * *

---

[1] A semi-submersible vessel is a specialized marine vessel used in a number of offshore roles, such as an offshore drilling rig, safety vessel, oil production facility, or heavy lift crane.  (*See* Declaration of Todd Ladd, ¶ 2, attached as Exhibit 2).  With its hull structure submerged at a deep draft, a semi-submersible is less affected by wave loadings than a normal ship.  (*Id.*).  With a small water-plane area, however, the semi-submersible is sensitive to load changes, and therefore must be carefully trimmed to maintain stability.  (*Id.*).  Unlike a submersible, a semi-submersible vessel is not supported by resting on the seabed.  (*Id.*).  Semi-submersible vessels are able to transform from a deep to a shallow draft by de-ballasting (removing ballast water from the hull), thereby becoming surface vessels. (*Id.*).  Typically, they are moved from location to location in this configuration.  (*Id.*).

A:      I would say that it has the design to accommodate people.

Q:      (By Mr. Baldwin) And it also has the design capabilities to move people from one location to another just like it did on the tow from location in February of 2014 to Gulf Marine's facility, correct?

A:      Yes[2]

                                    * * *

Q:      And so during that tow from the on-site location to Gulf Marine's facility, the ATP Innovator moved equipment from one location to another, correct?

A:      And from that, you know that the ATP Innovator was and had the design capabilities to move equipment from one location to another, correct?

                                    * * *

A:      Correct.[3]

Like a typical semi-submersible, the INNOVATOR was constructed with a steel hull and twenty-five (25) ballast tanks to insure her ability to float.  (Exh. 2, *Id.*, ¶ 4).  She has the typical semi-submersible configuration described above, with a watertight bulkhead and additional tanks for fuel, cement, water, and mud to support her function as a mobile drilling vessel.  (*Id.*).  The INNOVATOR is a United-States flag vessel documented under the laws of the United States, having been registered with the United States Coast Guard's National Vessel Documentation Center and issued Official Number 575567.[4]  The INNOVATOR was issued a "Registry" endorsement with the United States Coast Guard[5] and is an inspected vessel by the United States

---

[2] *See* Deposition of Joseph Key, 30:15-31:1, attached hereto as Exhibit 3.

[3] *Id.*, 41:7-14.

[4] *See* Certified Copy of Certificate of Documentation, attached as Exhibit 4.  Under 46 C.F.R. § 67.111, the National Vessel Documentation Center issues an official number to a vessel upon initial documentation of the vessel with the National Vessel Documentation Center.  The official number must be permanently affixed to the vessel.  46 C.F.R. § 67.121.

[5] *See* Exh. 4.  Under 46 C.F.R. § 67.17, a "registry endorsement entitles to employment in the foreign trade; trade with Guam, American Samoa, Wake, Midway, or Kingman Reef; and any other employment for which a coastwise, or fishery endorsement is not required."

Coast Guard.  As an inspected vessel, she received a Certificate of Inspection from the United States Coast Guard that expired in February of 2016.  As a documented vessel, she received a Certificate of Documentation from the United States Coast Guard that expired in September of 2016.  (*See* Exh. 4).  The INNOVATOR is classed with the American Bureau of Shipping ("ABS"), which has conducted regular surveys of the vessel.  (Ladd Declaration, ¶ 15, Exh. 2) She also has International Maritime Organization ("IMO") Number 8754633, and Hull Number 742.[6]

The INNOVATOR has a long history in the Gulf of Mexico[7] and the Atlantic Ocean,[8] having worked on several jobs at several different sites.  In 2007, ATP Oil & Gas Corporation ("ATP") bought the semi-submersible, changed her name to the "ATP INNOVATOR," and granted a preferred ship mortgage on the INNOVATOR.  (*See* Abstract of Title, Exh. 1).[9]  ATP converted the INNOVATOR from a semi-submersible drilling rig to a semi-submersible production rig.  (Ladd Declaration, ¶ 5, Exh. 2).  The conversion consisted of removing drilling equipment and replacing it with production equipment.  (*Id.*).

Notably, the hull, superstructure, tanks and vessel qualities of the semi-submersible were not changed or affected in the conversion process.  (*Id.*).[10]  In all respects, the INNOVATOR remained a semi-submersible and continues to be a semi-submersible with inherent capabilities

---

[6] Under 33 C.F.R. 181.23, manufacturers of vessels are required to identify each vessel with primary and secondary hull identification numbers permanently affixed to the vessel.

[7] *See e.g.*, Affidavit of Joseph Key, R. Doc. 21-1, ¶ 7, explaining the INNOVATOR's prior work in the Gulf of Mexico for a project for ATP Oil & Gas Corp.

[8] *See Petroleum Services Holdings, Inc. v. Mobil Exploration & Producing Services, Inc.*, 680 F. Supp. 492, 493 (D.R.I. 1988) (involving personal injury when ROWAN MIDLAND was being used for drilling operations in the Atlantic Ocean).

[9] For a ship mortgage to be a valid first preferred mortgage within the meaning of Chapter 313 of Title 46 of the United States Code, the property that is mortgaged must be a vessel.  *See* 46 U.S.C. § 31322.

[10] *See also* Exh. 3, Depo. of Joseph Key, 65:22-66:6.

of moving from job site to job site.  (*Id.*).  Indeed, the documents produced by Amerindo in this case have continued to identify the INNOVATOR as a vessel post-conversion,[11] describing the INNOVATOR as follows:

> **3   VESSEL DESCRIPTION**
>
> The ATP Innovator is a rectangular, twin-hull, column-stabilized, mobile offshore drilling unit (MODU).
>
> The hulls and columns stabilize the rig and act together with transverse tubular members and main deck girders to carry deck loads and resist wave, wind and current forces.

