IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

GULF MARINE FABRICATORS , LP        §
     Plaintiff,                                    §
                                 §
VS.                                                       §          C. A. No. 2:16-cv-00430
                                 §          Rule 9(h) - Admiralty
THE ATP INNOVATOR, bearing IMO No.      §
742, her tackle, furniture, apparel,                §
appurtenances, etc., *in rem*, and AMERINDO  §
SERVICES LTD.  and BLUE SKY LANGSA     §
LTD., *in personam*,                               §
     Defendants.                                 §

**CLAIMANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
CLAIMANT'S MOTION TO DISMISS ARREST**

TO THE COURT:

     COMES NOW Amerindo Services Ltd., solely in its capacity as claimant to the ATP

INNOVATOR ("Amerindo" or "Claimant"), filing its Reply to Plaintiff's Opposition to Claimant's

Motion to Dismiss Arrest, and respectfully would show:

**I.**

     Plaintiff seeks to convert Amerindo's Motion to Dismiss into a summary judgment, despite

the statement by the United States Supreme Court in *Lozman v. City of Riviera Beach*, 568 U.S. 115

(2013) that "jurisdictional tests, often applied at the outset, should be as 'simple as possible.'" *Id.*

at 128, quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010).  To the extent the Court is inclined

to treat Amerindo's motion as one for summary judgment, Plaintiff has the burden of proof on the

issue of vessel status, as the party asserting a maritime lien.  Plaintiff admits this in its Opposition

by stating the following; to establish a maritime lien for necessaries, the lien claimant must show that

it furnished necessaries to a vessel on the order of the owner or person authorized by the owner.[1] Plaintiff is the lien claimant.

In such circumstances, where the nonmoving party bears the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *Celeotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party who must submit or refer to evidence that set out specific facts showing that a genuine issue of material fact exists. *Id*. at 324.

## II.

As the Court appreciates, the issue of vessel status already has been before this Court. The Court allowed the Plaintiff to conduct jurisdictional discovery, which has been completed in the form of the deposition of Joseph Key, and requests for production to which Amerindo and Blue Sky Langsa Ltd. have responded. Despite the fact that jurisdictional discovery has been completed, the only new evidence Plaintiff attaches to its Opposition, not attached to its prior Opposition, is (1) the deposition of Joseph Key, and (2) a third party stability report from Exmar Offshore dated March of 2007.[2]

---

[1]     *See* Dkt. No. 64 at p. 11.

[2]     Plaintiff cites to this third party stability report because the report utilizes the term "vessel" in parts of the report to describe the ATP INNOVATOR. The purpose of the report was to determine the structure's stability for the addition of a third production module. *See* Dkt. No. 64-5 at p. 7. A stability assessment was required because the addition of the third module would change the structure's wind profile area and lightship weight. *Id*. It is important to note that the report also refers to the structure as a floating offshore installation, or FOI. *Id*. at p. 43. Nevertheless, these statements by a third party contractor cannot establish whether the ATP INNOVATOR is a vessel. *Martin v. Fab-Con, Inc.*, 9 F.Supp.3d 642, 650 (E.D. La. 2014) ("Vessel status is determined by the history of the contrivance, its use, purpose, and perhaps

With this limited new evidence, Plaintiff discusses several "facts" that it deems important to the Court's analysis of the vessel status issue.  On a vessel status question, in cases where the structure is not permanently moored, which is the case here, *Lozman* instructs[3] the lower courts that a structure is not practically capable of maritime transportation "unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water."  *See Riley v. Alexander/Ryan Marine Servs. Co.*, 983 F.Supp.2d 884, 889 n. 3 (S.D. Tex. 2013), citing *Lozman*.  As to the latter, or carrying things over water, the United States Supreme Court gives guidance through its statement in *Lozman* that there is a line between items being transported from place to place (e.g. cargo) and items that are mere appurtenances to the structure that is relevant to the analysis.[4]  *Lozman*, 568 U.S. at 122; *see also Martin v. Fab-Con, Inc.*, 9 F.Supp.3d 642, 949 E.D. La. 2014).  From the foregoing, lower courts can understand that transporting the structure's equipment as opposed to cargo makes

---

potential, not what the parties call it.")  In terms of assessing Exmar's statements, Exmar is not even a party.

[3]     Plaintiff states several times that *Lozman* only applies to borderline cases, so it should not be applied here.  *Lozman* says that the case should offer guidance in a significant number of borderline cases where capacity is at issue, which it is here.  Since capacity is the issue here, *Lozman* applies. On this very point, Judge Rosenthal has stated that not all district courts agree that *Lozman* only applies to borderline cases. *Badon v. Nabors Offshore Corp.*, 2015 U.S. Dist. LEXIS 26382 at **11-12 (S.D. Tex. 2015)(copy attached as Ex. 1).

