United States District Court
Southern District of Texas
**ENTERED**
October 11, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| GULF MARINE FABRICATORS, LP, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:16-CV-430 |
| | § | |
| THE ATP INNOVATOR, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending is a motion to vacate the arrest of a vessel brought by Defendant Amerindo Services, Ltd., (Amerindo) in its capacity as claimant to the ATP INNOVATOR  (INNOVATOR or structure), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (D.E. 62).  Amerindo argues that the INNOVATOR is not a vessel for purposes of Plaintiff Gulf Marine Fabricators, LP, asserting a maritime lien. Gulf Marine filed a response to the motion to dismiss and Amerindo filed a reply to the response (D.E. 64, 65).  For the reasons discussed more fully below, it is recommended that the arrest of the vessel be vacated and Gulf Marine's *in rem* cause of action against the INNOVATOR be dismissed.

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1333 and Rule C of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Gulf Marine also asserts diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Venue is proper in this court because a substantial part of the acts or omissions giving rise to this

action occurred in Aransas Pass, Texas, which is located in the Corpus Christi Division of the Southern District of Texas.  28 U.S.C. § 1391.[1]

## <u>BACKGROUND</u>

Gulf Marine, which is organized as a limited partnership in Texas, operates a facility in Aransas Pass, Texas and provides various services to vessels moored there. Amerindo and Blue Sky Langsa Ltd. (Blue Sky) are foreign corporations incorporated in Delaware and do not have a principal place of business in Texas.  Amerindo is the registered owner of the INNOVATOR, a floating industrial structure.  Blue Sky operated the INNOVATOR.

On December 18, 2015, Amerindo and Blue Sky entered into a layberth agreement with Gulf Marine, wherein Gulf Marine agreed to provide various services for the INNOVATOR, including berthing and docking, mooring, horsepower, and utilities.  Gulf Marine also provided a monthly spacer barge, shore power, equipment including cranes and forklifts, a daily inspection, and maintenance.

Amerindo and Blue Sky agreed to pay Gulf Marine a monthly layberth fee of $55,000, as well as additional fees for the mooring and berthing of the vessel and services and equipment provided by Gulf Marine.  From November 15, 2015 through the present, Gulf Marine has invoiced Amerindo and Blue Sky for layberth fees as well as other services and equipment provided.  As of March 2017 the invoices totaled $1,200,323.69 and remain unpaid.  Amerindo and Blue Sky paid Gulf Marine a deposit of $165,000.

---

[1] Defendants object to both diversity jurisdiction and venue in their answer to Plaintiff's first amended complaint (D.E. 57 at p. 2).  However, they have not moved to dismiss for lack of diversity jurisdiction and have not moved for a change of venue.

When the deposit is subtracted from the total amount invoiced, Amerindo and Blue Sky had failed to pay Gulf Marine $1,135,323.69 as of March 2017.

Plaintiff filed a complaint and motion for issuance of a warrant of arrest on October 13, 2016 (D.E. 1, 2).  Following a hearing, the motion was granted and the INNOVATOR was arrested.  On November 18, 2016, Claimant filed a motion to vacate the arrest pursuant to Rule E(4)(f) of the Supplemental Rules for Admiralty or Maritime claims, arguing that the INNOVATOR is not a vessel for purposes of Plaintiff filing a maritime lien and Plaintiff responded (D.E. 21, 23).   The undersigned filed a Memorandum and Recommendation (M&R) on December 29, 2016 (D.E. 29), recommending that the motion to vacate be granted and that the orders issued on October 14, 2016 (D.E. 6-8 and 10) be vacated.

Plaintiff filed objections to the M&R to which the Claimant responded (D.E. 30, 35, 36-38).  The District Court held a hearing on April 5, 2017 and sustained Plaintiff's objection to the standard of proof, finding that the correct burden of proof at this stage of the litigation is "probable cause" and not "preponderance of the evidence."  The Court further ordered that Plaintiff had sixty days to conduct jurisdictional discovery (D.E. 55).