Although Amerindo's Motion to Dismiss claims that the INNOVATOR is immobile, Amerindo markets and promotes the INNOVATOR as a Mobile Offshore Production Unit on its website.[12] Amerindo further markets the INNOVATOR on Amerindo's website as presently docked at Gulf Marine's facility, awaiting charter.[13]

Moreover, among other characteristics, the INNOVATOR has the following vessel characteristics:

1.     Pontoon hull;

2.     Ballast tanks;

3.     Tow Bridles;

4.     Towing lugs;

5.     Fender frames;

6.     Navigational lights;

7.     Automated Identification System (AIS);

8.     Sleeping quarters and accommodations for 98 people on board;

---

[11] *See* ATP Innovator – Stability Analysis, p. 10, attached hereto as Exhibit 5.

[12] Exh. 3, Depo. of Joseph Key, 53:16-24, 54:23-55:7.

[13] *Id.*, 55:8-16.

9.      Galley;

10.     Main Control Room;

11.     Lifeboats;

12.     Anchors;

13.     Hull Positions System;

14.     Ballast System;

15.     GPS Positioning System;

16.     Draft marks;

17.     Anodes;

18.     Diesel and gas turbine generators;

19.     Mooring system; and

20.     Winches

(Exh. 2, *Id.*, ¶ 6).

In January of 2014, the INNOVATOR was towed to Ingleside, Texas to a berth at Gulf Marine's dock.  (*Id.*, ¶ 9).  The INNOVATOR was a "wet tow," meaning that she was seaworthy and capable of floating on her own during the transport to Gulf Marine's facility.  (*Id.*).  In the opinion of Amerindo's Joseph Key, the INNOVATOR was "seaworthy" at the time of the tow.[14] During the tow, the INNOVATOR had a crew on board which assisted in the tow and berthing at Gulf Marine's facility.  (*Id.*).  Upon reaching the port of Corpus Christi, a pilot boarded the INNOVATOR to assist in mooring her at Gulf Marine's facility.  (*Id.*).  The INNOVATOR's crew operated winches onboard the semi-submersible to moor her at Gulf Marine's dock.  (*Id.*).

---

[14] *Id.*, 37:21 – 38:1.

On September 14, 2015, ATP Partners sold the INNOVATOR to defendant Amerindo. (*See* Abstract of Title, Exh. 1).  Subsequently, Amerindo documented the INNOVATOR with the United States Coast Guard's National Vessel Documentation Center; and Amerindo granted ATP Partners a Preferred Ship Mortgage on the INNOVATOR.  (*Id.*).  On December 13, 2015, Amerindo, and its affiliate Blue Sky Langsa, Ltd, entered into a Layberth Agreement with Gulf Marine to continue berthing the INNOVATOR at Gulf Marine's dock (the "2015 Layberth Agreement") through June 30, 2016 and thereafter on a month-to-month basis not to exceed December 31, 2016.  (*See* 2015 Layberth Agreement, a copy of which is attached as an exhibit to the Ladd Declaration, Exh. 2).  The INNOVATOR has remained at Gulf Marine's facility since December of 2015, but has been moved at least once at the facility.  (Ladd Declaration, ¶ 10, Exh. 2).  During the recent movement of the INNOVATOR, she had line-handling crew on board, who operated the winches on the semi-submersible to assist in moving the INNOVATOR. (*Id.*, ¶ 13).  In addition, there was a pilot on board the INNOVATOR during the move.  (*Id.*). The INNOVATOR had GPS equipment and a laptop with navigation software to assist with the move.[15]

Moreover, the INNOVATOR has twenty-five (25) ballast tanks and a hull ballast system that was adjusted on a weekly basis prior to hurricane season to maintain the level and/or draft of the INNOVATOR.  (R. Doc. 23-2, ¶¶ 3-4, 14).  As evidenced by the Declaration of Joseph Key, Amerindo intends to put the INNOVATOR into service abroad, which will require the INNOVATOR to be towed a substantial distance across navigable waters to its intended location

---

[15] *Id.*, 81:12-18, 81:24-82:6.

in foreign waters.  (*See* R. Doc. 21-1, pp. 2-3, ¶ 3).   If the move requires a wet tow, the INNOVATOR will transport crew and equipment from Point A to Point B.[16]

## II.    PROCEDURAL BACKGROUND

On October 13, 2016, Gulf Marine filed this lawsuit against the INNOVATOR *in rem* and Amerindo and Blue Sky *in personam*.  (R. Doc. 1).  Gulf Marine asserted a claim against the INNOVATOR for a maritime lien for necessaries provided under the Layberth Agreement and sought to arrest the INNOVATOR under Rule C of the Supplemental Rules for Admiralty and Maritime ("Rule C").[17]   (*Id.*).   On October 17, 2016, the INNOVATOR was arrested by the United States Marshal's Service.  (R. Doc. 19).   Subsequently, Amerindo made a limited appearance on behalf of the INNOVATOR (R. Doc. 20) and filed a Motion to Vacate the arrest under Rule E(4)(f) of the Supplemental Rules for Admiralty and Maritime Claims, arguing that the INNOVATOR is not a vessel.  (R. Doc. 21).  Amerindo's Motion to Vacate was referred to Magistrate Judge B. Janice Ellington.  (*Id.*).

On December 14, 2016, before the parties had the opportunity to conduct jurisdictional discovery, Magistrate Judge B. Janice Ellington issued a Memorandum and Recommendation, recommending that the Motion to Vacate be granted and that the orders related to the seizure of the INNOVATOR be vacated.  (R. Doc. 29).  The basis for the Magistrate's Recommendation was the conclusion that the INNOVATOR is not a vessel.  (*Id.*).  On December 28, 2016, Gulf Marine filed a Motion for Review before the District Court of the Magistrate Judge's Memorandum and Recommendation.  (R. Doc. 30).