[4]     This is important here because Joseph Key was asked several times about the ATP INNOVATOR transporting equipment during the wet tow from the Mississippi Canyon Block to Ingleside.  This equipment is aptly described as vessel appurtenances.  There was no other choice but to carry what was on board the structure to Ingleside.  The only alternative would have been to jettison all of the equipment to its ultimate burial ground in Davy Jones' locker, which is not a feasible alternative for obvious reasons. Plaintiff has not provided this Court with any evidence that the ATP INNOVATOR has ever carried any cargo from one location to another.

a difference to the analysis.[5]  As is clear from the holding in *Lozman*, the critical issues to be

analyzed are (1) the physical characteristics of the structure,[6] and (2) its activities.[7]

      Despite conducting the allowed jurisdictional discovery, Plaintiff has failed to uncover any

---

[5]     For example, in *Martin*, the fact that plaintiff failed to present any evidence that the barge (UNITY) ever transported cargo, as opposed to its own furnishings, or that it was designed to do so, was an important factor in distinguishing the UNITY from the SUPER SCOOP in *Stewart v. Dura Constr. Co.*, 543 U.S. 481 (2005).  *Martin*, 9 F.Supp.3d at 649.

[6]     The physical characteristics of the ATP INNOVATOR are as follows: (1) it has no engines for propulsion, so it must be towed (wet or dry) if it is to move from one location to another, (2) it has no thrusters to move it around, (3) it does not have a DGPS automated positioning system to maintain its position automatically through thrusters, (4) it has no rudder or steering mechanism, (5) its primary purpose is not to transport people or cargo over water, (6) it does not have a raked bow, (7) it is designed and intended to be on location at a producing oil and gas field for a number of years, or as long as the field is operational, (8) once it is in place at an producing offshore oil and gas field, the job of the ATP INNOVATOR is to connect by pipe to various well heads to collect, process and separate oil and gas, and then transport the oil and gas by designated pipeline to the user located on shore, (9) it is held in place at the field by means of mooring lines anchored to suction piles embedded into the seabed, (10)while it has eight mooring winches, two in each corner, the structure does not carry any anchors; (11) it has obstruction lights, but no navigation lights, so navigation lights have to be supplied to the INNOVATOR for a wet tow, (12) it has no navigational computers, and (12) it has no bridge. *See* Dkt. No. 62 at Section II. Contrary to what Plaintiff alleges, the ATP INNOVATOR does not have an automated information system, or AIS.  *See* Dkt. No. 62-1 at p. 82, ll. 18-21; p. 95, ll. 4-15.

[7]     The Court has fully described the activities of the ATP INNOVATOR in Dkt. No. 29.  In terms of the structure being moved three times post-conversion, it has only moved once voluntarily, when it was wet towed to the Mississippi Canyon Block to serve as an offshore production facility.  The second move (through wet towage) from the Mississippi Canyon Block to Ingleside was at the mandate of the United States.  The third move within Gulf Marine's facility was mandated by Gulf Marine.  The structure obviously will have to move from Ingleside to a work location.  This is why it is described as a Mobile Offshore Production Unit, or MOPU, on Amerindo's website.  This fourth, and most probably last move will be a voluntary move if it occurs, and most likely will be in the form of a dry tow, and not a wet tow, as Plaintiff alleges twice in its Opposition.  Once it is moved onto location as a production facility, it most probably will stay there through the end of the structure's useful life.  *See* Dkt. No. 62-1 at p. 87, l. 14 - p. 89, l. 12; p. 93, ll. 14 - 22; p. 95, l. 22 - p. 96, l. 10.  Mr. Key's discussion of the website, and it describing the structure as a MOPU, is found at Dkt. No. 62-1 at p. 54, l. 23 - p. 55, l. 16.

new competent evidence supporting its argument that the ATP INNOVATOR is a vessel.  Its

inaccurate and/or incomplete allegations of a future wet towing,[8] of U.S. Flag,[9] that the structure

floats,[10] that it can move like the Super Scoop through adjusting ballast,[11] that it has anchors,[12] that

it has a hull positioning system,[13] that there are people on the structure during a wet tow,[14] and

---

[8]     The testimony from Joseph key is to the contrary.  He testified that if the structure is moved in the future, dry tow probably will be used.  Dkt. No. 62-1 at p. 95, l. 22 - p. 96, l. 10.  One reason a wet tow was used to move the unit from the Mississippi Canyon Block to Ingleside was because the weather would not allow a dry tow.  *Id*. at p. 95, l. 16 - p. 96, l. 14.  Mr. Key described the process for relocating at p. 91, l. 24 - p. 93, l. 25.