On July 5, 2017 Amerindo filed a motion to dismiss the arrest of the INNOVATOR pursuant to Fed. R. Civ. P. 12(b)(1)(D.E. 62).  A response and reply have been filed (D.E. 64, 65).  Amerindo argues that the issue is ultimately jurisdictional and that Plaintiff must prove jurisdiction by a preponderance of the evidence.  Amerindo further argues that the INNOVATOR is not a vessel under relevant statutes and case law.

Gulf Marine counters that the motion to dismiss should be treated as a motion for summary judgment and that the INNOVATOR is a vessel under General Maritime Law.

## LEGAL STANDARD

### A.  Motion to Dismiss or Motion for Summary Judgment?

Amerindo filed its motion pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, asserting the Court lacks subject matter jurisdiction because the INNOVATOR is not a vessel (D.E. 62).  In response, Gulf Marine argues that the pleading should be treated as a motion for summary judgment because lack of vessel status defeats Gulf Marine's maritime lien claims (D.E. 64).  In its reply to the response, Amerindo argues that a jurisdictional test applied at the outset of a case should be as simple as possible, but does not argue that the summary judgment standard should not apply (D.E. 65).  Amerindo further contends that if the Court treats its motion as a motion for summary judgment, Gulf Marine, as the party asserting the maritime lien, has the burden of proof on the issue of vessel status.

Challenges to a Court's jurisdiction generally are brought via a Rule 12(b)(1) motion to dismiss.  "'A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case.'"  *Hooks v. Landmark Industries, Inc.*, 797 F.3d 309, 312 (5th Cir. 2015)(quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998)).  However, where issues of fact are relevant to both subject matter jurisdiction and the claim on the merits, the Fifth Circuit directs that the trial court must assume jurisdiction

and proceed to the merits. *Montez v. Department of Navy*, 392 F.3d 147, 150 (5th Cir. 2004).

> In circumstances where "the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court … is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case" under either Rule 12(b)(6) or Rule 56.

*Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981)).  In other words, where the question of jurisdiction is intertwined with the merits of the case, the proper course of action is to reserve both the jurisdictional question and the merits until the parties have a chance to conduct discovery.  *Chatham Condominium Associations v. Century Village, Inc.*, 597 F.2d 1002, 1012 (5th Cir, 1979).

In this case, the District Court gave the parties an opportunity to conduct discovery on whether the INNOVATOR is a vessel and they have done so.  However, resolution of the issue of whether the INNOVATOR is a vessel will not necessarily result in a dismissal of this cause of action on the merits.   In addition to pleading maritime jurisdiction, Gulf Marine asserts in the alternative that this Court has diversity jurisdiction.  *See* First Amended and Restated Verified Complaint (D.E. 53 at pp. 1-2). Amerindo and Blue Sky deny the existence of diversity jurisdiction (D.E.  57 at p. 2). While a finding that the INNOVATOR is not a vessel would result in the vacating of the arrest order and dismissal of the *in rem* cause of action, it would not result in the dismissal of the underlying breach of contract case on the merits.   Accordingly, Amerindo's pending motion regarding the status of the vessel will be treated as a Rule

12(b)(1) motion to dismiss the *in rem* action, rather than as a motion for summary judgment.

### B.  Motion to Dismiss For Want of Jurisdiction

In ruling on a Rule 12(b)(1) motion to dismiss, a court may look at "'(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016)(quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).  The motion should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief.  *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).  A court may dismiss a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case.  *Id.*  The parties in this case agree that if the INNOVATOR is not a vessel, this Court lacks jurisdiction over the *in rem* action against it.

### ANALYSIS

### A.  History of the INNOVATOR

The INNOVATOR is a semi-submersible special purpose platform used as a floating offshore production facility (Aff. of Joseph Key, D.E. 62-1 at p. 31).  It was built in 1976 as a semi-submersible drilling rig called the ROWAN-MIDLAND (D.E. 64-1 at p. 2).  *See also Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1210 (5th Cir. 1986) (ROWAN-MIDLAND described as a semi-submersible drilling rig).  While it was operated as a drilling rig, the Fifth Circuit found the structure to be "indisputably a

vessel" for purposes of concluding that a contract at issue was a maritime contract. *Fontenot*, 791 F.2d 1214, n. 5.