---

[16] *Id.*, 72:8-73:5.

[17] Gulf Marine also asserted *in personam* claims against Amerindo and Blue Sky for breach of the Layberth Agreement.  (R. Doc. 1).

On April 5, 2017, after oral argument on Gulf Marine's Motion, the District Court sustained Gulf Marine's first objection to the Magistrate's Memorandum and Recommendation, "finding that the correct standard of proof at this stage is probable cause and not a preponderance of the evidence." (R. Doc. 55). The District Court allowed Gulf Marine sixty (60) days to conduct jurisdictional discovery and ordered that any motion to dismiss by Amerindo be filed by July 5, 2017. (*Id.*). In the interim, the parties took the deposition of the Amerindo's Joseph Key, who provided an affidavit in support of Amerindo's original motion to vacate. Gulf Marine also propounded written discovery upon Amerindo, which produced a significant amount of documents on the issue of vessel status. As stated below, the deposition of Joseph Key and the documents provided by Amerindo in discovery support the INNOVATOR's status as a vessel and warrant the denial of Amerindo's Motion to Dismiss.

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Amerindo's Motion to Dismiss seeks dismissal on the grounds that the INNOVATOR is not a vessel. Vessel status is a prerequisite of Gulf Marine's maritime lien claim against the *in rem* defendant INNOVATOR. *See* 46 U.S.C. § 31342(a)(1); *see also Galehead Inc. v. M/V ANGLIA*, 183 F.3d 1242, 1244 (11th Cir. 1999). The issue of vessel status is necessarily one of jurisdictional fact that is interwoven with the merits of Gulf Marine's claims because the lack of vessel status defeats Gulf Marine's maritime lien claims. Accordingly, Amerindo's Motion to Dismiss should be treated as a motion for summary judgment subject to the standards of Rule 56 of the Federal Rules of Civil Procedure. *See Martin v. Fab-Con, Inc.*, 9 F. Supp. 642, 645-46 (E.D. La. 2014) (treating motion to dismiss based on vessel status as a motion for summary judgment because the issue of vessel status was a crucial component of the plaintiff's case).

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as matter of law.  Fed. R. Civ. P. 56(c).  All inferences from the record must be construed in the light most favorable to the non-movant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).   The moving party must demonstrate the absence of genuine issues of material fact, and if the moving party fails to meet this initial burden, the motion should be denied regardless of the non-movant's response.  *Little v. Liquid Air Corp*, 37 F.3d 1069, 1075 (5th Cir. 1994).

### 2.      The Elements of a Maritime Lien for Necessaries

"[A] maritime lien is a rough security device invented in the nineteenth century to keep ships moving in commerce while preventing them from escaping their debts by sailing away." THOMAS  J.  SCHOENBAUM,  ADMIRALTY  AND  MARITIME  LAW  § 9-1  (5th ed.) (Updated Nov. 2016).  The overarching goal of the maritime lien system is to keep "the channels of maritime commerce open—by ensuring that people who service vessels have an efficient way of demanding reimbursement for their labor and are thus willing to perform the services necessary to keep vessels in operation." *Mullane v. Chambers*, 438 F.3d 132, 138 (1st Cir. 2006). Thus, under Rule C of the Supplemental Rules for Admiralty and Maritime Claims, a party may bring an action *in rem* to enforce a maritime lien by seizing the vessel itself until the lien is satisfied. Supp. Adm. R. C(1)(a).  A court may order the sale of an arrested vessel, and that sale then extinguishes all liens against the vessel. *See Newpark Shipbuilding & Repair, Inc. v. M/V Trinton Brute*, 2 F.3d 572, 573 (5th Cir. 1993) ("a marshal's sale discharges all liens against the ship and grants the purchaser title free and clear of liens").

The Commercial Instruments and Maritime Lien Act, 46 U.S.C. § 31301, *et seq.* (the "CIMLA"), defines the circumstances in which a party is entitled to a maritime lien for necessaries.  The statute provides that:

> [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>
> (1)  has a maritime lien on the vessel;
>
> (2)  may bring a civil action in rem to enforce the lien; and
>
> (3)  is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342.  In sum, to establish a maritime lien for necessaries, the lien claimant must show that it (1) furnished repairs, supplies, or other necessaries (2) to a vessel (3) on the order of the owner or a person authorized by the owner. 46 U.S.C. § 31342(a)(1); *see also Galehead Inc. v. M/V ANGLIA*, 183 F.3d 1242, 1244 (11th Cir. 1999).  For present purposes, the only element in dispute is the second element: whether the INNOVATOR is a "vessel" for purposes of the CIMLA.  Amerindo does not contest the other two elements of a necessaries lien, *i.e.* the fact that the services and equipment provided by Gulf Marine constitute necessaries[18] or the fact that the services were provided on the order of the owner of the INNOVATOR.

### 3.    The INNOVATOR Constitutes a Vessel under the General Maritime Law

A "vessel" is defined by statute as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  1 U.S.C. § 3.  The Supreme Court has explained that the statutory definition of "vessel" includes "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."  *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 497

---

[18] It is well-settled that dockage or wharfage constitute necessaries.  *See* SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 9-3 (citing *The Western Wave*, 77 F.2d 695 (5th Cir. 1935)).

(2005).[19]  Therefore, for a thing to be classified as a vessel, its primary purpose does not have to be navigation or transportation.  *Id.* at 495–96.  In *Stewart*, the Supreme Court described the relevant inquiry in determining vessel status as "whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one."  *Id.* at 496.