[9]     The evidence cited by Plaintiff at page 4 of its opposition, which is Dkt. No. 64-4, does not say anything about flag.

[10]    The structure certainly does float.  However, this, in and of itself, does not make it a vessel. *Lozman*, 568 U.S. at 126 (rejecting the anything that floats approach to vessel status).  It can be said that every structure that has been held not to be a vessel floats on water.  The ATP INNOVATOR must float to work in the depth of water where is has worked and where it is expected to work in the future.  Because it floats, it has to have a crew to keep it stabilized. *See* Dkt. No. 62-1 at p. 97, l. 17 - p. 99, l. 3.

[11]    This argument, that adjusting the ATP INNOVATOR up and down in draft through the ballast system is just like the moving of the SUPER SCOOP in *Stewart*, is a stretch of Herculean proportion. *See Riley*, 983 F.Supp.2d at 889 for a discussion of movement versus transportation.  As is stated in *Lozman*, one primary key to the SUPER SCOOP being a vessel was the fact that the SUPER SCOOP **regularly**, or more specifically, every couple of hours, moved by means of anchors and cables while carrying equipment, machinery and a crew over water. 658 U.S. at 123-24.  It order to complete its dredging work, it had to move, and did move.  This is a far cry from adjusting operational draft on the ATP INNOVATOR, which does not move the structure to a different location, but simply keeps it level at the operational draft. *See* Dkt. No. 62-1 at p. 18, ll. 2-18.

[12]    Mr. Key testified that the ATP INNOVATOR does not have anchors. *See* Dkt. No. 62-1 at p. 85, ll. 3-12.  When on location, the winch lies connect to suction piles that are secured to the seabed. *Id*. at p. 92, ll. 4-16.

[13]    The ATP INNOVATOR does not have a hull positioning system. *See* Dkt. No. 62-1 at p. 85, ll. 16-18; Dkt. No. 62-1 at p. 33 of 36, paragraph 5..

[14]    As Mr. Key testified, the U.S. Coast Guard requires a crew to be on board the structure during a wet tow for firefighting and environment purposes.  The Coast Guard laso

-5-

equipment is moved during the wet tow[15] are not sufficient to create a material fact question that the ATP INNOVATOR is a vessel.[16]   Further, its protestation that if the Court holds the ATP INNOVATOR is not a vessel, it then will be questionable that any semi-submersible drilling rig could qualify as a vessel has no merit.   This protest ignores the fact that the vessel status determination requires a case by case analysis, rather than a decision based upon categories of structures.  It also ignores the significant, yet real difference between the purpose, from a practical standpoint, of the ATP INNOVATOR, which is an offshore production facility, and a drilling rig, which by its very nature is designed and built to move from location to location to drill wells. Contrariwise, the ATP INNOVATOR's purpose is to serve as a production facility for the life of an offshore field, or life of the structure.  It is not to move from one field to another on a regular basis.

---

required the Pilots and the tow masters. *See* Dkt. No. 62-1 at p. 88, l. 10 - p. 89, l. 2; p. 97, ll. 5-16.

[15]      As can be expected, all of the equipment, better described as appurtenances, moved with the structure in the wet tow mandated by the United States.  However, Plaintiff has not come forward with any evidence that the ATP INNOVATOR has ever transported cargo in the way that is required to establish vessel status, or that it is designed to do so.

[16]      Plaintiff's incorrect factual assertions are in line with its futile attempt to cite now to a post-*Lozman* case, which is *BW Offshore USA, LLC v. TVT Offshore A/S*, 145 F.Supp.2d 658 (E.D. La. 2015).  This case involved the BW PIONEER, which is what is known as a floating, production, storage and offloading unit (FSPO).  As a matter of physical characteristics, the BW PIONEER is ship shaped, built on the base of a converted oil tanker, maintained a full crew, flew the flag of Bermuda, has its own propulsion system, and could and can detach itself from a well and relocate to another well in as little as six hours. *Id*. at 663.  The Court found that not only was the BW PIONEER practically capable of maritime transport, it was imminently capable of it. *Id*.  The BW PIONEER was a vessel despite the fact that it had been out of navigation since 2009, but was not permanently out of navigation, as it could be more easily returned to navigation than a jack-up drilling rig.  *Id*. at 664.  Simply put, the BW PIONEER is nothing like the ATP INNOVATOR.  For the Court's reference, true and correct pictures of the BW PIONEER are attached as Ex. 2, which can be compared to a true and correct picture of the ATP INNOVATOR, which is attached as Ex. 3.