The structure was sold and in 2007 ATP Oil & Gas Corp (ATP) converted it from a semi-submersible drilling rig to a floating offshore production facility (Key Aff., D.E. 62-1 at p. 31).  At that time, the ROWAN-MIDLAND's name was changed to the ATP INNOVATOR.  The conversion involved adding process equipment, pipeline pumps, riser bays, separators, and chemical injection pumps (Deposition of Joseph Key at p. 90; D.E. 62-1 at p. 25).  The additional equipment added additional weight which resulted in the need to remove most of the major drilling equipment (*Id.*). The structure continued to be semi-submersible with no changes to the superstructure, the hull, ballast tanks, or water tanks (Key Depo. at pp. 66-67; D.E. 62-1 at p. 19).  The structure's mud tanks were removed during the conversion (Key Depo. at p. 66; D.E. 62-1 at p. 19).

The INNOVATOR's status as a vessel was the subject of litigation in *Case v. Omega Natchiq, Inc.*, No. H-08-0835, 2008 WL 2714124 (S.D. Tex. 2008).[2]  A construction worker was injured while working on the conversion of the structure from a drilling rig to a production platform and filed a lawsuit under the Jones Act.  At that time, the INNOVATOR had been towed to Mississippi Canyon in the Gulf of Mexico and was moored to the ocean floor with embedded plate anchors.  *Id.*, 2008 WL 2714124 at *7. Although the structure was capable of movement, there were no plans to move the structure as long as it was economically productive to keep it in its location.  *Id.*  The

---

[2] At the time the litigation began, the structure was called the ROWAN-MIDLAND. ATP bought the structure and changed its name while *Case v. Omega Natchiq, Inc.*, was pending.  *Omega Natchiq*, 2008 WL 2714124 at *3.

district court ruled that the structure was not a vessel. "The mooring of the [INNOVATOR] combined with the owners' intended use makes it inappropriate to classify it as a vessel." *Id.* at *8 (citing *Johnson v. Odeco Oil and Gas Co.*, 864 F.2d 40, 43 (5th Cir. 1989)(oil production platform not a vessel in large part due to owners' intent to leave structure permanently affixed to ocean floor)).

The INNOVATOR was the subject of an enforcement action brought by the United States in *United States v. ATP Oil & Gas Corp.*, 955 F.Supp.2d 616 (E.D. La. 2013). The district court described the INNOVATOR as a "floating production platform facility," noting that it was permanently moored to the sea floor at a location and was not "operating as a vessel or other floating craft, and has been engaged in the production of oil and natural gas." *Id.* at 618. As a result of that action, oil production activity on the INNOVATOR was stopped and the vehicle was towed from the Gulf of Mexico to Gulf Marine's dock (D.E. 29 at pp. 2-3; Key Depo. at pp. 27-28; D.E. 62-1 at p. 9).

In 2015, the INNOVATOR was towed approximately 200 yards from one berth to another to allow Gulf Marine fabricators to move out equipment they had built. That is the only time the structure has been moved since arriving at the Gulf Marine dock. (Key Depo. at pp. 35-37, 40; D.E. 62-1 at pp. 11, 12).

It is Amerindo's intent to relocate the structure to an operating oil and gas field when oil prices make that relocation practical (Key Aff. at p. 3; D.E. 62-1 at p. 32). On Amerindo's website, it advertises the INNOVATOR as a mobile offshore production unit awaiting charter (Key Depo. at pp. 54-55; D.E. 62-1 at p. 16).