The Supreme Court in *Stewart* considered whether a massive dredge known as the Super Scoop qualified as a vessel.  The Court noted that the Super Scoop had limited means of self-propulsion, but that she was able to move short distances.  The structure also had "a captain and crew, navigational lights, ballast tanks, and a crew dining area." 543 U.S. at 484.  Although maritime transportation was not the primary purpose of the Super Scoop and the structure was not in navigation at the time of the incident giving rise to dispute, the Court held that the structure was still a vessel because the Super Scoop was engaged in maritime transportation while traversing a navigable waterway with equipment and workers.  The Court further stated that "[b]y including special-purpose vessels like dredges, § 3 sweeps broadly . . ." *Id.* at 494..

Under *Stewart*, the INNOVATOR is a vessel.  Like the dredge in *Stewart*, the INNOVATOR has the capability to, and in fact does, regularly adjust its position to ensure its draft.  Specifically, the ballast tanks or hull ballast system of the INNOVATOR regularly position the INNOVATOR.  The INNOVATOR has twenty-five (25) ballast tanks and a hull ballast system that were adjusted on a weekly basis prior to hurricane season to maintain the level and/or draft of the INNOVATOR.  (R. Doc. 23-2, ¶¶ 3-4, 14).  This hull ballast system

---

[19] In *Stewart*, the Supreme Court explained that the Rules of Construction Act, 1 U.S.C. § 3, supplies the default definition of "vessel" throughout the United States Code "'unless the context indicates otherwise.'"  543 U.S. at 489-90.  "Section 3 merely codified the meaning that the term 'vessel' had acquired in general maritime law. See 1 S. Friedell, Benedict on Admiralty § 165 (rev. 7th ed. 2004). In the decades following its enactment, § 3 was regularly used to define the term 'vessel' in maritime jurisprudence."  *Id.* at 490.  Section 3 has supplied the definition of "vessel" for purposes of the Jones Act and the Longshore and Harbor Workers' Compensation Act.  *Id.* at 491.  Likewise, Section 3 has supplied the definition of "vessel" for purposes of the CIMLA.  *Louisiana Int'l Marine, L.L.C.*, 2012 WL 4718558, at *4; *see also Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621, 623 (5th Cir. 1955) (applying Section 3's definition of "vessel" to enforcement of a necessaries lien).

maintained the position of the INNOVATOR.  The INNOVATOR has inherent vessel features that, like the Super Scoop's vessel features, have been used regularly to maintain its position while afloat in navigable waters.  (*Id.*).

Furthermore, the Supreme Court recently provided additional guidance for courts to consider in "borderline cases where 'capacity' to transport over water is in doubt."[20]  *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735, 745 (2013).  The Supreme Court held that a thing is not a vessel "unless a reasonable observer, looking to the [thing's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water."  *Id.* at 741, 744–45.  The *Lozman* Court stated that while lack of self-propulsion may be a "relevant" factor to consider in determining vessel status, it "is not dispositive."  133 S. Ct. at 741 (citing *The Robert W. Parsons*, 191 U.S. 17, 31 (1903)).

Moreover, under *Lozman*, the INNOVATOR is a vessel because it is practically designed to be mobile and to transport both people and equipment as necessary.  It is completely misleading for Amerindo to contend on the one hand that the INNOVATOR is immobile[21] but then to market the INNOVATOR as a mobile production unit awaiting charter.  Moreover, Amerindo's Joseph Key readily admitted that the INNOVATOR is actually capable of transporting both people and equipment over navigable waters because the INNOVATOR has

---

[20] Semi-submersibles have never been "borderline cases" unless they are permanently attached to the seabed, casting their capacity to transport over water in doubt.

[21] In this regard, Amerindo's stated intent of moving the INNOVATOR to a permanent or semi-permanent location at some undefined point in time in the future also has no bearing on the issue of vessel status.  Such a subjective test is contrary to the Supreme Court's statement that the test for vessel status looks at objective manifestations, not the subjective intent of the owner.  *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735, 744 (2013) (agreeing that owner's intent is often "'unverifiable'" and "too easily manipulated" such that it would "invite gamesmanship.").  Otherwise, vessel owners like Amerindo would be able to slide their vessels in and out of vessel status simply to avoid maritime liens.

done so in the past.[22]   The simple fact that transportation of people or equipment is not the

INNOVATOR's primary function has no bearing on the issue of whether the INNOVATOR is a

vessel.  *See Stewart*, 543 U.S. at 495-96.

Amerindo cites to the Fifth Circuit's decision in *Baker v. Director, Office of Workers'*

*Compensation Programs*, 834 F.3d 542 (5th Cir. 2016) as support for dismissal.  In *Baker*, the

Fifth Circuit addressed whether a tension-leg platform called Big Foot was a vessel.  834 F.3d at

544-48.  The Fifth Circuit discussed the characteristics of Big Foot, noting several undisputed

facts in the case.  The appellate court stressed that the tension-leg platform was "only intended to

travel over water once in the next twenty years" to a field where it will be permanently attached

to the seabed.  *Id.* at 547.  In addition, the parties conceded that Big Foot was not built to

regularly transport goods or people, and the Fifth Circuit noted that the tension-leg platform

lacked means of self-propulsion, requiring it to be towed to move over water.  *Id.* at 544.  Based

on these undisputed facts, the Fifth Circuit held that a reasonable observer would not consider

Big Foot to be designed to a practical degree for carrying people or things over water.  *Id.* at 547.