Given the foregoing, Plaintiff has not pointed this Court to any competent evidence that supports its position that the ATP INNOVATOR is a vessel, or that creates an issue of material fact on the issue of vessel status. Because of this, Amerindo's motion should be granted.

### III.

The remainder of Plaintiff's Opposition appears to track its previous Opposition. Amerindo responds to those arguments as follows.

Plaintiff's Opposition to Claimant's Motion to Vacate Arrest contains one factual admission and one legal admission critical to the question of the status of the ATP INNOVATOR as a vessel. In terms of factual admission, Plaintiff admits that while the ATP INNOVATOR was at one time a semi-submersible drilling rig, it was converted from a drilling rig to an offshore production facility, which changed the purpose and use of the structure.[17] [Dkt. No. 64 at p. 4]. The job of a drilling rig, whether semi-submersible or jack-up, is to move onto an offshore field location, drill an oil and/or gas well, and then, when that project is complete, move to another location and do it all over again. The rig is a means of transporting the drilling rig, drill pipe, drilling mud, personnel and other equipment critical to offshore drilling from one location to another. The job of the offshore production facility like the ATP INNOVATOR is quite different. While the structure may have to

---

[17]     *Lozman* specifically discusses the issue of a transformed structure, indicting that the newly designed structure is what is relevant. *Lozman v. City of Riviera Beach*, 133 S.Ct. 735 (2013), citing *Kathriner v. Unisea, Inc.*, 975 F.2d 657, 660 (9th Cir. 1992)(floating processing plant was no longer a vessel where large opening had been cut into her hull). *See* Ex. A attached at p. 6.

be towed into position at the offshore oil and gas field,[18] once it is on location, the production facility is to remain there for the serviceable life of the field, which in all likelihood will be the remaining serviceable life of the INNOVATOR.  It will not move once it is on location.  Because of its intended purpose, the ATP INNOVATOR's function is far different than a semi-submersible or jack-up drilling rig that moves from location to location to drill wells.  This critical difference means the cases Plaintiff cites holding semi-submersible drilling and jack up rigs to be vessels have no application to this context.  Simply put, it is comparing apples to oranges.

In terms of a legal admission, Plaintiff correctly cites *De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185, 187 (5ᵗʰ Cir. 2006) for the proposition that the Fifth Circuit has held that the intent of the owner plays a significant role in determining whether a structure is a vessel.  [Dkt. No. 64 at p. 23].  Here, Amerindo's intent is clear.  It intends to use the structure as an offshore production facility for the life of the field or life of the structure.  While Plaintiff argues that the Amerindo's intent should prevent it from relying on cases where structures are permanently moored to the seabed, nothing could be more incorrect.  The projected activity for the structure is most relevant to the analysis, because it refutes the notion that the structure will move from place to place to place.

---

[18]    After the original conversion, the ATP INNOVATOR operated as a production facility on the Mississippi Canyon area of the Gulf of Mexico, off the Louisiana coast, connected to seabed and to oil and gas wells and pipelines.  It was taken out of service by ATP Infrastructure Partners LP (the owner) and/or ATP Oil & Gas Corp. (the operator) in 2014 and towed to Corpus Christi due to the ATP Oil & Gas Corp.'s financial difficulties following the drilling moratorium imposed after the DEEPWATER HORIZON oil spill.  The ATP INNOVATOR has been stacked or sitting idle in Ingleside ever since, but the purpose of the structure is the same as it was when it was operating as a deepwater production facility off the coast of Louisiana.  As is critical here, the ATP INNOVATOR is no longer a semi-submersible drilling rig, so cases involving semi-submersibles or jack-up drilling rigs have no application to the question of whether the ATP INNOVATOR, in its current state as an offshore production facility, is a vessel for maritime lien purposes.

-8-

Plaintiff's first substantive argument is that the ATP INNOVATOR is a vessel because it is like the SUPER SCOOP in *Stewart*. Why?  Because it adjusts ballast to maintain operational draft and stability.  This argument is addressed above.  The movement of the SUPER SCOOP to facilitate dredging operations bears no similarity to maintaining operational draft on the ATP INNOVATOR, which does not move the structure off its location.[19]

Plaintiff then discusses the intent of Amerindo to move the ATP INNOVATOR to its permanent location, stating that this has no bearing on the analysis.  It does, as it relates directly to the purpose of the structure, and thus its activities.  Plaintiff also tries to make hay by manufacturing a tale that Amerindo will wet tow the ATP INNOVATOR to its location, so it will carry people and equipment during the process.  These arguments misconstrue the contrary testimony of Joseph Key, which has been cited to previously, and ignores the purpose of the restructured ATP INNOVATOR. While Amerindo intends to move the structure to an offshore oil and gas field, this is a necessary means to an end.  The ATP INNOVATOR cannot perform its function where it is currently located. It must be towed to an offshore oil and gas field where it then can perform its function on a permanent basis.  The necessity to dry tow the ATP INNOVATOR to its final location does not change the purpose of the structure, which is a permanently moored offshore oil and gas production facility.  During a dry tow, no crew will be on the ATP INNOVATOR.