## B. Definition of "Vessel"

The Rules of Construction Act defines "vessel" as including "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. In *Lozman v. City of Riviera Beach*, 568 U.S. 115 (2013), the Supreme Court reviewed the definition of "vessel," focusing on the phrase "capable of being used . . . as a means of transportation on water." *Id.* at 121. The Court noted that not every floating structure is a "vessel." Things such as wooden washtubs or swimming platforms on pontoons are not "vessels," even though they are artificial contrivances capable of floating, moving under tow, and "incidentally carrying even a fair-sized item or two when they do so." *Id.* The Court emphasized that a vessel must be capable of being used as a means of transportation on water, i.e., conveying things or persons from one place to another. *Id.* (internal citations and emphasis omitted). "Consequently, in our view a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id.*

The Court determined that the structure at issue in *Lozman*, described as a floating home,[3] was not a vessel. The court noted that nothing about the structure indicated that it was designed to any practical degree to transport things or persons over water. The

---

[3] The structure measured sixty feet by twelve feet and "consisted of a house-like plywood structure with French doors on three sides. … It contained a sitting room, bedroom, closet, bathroom, and kitchen, along with a stairway leading to a second level with office space. … An empty bilge space underneath the main floor kept it afloat." *Lozman*, 568 U.S. at 118.

structure had no rudder or other steering mechanism.  The hull was unraked and it had a rectangular bottom ten inches below the water.  There was no mechanism to generate or store electricity, which could be obtained only through ongoing connections with the land.  Its rooms looked like ordinary nonmaritime living quarters.  *Id.* at 121-122.  The structure had no ability to propel itself, which the Court found to possibly be a relevant characteristic, although not dispositive.  *Id.* at 122.

The Court compared *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19 (1926), where a wharfboat was found not to be a vessel, with *Stewart v. Dutra Constr. Co.*, 543 U.S. 481 (2005), where a dredge was found to be a vessel.  Water transportation was not the primary purpose of either of the structures; neither was in motion at relevant times; and both were sometimes attached, although not permanently attached, to the ocean floor.  *Lozman*, 568 U.S. at 124.  The Court found that the basic difference between the structures was that the dredge was regularly, but not primarily used (and was designed in part to be used) to transport equipment and workers over water while the wharfboat was not designed to any practical degree to serve a transportation function and did not do so.  *Id.* at 125.

## C.  Application of the Definition to the INNOVATOR

Amerindo, which has the burden under Fed. R. Civ. P. 12(b)(1) of showing that the INNOVATOR is not a vessel, argues that the following factors support its argument: (1) The INNOVATOR has no engines or other means of self-propulsion and must be towed to a new location;  (2) It does not have thrusters, rudders, a steering mechanism, or a differential global positioning system (DGPS) and thus cannot regulate its position; (3)

It does not have a raked bow; (4) Its primary purpose is not to transport people or cargo over water, but rather to sit on location at a producing oil and gas field for a number of years or as long as the field is operational; (5) It is held in its location in the field by mooring lines anchored to suction piles embedded in the seabed; (6) It is connected by pipe to various well heads to collect, process, and separate oil and gas, which is then transported via pipeline to the user on the shore.  These factors will be examined in light of *Stewart*, *Lozman*, and other relevant precedent.

### (1) Means of Self-Propulsion

It is undisputed that the INNOVATOR has no engines or other means of self-propulsion.  Lack of self-propulsion is not dispositive, but may be a relevant characteristic.  *Lozman*, 568 U.S. at 122.  In *Stewart*, the Supreme Court determined that a very large dredge, known as the *Super Scoop*, was a vessel.  The Court looked at various factors, including the fact that the Super Scoop had only limited self-propulsion and was moved longer distances by tug boat.  However it could move shorter distances by manipulating its anchors and cables and typically moved thirty to fifty feet every couple of hours.  *Stewart*, 543 U.S. at 484-485.

Gulf Marine contends that the INNOVATOR is like the *Super Scoop* because it has ballast tanks that are used to regularly adjust its position to ensure its draft[4] and maintain its position.  Joseph Key, one of the crew members of the INNOVATOR who worked as a ballast control operator on the structure, explained that in order for the

---

[4] "Draft" is the distance between the bottom of the unit and the water line (Key Depo. at p. 23; D.E. 62-1 at p. 8).