Unlike in *Baker*, the evidence submitted by Gulf Marine establishes the mobile nature

and design of the INNOVATOR, as does the testimony supporting the INNOVATOR's practical

capabilities of maritime transportation and the INNOVATOR's regular ballasting/deballasting to

maintain the INNOVATOR's position.  (*See* R. Doc. 23-2, ¶¶ 3-5).  This evidence is critical to

distinguishing Big Foot from the INNOVATOR.  Moreover, as one post-*Lozman* court properly

held, the mere fact that a mobile offshore unit does not move for a number of years does not

remove it from vessel status.  *See BW Offshore USA, LLC*, 145 F. Supp. 3d at 663-64 (finding

that floating offshore production platform was a vessel despite the fact that it had not moved

---

[22] Exh. 3, Depo. of Joseph Key, 30:15-31:1; 41:7-14.

from location in four years).  Additionally, the INNOVATOR's minimal movement since she was first berthed at Gulf Marine's facility is a function of her owner's financial difficulties, which have no bearing on the INNOVATOR's status as a vessel.  (*See* R. Doc. 23, p. 7) ("The Innovator is currently berthed for economic reasons.").  It is not a result of the INNOVATOR's lack of mobility; and as a result, it is improper to use the INNOVATOR's lack of movement since being towed to Gulf Marine as a basis to find the INNOVATOR not to be a vessel. Likewise, the lack of significant movement prior to being towed to the Gulf Marine facility was partially due to the bankruptcy of her former owner.  The financial difficulties of the INNOVATOR's present and past owners should not affect the issue of vessel status as a matter of law.

Likewise, the conversion of the INNOVATOR to a production rig did not change the vessel status of the INNOVATOR because it simply "consisted of removing drilling equipment and replacing it with production equipment."  (R. Doc. 23-2, ¶ 5).  As stated in the Declaration submitted by Gulf Marine in its Opposition, "[t]he hull, superstructure, tanks and vessel qualities of the semi-submersible were not changed or affected in the conversion process.  In all respects, the INNOVATOR remained a semi-submersible and continues to be a semi-submersible with inherent capabilities of moving from job site to job site."  (*Id.*).  As a result, the conversion did not affect or change vessel status, and the conversion is not a basis for finding the INNOVATOR to be a non-vessel.

The INNOVATOR's status as a vessel is in line with the Fifth Circuit's legion of cases which have repeatedly held that mobile offshore drilling units like the INNOVATOR are vessels under the General Maritime Law <u>unless they are permanently attached to the seabed</u>. *Compare In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F.

Supp. 2d 943, 949 (E.D. La. 2011), *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014), *with Scroggs v. Bis Salamis, Inc.*, No. 09-1007, 2010 WL 3910563 (E.D. Tex. 2010) (holding that floating production semi-submersible that was permanently moored to the seabed through 16 chain mooring lines and that would cost $400 to $500 million to move was not a vessel).[23]   In *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959), the Fifth Circuit held that a floating drilling platform is a vessel, despite the fact that it was not self-propelled and that its primary purpose was to drill for oil.

More recently, in *Demette v. Falcon Drilling Co, Inc.*, 280 F.3d 492, 498, n.18 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009), the Fifth Circuit found it "beyond dispute" that a jack-up rig was a vessel under maritime law.[24]   Likewise, a district court recently found that the DEEPWATER HORIZON, a semi-submersible, deep-water drilling platform was a vessel.   *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d at 950; *see also Manuel v. P.A.W. Drilling & Well Serv., Inc.*, 135 F.3d 344, 348 (5th Cir. 1998) ("In a long line of cases, we have held a variety of special purpose structures, far removed from the conventional notion of ships and seagoing barges, to be vessels.").   There is nothing that substantively distinguishes the INNOVATOR from the numerous other semi-submersible rigs that the Fifth Circuit has found to be vessels.

---

[23] *See also Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393, 394 n.1 (5th Cir. 1991) ("We have consistently applied general maritime law and the Jones Act . . . to accidents aboard special-purpose watercraft such as . . . semi-submersible . . . rigs."), *cert. denied*, 502 U.S. 1033 (1992); *Houston Oil & Minerals Corp. v. American Int'l Tool Co.*, 827 F.2d 1049, 1052–53 (5th Cir. 1987) ("Our cases applying the Jones Act and general maritime law to accidents aboard . . . semi-submersible . . . and other movable rigs . . . are legion.") (collecting cases), *cert. denied*, 484 U.S. 1067 (1988); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 n.5 (5th Cir. 1986) (concluding that the INNOVATOR's predecessor, the ROWAN MIDLAND, was "indisputably a vessel").

[24] A jack-up rig has legs that can be lowered and secured to the seabed.  Once the legs are secured, the rig is "jacked-up" out of the water to create a drilling platform. The process is reversible, and a jack-up rig can be towed to new sites.  *Id.* at 495.

In *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d 943, 949 (E.D. La. 2011), *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014), the Fifth Circuit affirmed the district court's finding that the Mobile-Offshore-Drilling-Unit DEEPWATER HORIZON was a vessel.  Although only one party contested vessel status in that case, it is well-settled that parties cannot consent to subject matter jurisdiction.[25]  As a result, the fact that the vast majority of the parties in the *Deepwater Horizon* litigation agreed that the DEEPWATER HORIZON rig was a vessel is of no moment. Moreover, although the Fifth Circuit did not discuss *Lozman* in the *Deepwater Horizon* litigation, the Fifth Circuit's lack of discussion of *Lozman* is readily explained by the fact that by its own terms, *Lozman* was intended to apply to only "borderline cases" in which vessel status is at issue.  *Lozman*, 133 S. Ct. at 745.  Semi-submersible rigs have never been "borderline cases." *See BW Offshore USA, LLC*, 145 F. Supp. at 662 ("Longstanding precedent in this circuit establishes that mobile offshore drilling units are vessels under general maritime law.") (citation omitted).