As court's have held, the mere fact that a structure can be towed to a position where it will be permanently located is not dispositive of the issue of vessel status.  All of the facts and

---

[19]        A similar argument was made unsuccessfully in *Riley*, where it was argued that the MAD DOG Spar in *Riley* could actually more laterally from well to well.  The court noted that there is a difference between movement and transportation, and while the MAD DOG was capable of movement, that is not transportation.  Here, adjusting the ATP INNOVATOR to maintain operational draft is not transportation.  983 F.Supp.2d at 889.

circumstances surrounding the structure's purpose must be assessed.  In fact, the United States Supreme Court addressed the issue of the structure being towed in *Lozman*, holding that the mere fact that a structure gets towed is insufficient to sustain a conclusion of vessel status.  *Lozman*, 568 U.S. at 123, citing *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 20-21(1926)(wharfboat not a vessel even though each winter it was towed to a harbor to protect it from ice).  Towing in and of itself is not dispositive of vessel status.

Plaintiff then cites the same cases it did before arguing that the ATP INNOVATOR is just like all of the jack-up and semi-submersible rigs that have been held by the Fifth Circuit to be vessels.  These cases miss the mark, as they did before,[20] for the reasons discussed regarding the differences between the purpose of ATP INNOVATOR and that of drilling rigs.  Lastly, at the end of its opposition, Plaintiff tries to distinguish the cases cited by Amerindo in support of its motion to dismiss.  Noticeably absent from this discussion is any post-*Lozman* case, and any significant argument as to how and why the ATP INNOVATOR production facility is different in purpose from the ATP TITAN production facility, given that both structures were designed, constructed and put into service by the same company to perform the same job of collecting, processing and distributing oil and gas into various pipelines for transport to shore.  The ATP INNOVATOR originally performed this service, but was towed to shore when its operator went bankrupt.

The structure was in Corpus Christi when it was acquired by Amerindo.  The uncontroverted evidence before this Court is that Amerindo intends to have the structure permanently installed at an offshore oil and gas field where the structure will remain permanently until the end of its serviceable life.  To put it another way, Amerindo intends to put the structure to work doing the job

---

[20]   *See* Dkt. No. 29 at pp. 10-11.

it was restructured to do, or in other words, to serve its purpose. Given what Amerindo intends to do with the structure, the purpose of the ATP INNOVATOR is no different than the purpose for which the ATP TITAN was constructed. There can be no doubt that the present purpose of the ATP INNOVATOR is separate and distinct from its prior purpose as a semi-submersible drilling rig. The current form of the ATP INNOVATOR has the same intended purpose as the ATP TITAN, which is not a vessel. *See Warrior Energy Services Corp. v. ATP Titan*, 2014 A.M.C. 2514, 2516-18 (5th Cir. 2014). Likewise, the ATP INNOVATOR is not a vessel.

Given all of the foregoing, Plaintiff has failed to provide this Court with any competent evidence that creates a question of material fact as to whether the ATP INNOVATOR is a vessel. It is not, so Amerindo's motion should be granted.

WHEREFORE, PREMISES CONSIDERED, Amerindo Services Ltd., solely in its capacity as Claimant, prays: (1) that the Court hold that the ATP INNOVATOR is not a vessel, (2) because the ATP INNOVATOR is not a vessel, that the Court vacate the arrest of the ATP INNOVATOR, and (3) for such other relief to which it may be justly entitled.

Respectfully submitted,

By: */s/ Richard L. Gorman*
Richard L. Gorman
State Bar No. 00784155
Federal Bar No. 15685
12335 Kingsride Ln. #354
Houston, Texas 77024-4116
Telephone: (832) 725-4026
Facsimile: (713) 239-1020
Email: rg@richardgormanlaw.com
Attorney for Claimant
Amerindo Services Ltd.

-11-

OF COUNSEL:

RICHARD GORMAN LAW

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on this 2nd day of August 2017, a copy of the foregoing was served on counsel fo record ***By Notice of Electronic Filing***.

                                */s/ Richard L. Gorman*_____
                                  Of Richard Gorman Law

01879/reply.08/02/17