INNOVATOR to operate at the recommended draft and maintain proper inclination, sea water would be flooded into the structure, or flooded from one area to another (Key Depo. at p. 18; D.E. 62-1 at p. 7).  The ballast control operator uses an automated panel on board the structure to manipulate the amount of water in the ballast tanks (Key Depo. at pp. 21-22; D.E. 62-1 at pp. 7-8).

Once the INNOVATOR had arrived at the Gulf Marine facility, its draft remained constant.  It was ballasted and deballasted approximately once a month to correct minor angles of inclination (Key Depo. at p. 39; D.E. 62-1 at p. 12).  In 2015, when the INNOVATOR was moved a short distance at Gulf Marine's dock, the tanks were deballasted so that the tug boats could push it and reballasted when it reached its new location (Key Depo. at pp. 38, 42; D.E. 62-1 at pp. 12, 13).  In 2016 a decision was made to set the INNOVATOR on the bottom of Gulf Marine's facility to prevent movement.  Placing the facility on the bottom had the added benefit of lessening the possibility that it would float away during a hurricane (Key Depo. at pp. 77, 78; D.E. 62-1 at pp. 21-22).

Gulf Marine's contention that the ballasting system on the INNOVATOR is used like the Super Scoop's anchor and cable system is not supported by the record.  The INNOVATOR has no ability to move itself even minimally from one location to another like the *Super Scoop*.  Rather, the ballast system is used to maintain draft and keep the facility level and does not operate as a means of self-propulsion.  As discussed above, lack of self-propulsion is not dispositive of whether the INNOVATOR is a vessel, but it weighs on the side of finding that it is not a vessel.  *See Baker v. Director, Office of Workers' Compensation Programs*, 834 F.3d 542, 547-548 (5th Cir. 2016)(lack of self-

propulsion one factor in finding tension-leg offshore oil platform not a vessel); *Warrior Energy Services Corp. v. ATP TITAN M/V*,  551 Fed. Appx. 749, 752 (5th Cir. 2014)(court considered lack of self-propulsion [except for moving laterally using tow lines], among other factors, to find structure not a vessel); *Martin v. Fab-Con Inc.*, 9 F.Supp.3d 642, 649 (E.D. La. 2014)(lack of self-propulsion one factor in finding quarterbarge not a vessel); *Mooney v. W & T Offshore, Inc.*, No. 12-969, 2013 WL 828308 (E.D. La 2013)(lack of self-propulsion one factor in finding that tension-leg platform was not a vessel).

Gulf Marine cites *Offshore Co. v Robison*, 266 F.2d 769, 779 (5th Cir. 1959), which addressed the issue of whether a roughneck was a seaman for purposes of the Jones Act.  The court noted as part of its holding that special purpose structures not usually employed as means of transport by water but designed to float on water have been considered vessels by the courts.  *Id.* at 779.  The structure where the injury occurred had no engines and was moved by tugboat.  Whether the structure was a vessel was not an issue in the litigation.  The statement in *Robison* that such structures have been found to be vessels is not inconsistent with the *Lozman* finding that lack of self-propulsion is not dispositive of whether a structure is a vessel.  Notwithstanding *Robison*, in a case such as this which examines the issue of whether a particular structure is a vessel, the lack of non-propulsion weighs in favor of finding that it is not.

**(2) Means to Regulate Position**

The INNOVATOR has no means to regulate its position.  It has no radar, no automated identification system, no bridge, and no hull positioning system. [5]   When the structure was towed, a hand-held GPS device was used (Key Depo. at pp. 85-86; D.E. 62-1 at pp. 23-24).   In addition, a laptop with navigational software was brought on board the structure to determine the facility's position when demooring (Key Depo. at pp. 81-82; D.E. 62-1 at pp. 22-23).  The structure has a control room where the ballast control panel is located, but has no permanent navigational equipment (Key Depo. at p. 83; D.E. 62-1 at p. 23).  While the inability to regulate position does not appear to be dispositive, the lack of ability to do so weighs in favor of a finding that a structure is not a vessel.