The important takeaway from the *Deepwater Horizon* opinion is that it is a Fifth Circuit decision post-*Lozman* which held that a MODU similar to the INNOVATOR was a vessel.  In fact, the MODU in the *Deepwater Horizon* matter was attached to the seabed by 5,000 feet of pipe.  The district court's opinion stressed that the rig was mobile and that the Fifth Circuit has consistently found mobile rigs like the DEEPWATER HORIZON to be vessels.  808 F. Supp. 2d at 949-50 (citing *Robinson*, 266 F.2d at 779; *Demette*, 280 F.2d at 498 n.18; *Stewart*, 543 U.S. at 497).  The DEEPWATER HORIZON rig had dynamic positioning capabilities that served the same function as the INNOVATOR's mooring on location, *i.e.* to ensure that the rig remained

---

[25] *See Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999) (stating that "a party may neither consent to nor waive federal subject matter jurisdiction.").

stationary during operations.  *See U.S. v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 491 (5th Cir. 2014) (holding that the DEEPWATER HORIZON was a "stationary source" when on-site because the DEEPWATER HORIZON's thrusters and propulsion capabilities were used to hold the rig in place when on-site).  Like the DEEPWATER HORIZON, the INNOVATOR is also a mobile offshore unit and is marketed by Amerindo as being mobile.  The fact that the DEEPWATER HORIZON was found to be a vessel even when attached to the seabed further supports the finding that the INNOVATOR, which is presently berthed a Gulf Marine's facility, is a vessel.

The recent case of *Louisiana International Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*[26] is also instructive on the issue of vessel status in this case.  In *Louisiana International Marine, L.L.C.*, several parties asserted maritime lien claims against a semi-submersible drilling rig for the provision of various services, including towage of the rig as a "wet tow."  The rig was seized, and the seizure was challenged on a motion to vacate the arrest of the rig.  Although the issue in *Louisiana International Marine, L.L.C.* was framed as whether the rig was a "dead ship," the case is instructive because it addressed whether a semi-submersible similar in structure to the INNOVATOR was "practically capable of maritime transportation," as is required for a structure to be a vessel.[27]  The court cited to the fact that the rig was recently towed as a "wet tow" as evidence that the rig was indeed practically capable of such maritime

---

[26] *See La. Int'l Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*, No. 11-186, 2012 WL 1029934 (S.D. Tex. Mar. 9, 2012), *adopted La. Int'l Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*, No. 11-186, 2012 WL 1029703 (S.D. Tex. Mar. 26, 2012).

[27] Unlike the INNOVATOR, the semi-submersible drilling rig in *Louisiana International Marine, L.L.C.* had been cold-stacked for a decade and was partially dismantled with an equivocal intention to be scrapped. Generators had been removed from the rig, and it lacked lifeboats, navigational aids, and operational bilge pumps. It also was scheduled to undergo repairs before it could be placed back into operation.  It had less vessel features than the INNOVATOR, and yet was still determined to be a vessel.  2012 WL 1029934, at *7.

transportation.  Based primarily on the recent towage of the rig as a "wet tow," the court found the rig to be "practically capable of maritime transportation" and thus a vessel.  *Id.* at *7.

Similarly, in this case, the INNOVATOR was recently towed as a "wet tow" to Gulf Marine's dock.  (Ladd Declaration, ¶ 9, Exh. 2).  Like the rig in *Louisiana International Marine, L.L.C.*, the INNOVATOR also had line-handling crew and a pilot on board for portions of the tow to Gulf Marine's facility.  (*Id.*).  In addition, the INNOVATOR was recently moved and shifted, using line-handling crew on board the semi-submersible and a pilot as well.  (*Id.*, ¶ 13).  Like the rig in *Louisiana International Marine, L.L.C.*, the INNOVATOR was and is practically capable of maritime transportation.

Moreover, the INNOVATOR is indisputably a semi-submersible with all of the hallmarks of a vessel under established Fifth Circuit jurisprudence.  She has a steel hull with twenty-five (25) ballast tanks to insure its ability to float.  (*Id.*, ¶ 4).  She has the typical semi-submersible configuration with a watertight bulkhead and additional tanks for fuel, cement, water, and mud to support her function as a mobile drilling vessel.  (*Id.*).  Moreover, the INNOVATOR has the following objective vessel characteristics: Pontoon hull; Ballast tanks; Tow bridles; Towing lugs; Fender frames; Navigational lights; Automated Identification System (AIS); Sleeping quarters and accommodations for 98 people on board; Galley; Main Control Room; Lifeboats; Anchors; Hull Positions System; Ballast System; GPS Positioning System; Draft marks; Anodes; Diesel and gas turbine generators; Mooring system; and Winches.  (*Id.*, ¶ 6).  Amerindo documented the INNOVATOR with the National Vessel Documentation Center (*See* Exh. 3), and the INNOVATOR is currently classed with the American Bureau of Shipping.  (Ladd Declaration, ¶ 9, Exh. 2).  The United States Coast Guard inspected the INNOVATOR and issued a Certificate of Inspection for the INNOVATOR.

If the INNOVATOR were found not to be a vessel, it is questionable whether any semi-submersible rig could qualify as a vessel under *Lozman*, which would abrogate decades of Fifth Circuit jurisprudence.   All semi-submersible rigs require the assistance of tugs to move long distances and all semi-submersible rigs are attached to the seabed when on location.   In addition, semi-submersible rigs do not have a primary function of transporting people or cargo.   Yet, even with these characteristics, semi-submersible rigs like the INNOVATOR have always been classified as vessels unless they are (1) permanently attached to the seabed and (2) require an exorbitant cost to move to another location.