**(3) Lack of a Raked Bow**

When a court is trying to determine whether a structure is a vessel, it looks at whether it has features that objectively suggest that one of its primary purposes may have been transportation over water.  *Ducote v. Keeler & Co., Inc.*, 953 F.2d 1000, 1003 (5th Cir. 1992).  One objective factor courts take into consideration is whether the structure has a raked, or angled bow.  "While the mere presence of a raked bow does not mean that the structure is a vessel, it is a piece of evidence from which conflicting inferences could be drawn."  *Id.*  The INNOVATOR does not have a raked bow (Key Aff. at p. 2; D.E. 62-

---

[5] Gulf Marine asserts that the INNOVATOR has an automated identification system and a hull positioning system (D.E. 64 at pp. 5-6; Decl of Todd Ladd at pp. 2-3; D.E. 64-2 at pp. 2-3).  However, Key, who worked as the ballast control officer on the structure, testified that it does not have those features  (Key Depo. at pp. 82, 85; D.E. 62-1 at p. 23).  Except for regulating its draft and inclination, Gulf Marine does not assert that the INNOVATOR is otherwise capable of regulating its own position.

1 at p. 32).  While the lack of a raked bow does not necessarily lead to the conclusion that the INNOVATOR is not a vessel, it supports rather than detracts from that conclusion.

### (4)  Primary Purpose

Amerindo asserts that the INNOVATOR is not a vessel because its primary purpose is not to transport people or cargo over water.  In *Stewart*, the *Super Scoop* dredge case, the Supreme Court focused on the fact that the 1 U.S.C. § 3 definition of a vessel includes the language "used, or capable of being used, as a means of transportation on water."  *Stewart*, 543 U.S. 493.  The Court noted the general maritime law has drawn a distinction between watercraft temporarily stationed in a particular location and those permanently affixed to shore or resting on the ocean floor.  *Id.* at 493-494.  "Simply put, a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement."  *Id.* at 494.  The Court further noted that nothing in §3 requires that a watercraft be used primarily as a means of transportation on water.  *Id.* at 495.  "The question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one."  *Id.* at 496.

Gulf Marine argues that the INNOVATOR is practically designed to be mobile and to transport both people and equipment as necessary and has done so in the past. Gulf Marine further asserts that the fact that transportation of people or equipment is not the INNOVATOR's primary function has no bearing on the issue of whether it is a vessel, citing *Stewart*, 543 U.S. at 495-496.

In *Lozman*, the Court noted that even though the primary use of the *Super Scoop* was not transportation over water, it did share aspects of traditional seagoing vessels, such as "'a captain and crew, navigational lights, ballast tanks, and a crew dining area.'" *Lozman*, 568 U.S. at 123 (quoting *Stewart*, 543 U.S. at 485). After noting that the *Super Scoop* could navigate only by manipulating its anchors and cables, the Court stated, "Nonetheless it did move. In fact it moved over water 'every couple of hours.'" *Id.* (quoting *Stewart*, 543 U.S. at 485).

The Court went on to note that even though the primary function of the *Super Scoop* was not transportation, it was used regularly, and was designed in part to be used, to transport workers and equipment over water. The Court compared *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625 (1887), where a floating drydock was not a vessel because it was permanently affixed to a wharf, with *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 53 U.S. 527, 535 (1995), where a barge sometimes attached to a river bottom and used as a work platform remained a vessel when at other times it was used for transportation. *Lozman*, 568 U.S. at 125.

The Court also distinguished consideration of an owner's intent with regard to a structure from consideration of the purpose of a structure. An owner's intent with regard to a structure is too subjective to be considered when determining whether a structure is a vessel, but objective evidence of a waterborne transportation purpose, such as physical attributes and behavior of the structure, may be considered as objective manifestations of relevant purpose. *Lozman*, 568 U.S. at 128.