In its Motion to Dismiss, Amerindo cites to a list of nine (8) items as support for its position on vessel-status.  (R. Doc. 62, pp. 2-3).   Four of the eight items relate to the lack of self-propulsion (i.e. lack of engines, thrusters, automated positioning of thrusters, or steering mechanism) and a fifth relates to the absence of a "raked bow."[28]   (*Id.*).   In *Lozman*, the Supreme Court made clear that while lack of self-propulsion "may be a relevant factor" to consider in determining vessel status, it "is not dispositive."   133 S. Ct. at 741 (citing *The Robert W. Parsons*, 191 U.S. 17, 31 (1903)).   In *Louisiana International Marine, L.L.C.*, the district court found a semi-submersible rig to be a vessel despite the lack of self-propulsion, thrusters or steering mechanism.   2012 WL 1029934, at *4, *7.   Moreover, Amerindo's reliance on lack of self-propulsion ignores the plethora of objective vessel-characteristics cited above.   Like the dredge in *Stewart*, the INNOVATOR's primary purpose is not navigation or commerce; yet, like the dredge in *Stewart*, she has a hull, ballast tanks, navigational lights, crew quarters, and a galley.  (Ladd Declaration, ¶¶ 4-6, Exh. 2).   Similar to the dredge in *Stewart*, the INNOVATOR is a vessel.

---

[28] The final three (3) items relate to the INNOVATOR's design and intended use, and they are discussed below.

Further, the Fifth Circuit has cautioned against rigid reliance on certain factors, including certain items cited by Amerindo, to determine vessel status. *Manuel*, 135 F.3d at 351-52 (citation omitted). In *Manuel*, the Fifth Circuit found a floating workover rig to be a vessel, stating that characteristics like a "raked bow" are not to be applied mathematically and are only useful guides. *Id.* at 351-52 (citation omitted).[29] Similarly, like the rig in *Manuel* and the rig in *Louisiana International Marine, L.L.C.*, the INNOVATOR is a vessel under the General Maritime Law despite the absence of self-propulsion or a "rake bow." As set forth herein, the INNOVATOR is designed to be towed from site to site with equipment and crew. (Ladd Declaration, ¶¶ 3-5, Exh. 2). As a semi-submersible, the INNOVATOR is not supported by resting on the seabed. (*Id.*, ¶ 3). Semi-submersible vessels like the INNOVATOR are able to transform from a deep to a shallow draft by de-ballasting (removing ballast water from the hull), thereby becoming surface vessels. (*Id.*). When the INNOVATOR was towed to Gulf Marine's facility, she was moved from location to location in this configuration. (*Id.*, ¶¶ 5-6, 9). When she will be towed to another site, she will also be moved in this configuration. The INNOVATOR is clearly capable of transporting crew and equipment over water sufficient to qualify as a vessel for purposes of the CIMLA and General Maritime Law. Accordingly, Amerindo's Motion to Dismiss should be denied.

---

[29] *See also Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621, 623 (5th Cir. 1955) ("The 'Carol Ann' was an artificial contrivance capable of being used as a means of water transportation. It was afloat. Before repairs, it was towed across the Gulf of Mexico; after repairs, it was towed from Port Arthur to Port Isabel, Texas. It had a deck; it had cabins, it had superstructure. It had no motive power of its own; no steering mechanism; but it definitely was capable of being used as a means of transportation under tow. Under the doctrine laid down in The Scorpio, supra, and many other cases, it is plain to us that the 'Carol Ann' was a 'vessel' subject to a maritime lien, enforceable by suit in rem.").

**4.    Amerindo Continues to Cite and Rely upon Cases Involving *Permanently Moored* Structures That Were Practically Incapable of Maritime Transportation and Thus Inapposite to the Temporarily Berthed INNOVATOR**

In its Motion to Dismiss, similar to its prior Motion to Vacate, Amerindo cites to several cases in which courts have held that floating production platforms that were permanently attached to the seabed were not vessels. The owners of the platforms in the cases cited by Amerindo had no intention to move them and the cost to do so was exorbitantly expensive, ranging from $42 million to $500 million. Several of the cases cited by Amerindo even involved the same production facility, the THUNDER HORSE, which was permanently attached to the seabed for the anticipated life of the facility and would cost $400-$500 million to move. The THUNDER HORSE stands in stark contrast to the INNOVATOR, which was recently towed to Gulf Marine's dock as a wet tow with crew and pilot on board and was recently moved with the assistance of the INNOVATOR's crew and a pilot on board.

Despite the fact that the INNOVATOR was never permanently attached to the seabed at any time that Gulf Marine provided necessaries to the vessel,[30] Amerindo argues that the INNOVATOR's design and future at a job-site "for a number of years" make her similar to the structures that are permanently attached to the seabed. In *Louisiana International Marine, L.L.C.*, *supra*, the district court addressed the same line of cases relied upon by Amerindo in its motion to vacate. The district court expressly rejected the applicability of various cases which have held that certain floating structures were not vessels. The court stated: "In each of these

---

[30] At Amerindo's request, Gulf Marine temporarily ballasted down the INNOVATOR at the water's bottom at Gulf Marine's dock during this year's hurricane season to provide further safety and security with respect to a potential breakaway of the INNOVATOR. (Ladd Declaration, ¶ 14, Exh. 2). Previously, when afloat, the hull ballast system was adjusted on a weekly basis to maintain level and/or draft. (*Id.*). The need to submerge the INNOVATOR during hurricane season further demonstrates the practical capability of the INNOVATOR to perform maritime transportation, both with respect to the INNOVATOR's capability to ballast down as necessary and with respect to the INNOVATOR's threatened movement over navigable water during heavy weather.

cases, however, it was determined that the fact that the structures at issue were permanently moored to the ocean floor rendered them *practically incapable* of maritime transportation by the time of the incidents giving rise to the respective causes of action."  *Id.* at *7 (emphasis in original).  As a result, the court found the cases to be "readily distinguishable."