Applying *Stewart* and *Lozman* to the instant case, it is clear that while the INNOVATOR is capable of carrying equipment and people when it is towed, it is not practically designed to do so.   The district court in the *Omega Natchiq* case, when discussing whether the INNOVATOR was a vessel for purposes of the Jones Act, found that the INNOVATOR was going to be fixed at its location for as long as it took to fully exploit the field and that the long-term commitment supported an inference that it was more like a work platform than a semi-submersible drilling rig.   *Omega Natchiq*, 2008 WL 2714124 at * 7.   "While the structure was capable of movement and could potentially be moved in the future, such movement was not a part of its primary purpose as a production facility intended to be fixed in one [location] for an extended indefinite period."   *Id.*

When the INNOVATOR was towed from the Gulf of Mexico by order of the United States government, approximately twenty people were on board, including the offshore installation manager, the barge supervisor, the ballast control operators, the crane and rigging crew, mechanics, electricians, and catering staff.   Two masters and two or three pilots boarded the structure to communicate with the tugboat captains   (Key Depo. at pp. 30-32, 87; D.E. 62-1 at pp. 10, 24).   When it was moved a short distance in 2015, an electrician, two roustabouts, some third party mechanics, and two pilots boarded the structure to help with the move (Key Depo. at p. 41; D.E. 62-1 at p. 12).   Although the INNOVATOR has permanent obstruction lights, navigational lights are installed when it is towed and a GPS monitor and navigation software are taken aboard and used (Key Depo. at pp. 80-82; D.E. 62-1 at pp. 22-23).   Since it has been at the Gulf Marine

Dock, the only crew associated with it are Key, the ballast control operator who adjusts the ballast approximately once a month, and a contractor who goes to the structure several days per week to conduct a security inspection and maintain and inspect certain equipment on board (Key Depo. at pp. 56, 58; D.E. 62-1 at pp. 16, 17).

Key testified that if the INNOVATOR is going to be used as an oil and gas production facility in the future, it will have to be towed to a field that has been predrilled and is ready to produce.  Once at the site, it will take between six weeks and six months for a subsea vessel to connect the structure to the subsea wellheads, run a pipeline, connect the pipeline pumps, and moor the structure to the seabed with suction plates and mooring gear (Key Depo. at p. 92; D.E. 62-1 at p. 25).  The same operation occurred in reverse when the INNOVATOR was removed from the Gulf of Mexico and has to happen every time it is moved while it is operating as a production facility (Key Depo. at pp. 93-95; D.E. 62-1 at pp. 25-26).

The history of the INNOVATOR and its current configuration are inconsistent with the notion that it is practically capable of being used to transport people or cargo over water.  It has been towed twice since 2007, once to the Gulf Marine dock and once within the Gulf Marine facility.  While people and objects were on it when it was towed, a reasonable observer, looking at the structure's physical characteristics and activities, would not consider it designed to a practical degree for carrying people or things over water.  *Lozman*, 568 U.S. at 121.  The fact that it takes a crew operating underwater between six weeks and six months to ready the structure for a move once it is in place at a field undercuts the notion that it is a practical possibility that it can be used as a means

of transportation on water.  *Compare BW Offshore USA, LLC v. TVT Offshore AS*, 145 F.Supp.3d 658, 663 (E.D. La. 2015)(floating production, storage, and offloading unit found to be a vessel could detach itself from the well and relocate under its own power in as little as six hours).  Accordingly, it is recommend that a finding be made that the INNOVATOR's primary purpose is not maritime transportation, but that it is more accurately described as a work platform.

### (5)  Remaining Factors

The other factors cited by Amerindo for finding that the INNOVATOR is not a vessel are that it is held in its location in the field by mooring lines anchored to suction piles embedded in the seabed and it is connected by pipe to various well heads to collect, process, and separate oil and gas, which is then transported via pipeline to the user on the shore.  These factors were considered above as part of the discussion regarding its primary purpose and weigh in favor of finding that the INNOVATOR is a work platform and not a vessel.