Likewise, the cases relied upon by Amerindo are "readily distinguishable" from the INNOVATOR, which is not attached to the seabed and instead is berthed at Gulf Marine's dock where she was towed as a wet tow and has remained berthed since Amerindo entered into the 2015 Layberth Agreement.   Amerindo's allegations regarding the intended use of the INNOVATOR at an unknown location in the future for a "number of years" is simply theoretical and is refuted by the recent towage of the INNOVATOR to Gulf Marine's dock, the continued dockage at Gulf Marine's facility, and the intent of Amerindo to tow the INNOVATOR a substantial distance over navigable waters to work abroad.

The Fifth Circuit has recognized that a vessel owner's intent may play a significant role in determining whether a structure was "permanently moored" and therefore not practically capable of use as a means of transportation on water.  *See De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185, 187 (5th Cir. 2006).   Under the law, Amerindo's intent to move the INNOVATOR in the near future directly refutes Amerindo's reliance on cases involving permanently moored structures because Amerindo's intent is evidence that the INNOVATOR is *not* permanently moored, thus distinguishing the cases relied upon by Amerindo.

Finally, as shown from the brief descriptions of the cases cited by Amerindo, they are inapposite to and easily distinguishable from the INNOVATOR:[31]

---

[31] In addition to citing to cases involving floating production platforms permanently attached to the seabed, Amerindo also erroneously relies on two cases involving permanently moored barges serving as floating hotels.  *See Martin v. Fab-Con, Inc.*, 9 F. Supp. 3d 642, 644-45 (E.D. La. 2014) (involving personal injury on quartersbarge used as floating hotel and spudded in place at a job site); *Higginbotham v. Drake Towing, L.L.C.*, 2016 A.M.C. 227,

- *Mendez v. Anadarko Petroleum Corp.*, 466 Fed. Appx. 316 (5th Cir. 2012)

  - Personal injury in 2008 on floating gas-production spar permanently moored to the seabed since 2004, would cost $42 million and take 50 days to move it, and no intent to move the spar in the future.  *Id.* at 317

- *Mooney v. W&T Offshore, Inc.*, 2013 A.M.C. 1480 (E.D. La. 2013)

  - Personal injury on tension leg platform that was permanently attached to the seabed by steel tubes and that had not been moved since it was installed and anchored to the sea floor.  *Id.* at 1487-89.

- *Warrior Energy Services Corp. v. ATP Titan*, 2014 A.M.C. 2514 (5th Cir. 2014)

  - Involving Floating production facility moored to the outer continental shelf by twelve chain mooring lines connected to twelve anchor piles that had not been moved since installed in the seabed and that would require 12 months to move at a cost of $70 to $80 million.  *Id.* at 2517-18.

- *Washington v. BP Am., Inc.*, No. 10-1486, 2012 WL 5831800 (W.D. La. 2012)

  - Personal injury on floating production drilling quarters that was permanently moored by 16 cables to the seabed, that would cost $400 million to relocate the drilling quarters, and that was intended to remain in place during the duration of its useful life.  *Id.* at *2-*5.

- *Moore v. Bis Salamis, Inc.*, 748 F. Supp. 2d 598 (S.D. Tex. 2010)

  - Personal injury on floating production facility that was permanently moored to the seabed through 16 chain mooring lines and that would cost $400 to $500 million to move, and stating that "because of its extensive attachment to the ocean floor and long-term commitment to a single location, ... the THUNDER HORSE is a work platform that is permanently attached to the seabed and not a Jones Act vessel."  *Id.* at 608.

- *Rushing v. Pride Intern., Inc.*, No. 11-0294, 2011 WL 3021043 (S.D. Tex. 2011);

  - Personal injury on same floating production facility that was the subject of *Moore*, *supra*, that was permanently moored to the seabed through 16 chain mooring lines and that would cost $400 to $500 million to move.  *Id.* at *5-*7.

- *Scroggs v. Bis Salamis, Inc.*, No. 09-1007, 2010 WL 3910563 (E.D. Tex. 2010);

---

233 (E.D. La. 2015) (involving personal injury on spud barge spudded in place and serving as dormitory for job site).  Unlike the permanently attached barges in *Martin* and *Higginbotham*, the INNOVATOR is temporarily berthed at Gulf Marine's dock and will be moved to foreign waters.  Neither case involves structures that are factually similar to the INNOVATOR.

- o Personal injury on same floating production facility that was the subject of *Moore*, *supra*, that was permanently moored to the seabed through 16 chain mooring lines and that would cost $400 to $500 million to move. *Id.* at *4-*8.

- *Abram v. Nabors Offshore Corp.*, No. 09-4091, 2010 WL 3433056 (S.D. Tex. 2010);

  - o Personal injury on rig mounted on platform that was permanently attached to the seabed with no intention of being moved to another site. *Id.* at *3-*4.

## IV.   CONCLUSION

For the foregoing reasons, the INNOVATOR qualifies as a vessel for purposes of the Commercial Instruments and Maritime Liens Act; and Amerindo's Motion to Dsimiss should be dismissed.

Respectfully submitted,

/s/ William C. Baldwin

Lara D. Pringle (Texas Bar No. 24056164)
Jones Walker LLP
First City Tower
1001 Fannin Street, Suite 2450
Houston, Texas 77002
Telephone: (713) 437-1800
Facsimile: (713) 437-1810
Email: Lpringle@joneswalker.com

*Of Counsel:*
WILLIAM C. BALDWIN (#31613)
HANSFORD P. WOGAN (#34825)
Jones Walker LLP
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:    (504) 582-8315
Facsimile:     (504) 589-8315
Email: wbaldwin@joneswalker.com
         fwogan@joneswalker.com
**Attorneys for Gulf Marine Fabricators, LP**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of July, 2017, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.  I also certify that I have mailed this filing by United States Postal Service to any non-CM/ECF participants.

*/s/ William C. Baldwin*