## D.  Other Considerations

Gulf Marine emphasizes that the INNOVATOR is the same basic structure it was when it was a semi-submersible drilling rig and that it was considered a vessel at that time.  Gulf Marine points to the characteristics which have remained unchanged since the conversion:  a steel hull with ballast tanks to insure floatability; a watertight bulkhead and tanks for fuel, cement, and water; a pontoon hull; tow bridles; towing lugs; fender frames; sleeping quarters for ninety-eight people; a galley; lifeboats; ballast system; draft marks; anodes; diesel and gas turbine engines; a mooring system; and winches.

Gulf Marine is correct that as a semi-submersible drilling rig, the INNOVATOR was found to be a vessel in *Fontenot*, 791 F.2d at 1215, n. 5.  However, in *Lozman* the Court noted that "[a] craft whose physical characteristics and activities objectively evidence a waterborne transportation function may still be rendered a nonvessel by later physical alterations."  *Id.*, 568 U.S. at 129.  Since its conversion to a floating production unit, the INNOVATOR was found to not be a vessel in *Omega Natchiq*, 2008 WL 2714124 at *8 and *ATP Oil & Gas*, 955 F.Supp.2d at 618.  Accordingly, the fact that prior to its conversion the INNOVATOR was considered a vessel does not necessarily lead to the conclusion that it is still a vessel.

Also, although it does possess some characteristics of a vessel, the items listed above are as common to floating work platforms as they are to vessels.  In *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290, 294, n. 5 (5th Cir. 1990)(citing *Johnson*, 864 F.2d at 43), the Fifth Circuit noted that a quarterbarge had seven of nine factors previously recognized as conferring vessel status on a structure.[6]  Nevertheless, the court found that the factors were not to be applied mathematically but were useful guides in determining vessel status and that the quarterbarge's transportation function was subordinate to its contrasting function of providing housing in shallow waters.  *Id.*  As discussed above, the INNOVATOR in its current state lacks a transportation function because moving it from one location to another is a very long and costly process.

_____

[6] The structure had navigational lights; a raked bow; life-saving equipment; crew quarters; the owner's intention to move it on a recurring basis; the presumed ability to be refloated after years of deterioration; and a relatively short time remaining stationary.  It lacked bilge pumps and Coast Guard registration.  *Gremillion*, 904 F.2d at 294, n. 5.

Accordingly, despite the fact that it floats and has some characteristics of a vessel, it is recommended that a finding be made that it is not a vessel.

Gulf Marine also points out that the INNOVATOR is registered with the United States Coast Guard National Vessel Documentation Center and has been referred to as a vessel for purposes of a stability report determining feasibility of adding a third production module to the structure (D.E. 64-4 and 64-5 at pp. 7).  In addition, the INNOVATOR is classed with the American Bureau of Shipping and has a number issued by the International Maritime Organization and a hull number (Decl. of Todd Ladd at p. 5; D.E. 64-2 at p. 5).  However, "'[v]essel status is determined by the history of the contrivance, it (sic) use, purpose, and perhaps potential, not what the parties call it.'" *Martin*, 9 F.Supp.3d at 650 (quoting *St. Paul Fire & Mar. Ins. Co. v. SSA Gulf Terminals, Inc.*, No. Civ. A. 01-3063, 2002 WL 31260153 at *6 (E.D. La. Oct. 8, 2002)). Thus, the fact that entities have referred to the INNOVATOR as a vessel does not lead to the conclusion that it is a vessel for purposes of Gulf Marine's maritime lien.

## CONCLUSION

Based on the foregoing, it is respectfully recommended that a finding be made that the ATP INNOVATOR is not a vessel for purposes of Gulf Marine's maritime lien.  It is further recommended that Amerindo's Motion to Dismiss the Arrest of the INNOVATOR

(D.E. 62) be GRANTED and the arrest and related orders (D.E. 6, 7, 8 and 10) be VACATED.

Respectfully submitted this 11th day of October, 2017.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).