UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| GULF MARINE FABRICATORS, LP<br>        Plaintiff,<br><br>VERSUS<br><br>THE ATP INNOVATOR, bearing IMO No. 742, her<br>tackle, furniture, apparel, appurtenances, etc., *in rem*,<br>AMERINDO SERVICES LTD, *in personam*<br>BLUE SKY LANGSA LTD, *in personam*<br>        Defendants. | CIVIL ACTION NO. 2:16-cv-00430<br><br>IN ADMIRALTY,<br>F.R.C.P. 9(h) and Rule C |

**GULF MARINE FABRICATORS, LP'S**
**MEMORANDUM IN SUPPORT OF MOTION FOR REVIEW**
**OF MAGISTRATE'S MEMORANDUM AND RECOMMENDATION**

**MAY IT PLEASE THE COURT:**

Plaintiff, Gulf Marine Fabricators, LP ("Gulf Marine"), respectfully files this

Memorandum in support of its Motion for Review of Magistrate Judge's Memorandum and

Recommendation, R. Doc. 70 (the "Recommendation"), as amended (R. Doc. 71), on

defendant's Motion to Dismiss Arrest of the *in rem* defendant ATP INNOVATOR (R. Doc. 62).

The Recommendation is a dispositive ruling under Rule 72 and is subject to *de novo* review

before this Court.  As set forth below, the Recommendation that the INNOVATOR is not a

vessel is contrary to long-established law within the Fifth Circuit and the Supreme Court's

seminal decision on vessel-status in *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 497

(2005).  Moreover, the Recommendation improperly treated Amerindo's motion as a Rule

12(b)(1) motion instead of treating it as a motion for summary judgment and affording Gulf

Marine the proper procedural safeguards thereunder.  Accordingly, Gulf Marine files this request

for review of the Magistrate's Recommendation and respectfully requests that the Court conduct

a *de novo* review and deny the Motion to Dismiss Arrest.

## I.  FACTUAL BACKGROUND

This case arises out of the failure by defendants Amerindo Services, Ltd. ("Amerindo") and Blue Sky Langsa Ltd. ("Blue Sky") to pay for dockage and other services provided by Gulf Marine to the ATP INNOVATOR, a semi-submersible rig berthed at Gulf Marine's dock in Port Aransas, Texas.  (R. Doc. 1, ¶¶ VII, XII).  Pursuant to a Layberth Agreement, Amerindo and Blue Sky agreed to pay Gulf Marine $55,000 per month to dock the ATP INNOVATOR at Gulf Marine's facility.  (*Id.*, ¶ VIII).  In addition, Amerindo and Blue Sky agreed to pay Gulf Marine for services provided to the INNOVATOR.  (*Id.*).  Other than an initial security deposit, Amerindo and Blue Sky have not made any payments to Gulf Marine under the Layberth Agreement.  (*See* R. Doc. 54-2, p. 12; R. Doc. 54-3, Decl. of Todd Ladd).  To date, Gulf Marine is owed well over $1,000,000, which figure continues to accrue daily.  (*Id.*).

The INNOVATOR was built in 1976 as a semi-submersible vessel[1] and was later converted into a semi-submersible production unit.  Following this conversion, the "structure continued to be semi-submersible with no changes to the superstructure, the hull, ballast tanks or water tanks."  (R. Doc. 71, p. 7).  Jurisdictional discovery in this case on the issue of vessel status confirmed that, as a mobile offshore vessel, the INNOVATOR is designed to a practical degree to transport people and equipment over navigable water.  Specifically, Amerindo's Joseph Key testified as follows:

---

[1] A semi-submersible vessel is a specialized marine vessel used in a number of offshore roles, such as an offshore drilling rig, safety vessel, oil production facility, or heavy lift crane.  (*See* R. Doc. 64-2, Declaration of Todd Ladd, ¶ 3).  With its hull structure submerged at a deep draft, a semi-submersible is less affected by wave loadings than a normal ship.  (*Id.*).  With a small water-plane area, however, the semi-submersible is sensitive to load changes, and therefore must be carefully trimmed to maintain stability.  (*Id.*).  Unlike a submersible, a semi-submersible vessel is not supported by resting on the seabed.  (*Id.*).  Semi-submersible vessels are able to transform from a deep to a shallow draft by de-ballasting (removing ballast water from the hull), thereby becoming surface vessels. (*Id.*).  Typically, they are moved from location to location in this configuration.  (*Id.*).

Q      You would agree with me that the ATP Innovator has design capabilities to actually transport people from one location to another because it, in fact, did transport on that instance correct?

        * * *

A:      I would say that it has the design to accommodate people.

Q:      (By Mr. Baldwin) And it also has the design capabilities to move people from one location to another just like it did on the tow from location in February of 2014 to Gulf Marine's facility, correct?

A:      Yes[2]

        * * *

Q:      And so during that tow from the on-site location to Gulf Marine's facility, the ATP Innovator moved equipment from one location to another, correct?

A:      And from that, you know that the ATP Innovator was and had the design capabilities to move equipment from one location to another, correct?

        * * *

A:      Correct.[3]

## II.    PROCEDURAL BACKGROUND

On October 13, 2016, Gulf Marine filed this lawsuit against the INNOVATOR *in rem* and Amerindo and Blue Sky *in personam*.  (R. Doc. 1).  Gulf Marine asserted a claim against the INNOVATOR *in rem* for a maritime lien for necessaries provided under the Layberth Agreement and sought to arrest the INNOVATOR under Rule C of the Supplemental Rules for Admiralty and Maritime Claims ("Rule C").[4]  (*Id.*).  On October 17, 2016, the INNOVATOR was arrested by the United States Marshal's Service.  (R. Doc. 19).  Subsequently, Amerindo made a limited appearance on behalf of the INNOVATOR (R. Doc. 20) and filed a Motion to

---

[2] *See* R. Doc. 64-3, Deposition of Joseph Key, 30:15-31:1.

[3] *Id.*, 41:7-14.

[4] Gulf Marine also asserted *in personam* claims against Amerindo and Blue Sky for breach of the Layberth Agreement.  (R. Doc. 1).

Vacate the arrest under Rule E(4)(f) of the Supplemental Rules for Admiralty and Maritime Claims, arguing that the INNOVATOR is not a vessel.  (R. Doc. 21).  After the Magistrate issued a Memorandum and Recommendation that recommended that Amerindo's Motion to Vacate be granted, Gulf Marine sought review before this Court.  (R. Doc. 30).

On April 5, 2017, the Court sustained Gulf Marine's first objection to the Magistrate's Memorandum and Recommendation, "finding that the correct standard of proof at this stage is probable cause and not a preponderance of the evidence."  (R. Doc. 55).  The Court allowed Gulf Marine sixty (60) days to conduct jurisdictional discovery and ordered that any motion to dismiss by Amerindo be filed by July 5, 2017.  (*Id.*).  In the interim, the parties took the deposition of the Amerindo's Joseph Key, who provided an affidavit in support of Amerindo's original motion to vacate.  Gulf Marine also propounded written discovery upon Amerindo, which produced a significant amount of documents on the issue of vessel status.  On July 5, 2017, Amerindo filed a Motion to Dismiss Arrest of the *in rem* defendant INNOVATOR for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  (R. Doc. 62).

On October 11, 2017, the Magistrate issued her Recommendation on Amerindo's Motion to Dismiss Arrest, recommending that the INNOVATOR be deemed a non-vessel and further "that the arrest of the vessel be vacated and Gulf Marine's *in rem* cause of action against the INNOVATOR be dismissed."  (R. Doc. 70).  On October 20, 2017, the Magistrate issued an Amended Memorandum and Recommendation restating the recommendation that the INNOVATOR be found to be a non-vessel and further "that the arrest of the vessel be vacated and Gulf Marine's *in rem* cause of action against the INNOVATOR be dismissed."  (R. Doc. 71).  Gulf Marine now files this objection, seeking review by this Court of the Magistrate's Recommendation and respectfully requesting that the Motion to Dismiss Arrest be denied.

### III.    LAW AND ANALYSIS

#### A.    Federal Rule of Civil Procedure 72 Provides for a *De Novo* Standard of Review on Gulf Marine's Request for Review of the Magistrate's Recommendation

Under Rule 72 of the Federal Rules of Civil Procedure, a magistrate judge can make only recommendations as to dispositive motions; and objections to the recommendations are reviewed *de novo* by the district judge. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). In this case, Amerindo filed a Motion to Dismiss Arrest of the *in rem* defendant INNOVATOR, contending that the INNOVATOR is not a vessel. Whether the INNOVATOR is a vessel is a dispositive issue subject to *de novo* review by this Court. The INNOVATOR must qualify as a "vessel" for Gulf Marine to be able to assert a maritime lien claim against the INNOVATOR under the Commercial Instatements and Maritime Lien Act (the "CIMLA"), 46 U.S.C. § 31301, *et seq.*, and Supplemental Admiralty Rule C. If the INNOVATOR is not a vessel, then Gulf Marine has no maritime lien claim under the CIMLA; and as a result, Amerindo's request for a dismissal of the arrest of the INNOVATOR on the grounds of vessel status is a dispositive issue because it goes to the very heart of Gulf Marine's *in rem* claims against the defendant INNOVATOR. As such, this Court should conduct a *de novo* review under Rule 72 of Gulf Marine's objection to the Magistrate's Recommendation.

#### B.    The Magistrate's Recommendation Incorrectly Treated Amerindo's Motion as a Rule 12(b)(1) Motion to Dismiss Instead of Converting the Motion to a Motion for Summary Judgment under Rule 56 and Affording Gulf Marine the Procedural Safeguards Thereunder

Amerindo's Motion to Dismiss Arrest is styled as a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. In opposition to Amerindo's Motion, Gulf Marine contended that the motion should be treated as a Motion for Summary Judgment under Rule 56 because the issue of vessel status is necessarily one of jurisdictional fact that is

interwoven with the merits of Gulf Marine's claims.   (R. Doc. 64, pp. 9-10).   The Recommendation, however, improperly treated Amerindo's Motion to Dismiss as a Rule 12(b)(1) motion to dismiss rather than applying the proper standard under Rule 56.  As discussed further below, the treatment of a motion to dismiss as a Rule 12(b)(1) motion or a Rule 56 motion is critical because the former does not afford a plaintiff the procedural safeguards afforded under Rule 56.

When a motion to dismiss is a direct attack on the merits of a claim, such as Amerindo's motion to dismiss an *in rem* defendant on the issue of vessel status, it should be treated as a motion for summary judgment.  *See Martin v. Fab-Con, Inc.*, 9 F. Supp. 642, 645-46 (E.D. La. 2014).   "When jurisdictional issues are intertwined with the merits, the adjudication of the jurisdictional issue in accordance with the procedure under a 12(b)(1) motion fails to offer the procedural safeguards attendant upon proceedings under a 12(b)(6) motion or a motion for summary judgment under Rule 56."  *Chatham Condominium Ass'ns v. Century Village, Inc.*, 597 F.2d 1002, 1011 (5th Cir. 1979).  Accordingly, dismissal in this context before trial for lack of subject matter jurisdiction "should be granted sparingly."  *Id.* at 1012.

As the district court in *Martin* noted:

> But, "when . . . issues of jurisdictional fact are intermeshed with the merits of a case, 'the jurisdictional issues should be referred to the merits, for it is impossible to decide one without the other.'" *Sierra Club v. Shell Oil Co.*, 817 F.2d 1169, 1172 (5th Cir. 1987) (quoting *McBeath v. Inter–Am. Citizens for Decency Comm.*, 374 F.2d 359, 363 (5th Cir. 1967)); Wright, *et al., supra*, § 1350. Put slightly differently, "[w]here the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Sierra Club*, 817 F.2d at 1172 (alterations in original) (quoting *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981)); *accord Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004). The Fifth Circuit has explained that "[n]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no

claim is found to exist, the case is dismissed on the merits." *Montez*, 392 F.3d at
150 (quoting *Williamson*, 645 F.2d at 415).

*See Martin*, 9 F. Supp. at 645-46 (emphasis added).

In this case, vessel status is a prerequisite of Gulf Marine's maritime lien claim against
the *in rem* defendant INNOVATOR.  *See* 46 U.S.C. § 31342(a)(1); *see also Galehead, Inc. v.
M/V ANGLIA*, 183 F.3d 1242, 1244 (11th Cir. 1999).  The issue of vessel status is necessarily
one of jurisdictional fact that is interwoven with the merits of Gulf Marine's claims because the
lack of vessel status defeats Gulf Marine's maritime lien claims.  *Id.*  Accordingly, Amerindo's
Motion to Dismiss should have been treated as a motion for summary judgment subject to the
standards of Rule 56 of the Federal Rules of Civil Procedure.  *See Martin*, 9 F. Supp. at 645-46
(treating motion to dismiss based on vessel status as a motion for summary judgment because the
issue of vessel status was a crucial component of the plaintiff's case).

In the Magistrate's Recommendation, however, the Magistrate Judge rejected Gulf
Marine's contention that Amerindo's Motion should be converted to a Motion for Summary
Judgment under Rule 56.  The Recommendation stated that the resolution of Amerindo's Motion
will not result in dismissal of this case because Gulf Marine also has pending *in personam* claims
against Amerindo; however, the granting of Amerindo's Motion will indisputably result in the
dismissal, with prejudice, of Gulf Marine's *in rem* claim against the *in rem* defendant ATP
INNOVATOR and thus is a direct challenge to the existence of a federal cause of action.  Gulf
Marine's *in rem* claim against the INNOVATOR is a wholly distinct and separate federal cause
of action from Gulf Marine's *in personam* breach of contract claims against Amerindo.  *See
Merchants Nat'l Bank of Mobile v. Dredge General G.L. Gillespie*, 663 F.2d 1338, 1350 (5th
Cir. 1981) ("A maritime lien represents a property interest entirely distinct from an in personam
right.").  Gulf Marine's *in rem* cause of action lies in admiralty against the vessel herself as a

defendant such that the INNOVATOR is the *res* or subject matter of the action.  *See id.* ("An action in admiralty to enforce a maritime lien is not an action against any particular person to compel him to do or to forebear anything; it is an action in rem asserting against the world the claim of a plaintiff to an offending ship. It is a real action to enforce a real right.") (quoting E. Biele, *Maritime Liens Arising out of Collision*, 51 Tulane L. Rev. 1134, 1134 (1977)).

Moreover, Gulf Marine's *in rem* claim is subject to special admiralty rules, including Rules C and E of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which afford special procedural rights and remedies (including the arrest of a vessel under Rule C and the interlocutory sale of a vessel under Rule E) that do not apply outside of the maritime context.  *See* Suppl. Adm. R. C, E.  Although *in rem* and *in personam* actions may be tried together, they are completely distinct from each other, particularly where, as here, the *in rem* action is based in admiralty jurisdiction and the *in personam* breach of contract action is based in diversity jurisdiction.  Since Amerindo's Motion to Dismiss attacks the vessel status of the *in rem* defendant INNOVATOR, it is a direct attack on the merits of Gulf Marine's *in rem* claims against the INNOVATOR.  Accordingly, under the law and contrary to the Magistrate's Recommendation, Amerindo's Motion to Dismiss Arrest should have been treated as a motion for summary judgment.  Because Amerindo's motion, if granted, would result in the dismissal of a federal cause of action, the motion should be viewed through the lens of Rule 56 and "'the proper course . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of plaintiff's case.'"  *Martin*, 9 F. Supp. At 646-46 (quoting *Sierra Club*, 817 F.2d at 1172).

The difference in reviewing a motion to dismiss as a Rule 12(b)(1) motion or a Rule 56 motion is critical because it directly affects the court's ability to weigh evidence and does not

afford the proper safeguards to a plaintiff like Gulf Marine.   As the Fifth Circuit stated in

*Chatham Condominium Assn's v. Century Village, Inc.*, 597 F.2d at 1011-12:

> The procedure under a motion to dismiss for lack of subject matter jurisdiction is
> quite different. At the outset we must emphasize a crucial distinction, often
> overlooked, between 12(b)(1) motions that attack the complaint on its face and
> 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact,
> quite apart from any pleadings. The facial attack does offer similar safeguards to
> the plaintiff: the court must consider the allegations of the complaint as true. The
> factual attack, however, differs greatly for here the trial court may proceed as it
> never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual
> 12(b)(1) motion is the trial court's jurisdiction its very power to hear the case
> there is substantial authority that the trial court is free to weigh the evidence and
> satisfy itself as to the existence of its power to hear the case. In short, no
> presumptive truthfulness attaches to plaintiff's allegations, and the existence of
> disputed material facts will not preclude the trial court from evaluating for itself
> the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of
> proof that jurisdiction does in fact exist.

597 F.2d at 1012 (quotations omitted).

By treating Amerindo's Motion to Dismiss Arrest as a Rule 12(b)(1) Motion, the

Magistrate improperly weighed evidence, resolved disputed issues of fact, and did not afford the

proper procedural safeguards to which Gulf Marine is entitled under Rule 56.   The Magistrate's

Recommendation clearly resolved disputed issues of fact, finding that:

- The INNOVATOR had no positioning system and no automated identification
  system or hull positioning system (R. Doc. 71, p. 14, n.6), despite Gulf Marine
  presenting evidence of the INNOVATOR having an Automated Identification
  System (AIS), hull ballast system, Hull Positions System, and GPS Positioning
  System. (R. Doc. 64-2, pp. 2-3, ¶¶ 4, 6).

- The INNOVATOR had no permanent navigational equipment (R. Doc. 14),
  despite Gulf Marine presenting evidence of the INNOVATOR having Automated
  Identification System (AIS), hull ballast system, Hull Positions System, and GPS
  Positioning System.  (R. Doc. 64-2, pp. 2-3, ¶¶ 4, 6).

- The INNOVATOR was ballasted and deballasted once a month (R. Doc. 71, p.
  12), despite Gulf Marine presenting evidence that it was ballasted on a weekly
  basis to maintain the draft of the INNOVATOR (R. Doc. 64-2, ¶¶ 3-4, 14).

The Magistrate also rejected or otherwise failed to give due deference under Rule 56 to competent, sworn deposition testimony of Amerindo's Joseph Key, who agreed under oath that the INNOVATOR is designed to accommodate passengers and move both passengers and equipment from one location to another.[5]  The Magistrate's Recommendation made the above factual determinations, and improperly weighed evidence and resolved factual disputes in favor of Amerindo, to ultimately recommend that the INNOVATOR be found not to be a vessel.  Gulf Marine respectfully submits that it was improper for the Magistrate to weigh evidence and resolve disputed factual issues, particularly where the resolved factual issues led to the ultimate recommendation on vessel status.  Instead, the Magistrate should have treated the Motion to Dismiss as a motion for summary judgment, affording Gulf Marine the proper procedural safeguards thereunder and denying the motion due to disputed issues of material fact because, at the very least, Gulf Marine presented sufficient facts to stave off Amerindo's jurisdictional attack.

### C.      The INNOVATOR Constitutes a Vessel under the General Maritime Law

The INNOVATOR is a vessel under well-established law.  A "vessel" is defined by statute as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  1 U.S.C. § 3.  The Supreme Court has explained that the statutory definition of "vessel" includes "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."  *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 497 (2005).[6]  Therefore, for a thing to be

---

[5] *See* R. Doc. 64-3, Dep. of Key, 30:15-31:1.

[6] In *Stewart*, the Supreme Court explained that the Rules of Construction Act, 1 U.S.C. § 3, supplies the default definition of "vessel" throughout the United States Code "'unless the context indicates otherwise.'"  543 U.S. at 489-90.  "Section 3 merely codified the meaning that the term 'vessel' had acquired in general maritime law. See 1 S. Friedell, Benedict on Admiralty § 165 (rev. 7th ed. 2004).  In the decades following its enactment, § 3 was regularly used to define the term 'vessel' in maritime jurisprudence."  *Id.* at 490.  Section 3 has supplied the

classified as a vessel, its primary purpose does not have to be navigation or transportation. *Id.* at 495–96.  In *Stewart*, the Supreme Court described the relevant inquiry in determining vessel status as "whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one." *Id.* at 496.

The Supreme Court in *Stewart* considered whether a massive dredge known as the Super Scoop qualified as a vessel. The Court noted that the Super Scoop had limited means of self-propulsion, but that she was able to move short distances. *Id.* at 484-85.  The structure also had "a captain and crew, navigational lights, ballast tanks, and a crew dining area." *Id.* at 484. Although maritime transportation was not the primary purpose of the Super Scoop and the structure was not in navigation at the time of the incident giving rise to dispute, the Court held that the structure was still a vessel because the Super Scoop was engaged in maritime transportation while traversing a navigable waterway with equipment and workers. *Id.* at 495-97.  The Court further stated that "[b]y including special-purpose vessels like dredges, § 3 sweeps broadly . . ." *Id.* at 494.

### 1.  *The INNOVATOR Is a Vessel under* Stewart

Under *Stewart*, the INNOVATOR is a vessel.  Like the dredge in *Stewart*, the INNOVATOR has the capability to, and in fact does, regularly adjust its position to ensure its draft. (R. Doc. 64-2, ¶¶ 3-4, 14).  Specifically, the ballast tanks or hull ballast system of the INNOVATOR regularly position the INNOVATOR. (*Id.*)  The INNOVATOR has twenty-five (25) ballast tanks and a hull ballast system that were adjusted on a weekly basis prior to hurricane season to maintain the level and/or draft of the INNOVATOR. (R. Doc. 64-2, ¶¶ 3-4,

---

definition of "vessel" for purposes of the Jones Act and the Longshore and Harbor Workers' Compensation Act. *Id.* at 491.  Likewise, Section 3 has supplied the definition of "vessel" for purposes of the CIMLA. *Louisiana Int'l Marine, L.L.C.*, 2012 WL 4718558, at \*4; *see also Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621, 623 (5th Cir. 1955) (applying Section 3's definition of "vessel" to enforcement of a necessaries lien).

14).  This hull ballast system maintained the position of the INNOVATOR.  (*Id.*)  The INNOVATOR has inherent vessel features that, like the Super Scoop's vessel features, have been used regularly to maintain its position while afloat in navigable waters.  (*Id.*).

Despite the evidence presented by Gulf Marine, the Magistrate's Recommendation found that the record did not support Gulf Marine's contention that the INNOVATOR was used in a similar fashion as the Super Scoop.  (R. Doc. 71, pp. 11-14).  There is no substantive difference between the movement of the Super Scoop a few feet every few hours by means of limited self-propulsion and the INNOVATOR's ballasting and deballasting to maintain its draft and floating position.  Both structures have to be towed long distances and neither structure has a primary purpose of transporting people or equipment.  In distinguishing the two structures, the Magistrate's Recommendation discredited the evidence presented by Gulf Marine on the regular, weekly ballasting and adjustment of the INNOVATOR to maintain her draft (R. Doc. 64-2, ¶¶ 3-4, 14), finding instead that the draft remained constant and was ballasted only monthly to "correct minor angles of inclination."  (R. Doc. 71, p. 12).  Gulf Marine submits that the Magistrate's attempt to distinguish the two structures is improper.  The Supreme Court in *Stewart* emphasized that the definition of vessel under Section 3 "sweeps broadly" and that 'Section 3 requires only that a watercraft be 'used, or capable of being used, as a means of transportation on water' to qualify as a vessel."   543 U.S. at 494.  The INNOVATOR clearly meets this liberal threshold; and under *Stewart*, the INNOVATOR is a vessel.  *Id.*

2.      *The INNOVATOR Is a Vessel under* Lozman

The Supreme Court recently provided additional guidance for courts to consider in "borderline cases where 'capacity' to transport over water is in doubt."[7]  *Lozman v. City of*

---

[7] Semi-submersibles have never been "borderline cases" unless they are permanently attached to the seabed, casting their capacity to transport over water in doubt.  Therefore, the INNOVATOR is not a borderline case

*Riviera Beach, Fla.*, 133 S. Ct. 735, 745 (2013). The Supreme Court held that a thing is not a vessel "unless a reasonable observer, looking to the [thing's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id.* at 741, 744–45. The *Lozman* Court stated that while lack of self-propulsion may be a "relevant" factor to consider in determining vessel status, it "is not dispositive." *Id.* (citing *The Robert W. Parsons*, 191 U.S. 17, 31 (1903)).

Under *Lozman*, the INNOVATOR is a vessel because it is practically designed to be mobile and to transport both people and equipment as necessary. It is completely misleading for Amerindo to contend on the one hand in this case that the INNOVATOR is immobile[8] but then to market the INNOVATOR to the rest of the world as a mobile production unit awaiting charter.[9] The simple fact that transportation of people or equipment is not the INNOVATOR's primary function has no bearing on the issue of whether the INNOVATOR is a vessel. *See Stewart*, 543 U.S. at 495-96.

In the Magistrate's Recommendation, the Magistrate reviewed several factors, concluding that each one militated in favor of finding that the INNOVATOR is not a vessel. In the process, the Magistrate's Recommendation does not address the testimony of Amerindo's Joseph Key, who acknowledged that the INNOVATOR is designed to practically transport

---

warranting consideration of the *Lozman* decision. Nonetheless, even under *Lozman*, the INNOVATOR is a vessel as discussed herein.

[8] In this regard, Amerindo's stated intent of moving the INNOVATOR to a permanent or semi-permanent location at some undefined point in time in the future also has no bearing on the issue of vessel status. Such a subjective test is contrary to the Supreme Court's statement that the test for vessel status looks at objective manifestations, not the subjective intent of the owner. *Lozman*, 133 S. Ct. at 744 (agreeing that owner's intent is often "'unverifiable'" and "too easily manipulated" such that it would "invite gamesmanship."). Otherwise, vessel owners like Amerindo would be able to slide their vessels in and out of vessel status simply to avoid maritime liens.

[9] *See* R. Doc. 64-3, Deposition of Joseph Key, 55:8-16.

equipment and people over navigable waters.[10]   This testimony is pivotal and should be dispositive of the issue of vessel status.   The Magistrate's Recommendation also minimizes the import of the undisputed vessel characteristics of the INNOVATOR, including its hull, ballast tanks, ballast control room, marine crew, crew quarters, lifeboats, hull and GPS positioning systems, and mooring systems with winches.

The record evidence before the Magistrate and before this Court demonstrates that the INNOVATOR is temporarily berthed at Gulf Marine's dock and that it can be and has been moved short distances without significant effort or cost.  (R. Doc. 64-2, ¶¶ 9, 13-14).  However, in reviewing Amerindo's Motion to Dismiss, the Magistrate's Recommendation incorrectly focused on the future potential use of the INNOVATOR and not the current status, stating: "The fact that it takes a crew operating underwater between six weeks and six months to ready the structure for a move once it is in place at a field undercuts the notion that it is a practical possibility that it can be used as a means of transportation over water."  (R. Doc. 71, pp. 18-19).  This statement is contrary to the INNOVATOR's temporary mooring at Gulf Marine's dock, its prior movement without any evidence of difficulty from slip to slip within Gulf Marine's facility, and its marketed ability to serve as a "Mobile Offshore Production Unit."[11]   Amerindo's whole purpose of marketing the INNOVATOR as a mobile unit is to emphasize its ability to move from

---

[10] *Id.*, 30:15-31:1; 41:7-14.

[11] The Supreme Court in *Stewart* explained that the distinction between permanent mooring and temporary mooring is often dispositive on the issue of vessel status: where a structure is permanently affixed, it loses its vessel status because it is "not *practically* capable of being used to transport people, freight, or cargo from place to place." *See Stewart*, 543 U.S. at 493 (emphasis in original); *cf. Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625, 626-27 (1887) (finding drydock to be a non-vessel because it was a fixed structure permanently moored) *and Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19 (1926) (finding that a wharfboat was not a vessel because it was secured by cables to the mainland evidencing a "permanent location.").  Unlike the drydock in *Cope* and the wharfboat in *Evansville*, the INNOVATOR is temporarily berthed at Gulf Marine's dock and is clearly capable of being used for maritime transportation.

field to field to service the needs of a customer.[12]  The Magistrate's statement about the future is also contrary to *Lozman's* admonition against relying on an owner's stated future intent in determining vessel status because intent is "too easily manipulated."  133 S. Ct. at 744.

Indeed, relying on an owner's intent invites and allows the precise gamesmanship displayed by Amerindo in this case.   Amerindo secured financing to buy the INNOVATOR in part by granting a ship mortgage on the INNOVATOR.  (*See* R. Doc. 64-1, p. 5 of 6; *see also* Omega's Memorandum in Support of Motion to Intervene, R. Doc. 72-1, pp. 2-3).  It is hornbook law that a ship mortgage can only be granted on a vessel, and thus, if the INNOVATOR is not a vessel, the ship mortgage on her is unenforceable as to the *in rem* property.  *See* 46 U.S.C. § 31322.

After acknowledging the INNOVATOR's status as a vessel in granting a ship mortgage over her,[13] Amerindo then contracted with Gulf Marine to berth Amerindo's vessel for an extended period of time.  Amerindo enjoyed the benefit of wharfage from Gulf Marine, in large part because Gulf Marine had the reasonable belief that it had (and still has) a maritime lien in the INNOVATOR because she is a vessel.  All the while, Amerindo also continued to market the INNOVATOR as a mobile unit awaiting charter to go to work.  Amerindo subsequently failed to pay Gulf Marine for the services provided for over two years (R. Doc. 1, ¶¶ VII, XII; R. Doc. 54-2, p. 12; R. Doc. 54-3, Decl. of Todd Ladd).  When Gulf Marine sought to enforce its maritime lien on the INNOVATOR, Amerindo conveniently argued that the vessel was never a vessel to begin with.  This type of gamesmanship should not be tolerated.

---

[12] *See id.*, 55:8-16 (testifying that the INNOVATOR was marketed as awaiting charter to go to work).

[13] ASRC Energy Services Omega, LLC ("Omega"), as the purported assignee of the ship mortgage on the INNOVATOR, recently sought to intervene in this case for a second time, setting forth arguments on the issue of vessel status.  (R. Doc. 72).  The Magistrate denied the requested intervention.  (R. Doc. 74).  Gulf Marine submits that with a *de novo* review before this Court of the Magistrate's ruling on the issue of vessel status, this Court may review, consider and even take judicial notice of the arguments and documents presented by Omega on vessel status.

The Recommendation also states that "the Innovator in its current state lacks a transportation function because moving it from one location to another is very long and costly process." (R. Doc. 71, p. 21). There was no evidence whatsoever before the Magistrate with respect to the cost to move the INNOVATOR from her current position, much less once it is on site in a field. The Recommendation's statement on cost to move the INNOVATOR is not supported by any record evidence. It was error to rely on this issue to recommend a finding on vessel status.

Indeed, the evidence submitted by Gulf Marine establishes the mobile nature and design of the INNOVATOR, as does the testimony supporting the INNOVATOR's design and practical capabilities of maritime transportation and the INNOVATOR's regular ballasting/deballasting to maintain the INNOVATOR's position. (*See* R. Doc. 64-2, ¶¶ 3-5). The Recommendation harps on the lack of movement by the INNOVATOR as a factor militating against the INNOVATOR being a vessel, but this focus misses the mark. The issue, as set forth in *Stewart* and *Lozman*, is the design and practical capability of the structure, not whether it has moved on a weekly, monthly, or annual basis. As one post-*Lozman* court properly held, the mere fact that a mobile offshore unit does not move for a number of years does not remove it from vessel status. *See BW Offshore USA, LLC v. TVT Offshore AS*, 145 F. Supp. 3d 658, 663-64 (E.D. La. 2015) (finding that floating offshore production platform was a vessel despite the fact that it had not moved from location in four years).

Additionally, the INNOVATOR's minimal movement since she was first berthed at Gulf Marine's facility is a function of her owner's financial difficulties, which have no bearing on the INNOVATOR's status as a vessel. (*See* R. Doc. 29, p. 7) ("The Innovator is currently berthed for economic reasons."). Amerindo has not been able to pay for berthing of the INNOVATOR

and clearly has not been able to pay for movement of the INNOVATOR.  The lack of significant

movement is not a result of the INNOVATOR's lack of mobility; and as a result, it is improper

to use the INNOVATOR's lack of movement since being towed to Gulf Marine as a basis to find

the INNOVATOR not to be a vessel.  Likewise, the lack of significant movement prior to being

towed to the Gulf Marine facility was partially due to the bankruptcy of her former owner.  The

financial difficulties of the INNOVATOR's present and past owners should not affect the issue

of vessel status as a matter of law.

### 3.  *The INNOVATOR Is a Vessel under Fifth Circuit Case Law*

The INNOVATOR's status as a vessel is in line with the Fifth Circuit's legion of cases

which have repeatedly held that mobile offshore drilling units like the INNOVATOR are vessels

under the General Maritime Law <u>unless they are permanently attached to the seabed</u>.  *Compare*

*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F.

Supp. 2d 943, 949 (E.D. La. 2011), *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157

(5th Cir. 2014), *with Scroggs v. Bis Salamis, Inc.*, No. 09-1007, 2010 WL 3910563 (E.D. Tex.

2010) (holding that floating production semi-submersible that was permanently moored to the

seabed through 16 chain mooring lines and that would cost $400 to $500 million to move was

not a vessel).[14]  In *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959), the Fifth Circuit

held that a floating drilling platform is a vessel, despite the fact that it was not self-propelled and

that its primary purpose was to drill for oil.  The Magistrate's Recommendation references

---

[14] *See also Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393, 394 n.1 (5th Cir. 1991) ("We
have consistently applied general maritime law and the Jones Act . . . to accidents aboard special-purpose watercraft
such as . . . semi-submersible . . . rigs."), *cert. denied*, 502 U.S. 1033 (1992); *Houston Oil & Minerals Corp. v.
American Int'l Tool Co.*, 827 F.2d 1049, 1052–53 (5th Cir. 1987) ("Our cases applying the Jones Act and general
maritime law to accidents aboard . . . semi-submersible . . . and other movable rigs . . . are legion.") (collecting
cases), *cert. denied*, 484 U.S. 1067 (1988); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 n.5 (5th Cir.
1986) (concluding that the INNOVATOR's predecessor, the ROWAN MIDLAND, was "indisputably a vessel").

*Robinson*, but fails to discuss the litany of cases that followed and relied upon *Robinson* and which control the instant case.

More recently, in *Demette v. Falcon Drilling Co, Inc.*, 280 F.3d 492, 498, n.18 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009), the Fifth Circuit found it "beyond dispute" that a jack-up rig was a vessel under maritime law.[15] Likewise, a district court recently found that the DEEPWATER HORIZON, a semi-submersible, deep-water drilling platform was a vessel. *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d at 950; *see also Manuel v. P.A.W. Drilling & Well Serv., Inc.*, 135 F.3d 344, 348 (5th Cir. 1998) ("In a long line of cases, we have held a variety of special purpose structures, far removed from the conventional notion of ships and seagoing barges, to be vessels."). There is nothing that substantively distinguishes the INNOVATOR from the numerous other semi-submersible rigs that the Fifth Circuit has found to be vessels.

The Magistrate's Recommendation does not discuss the recent case of *In re DEEPWATER HORIZON*, 808 F. Supp. 2d at 949, *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014), in which the Fifth Circuit affirmed the district court's finding that the Mobile-Offshore-Drilling-Unit DEEPWATER HORIZON was a vessel. Although only one party contested vessel status in that case, it is well-settled that parties cannot consent to subject matter jurisdiction.[16] As a result, the fact that the vast majority of the parties in the *Deepwater Horizon* litigation agreed that the DEEPWATER HORIZON rig was a vessel is

---

[15] A jack-up rig has legs that can be lowered and secured to the seabed. Once the legs are secured, the rig is "jacked-up" out of the water to create a drilling platform. The process is reversible, and a jack-up rig can be towed to new sites. *Id.* at 495.

[16] *See Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999) (stating that "a party may neither consent to nor waive federal subject matter jurisdiction.").

of no moment.  Moreover, although the Fifth Circuit did not discuss *Lozman* in the *Deepwater Horizon* litigation, the Fifth Circuit's lack of discussion of *Lozman* is readily explained by the fact that by its own terms, *Lozman* was intended to apply to only "borderline cases" in which vessel status is at issue.  *Lozman*, 133 S. Ct. at 745.  Semi-submersible rigs have never been "borderline cases."  *See BW Offshore USA, LLC*, 145 F. Supp. at 662 ("Longstanding precedent in this circuit establishes that mobile offshore drilling units are vessels under general maritime law.") (citation omitted).

The important takeaway from the *Deepwater Horizon* opinion is that it is a Fifth Circuit decision post-*Lozman* which held that a Mobile Offshore Drilling Unit (MODU) similar to the Mobile Offshore Production Unit (MOPU) INNOVATOR was a vessel.  In fact, the MODU in the *Deepwater Horizon* matter was attached to the seabed by 5,000 feet of pipe.  The district court's opinion stressed that the rig was mobile and that the Fifth Circuit has consistently found mobile rigs like the DEEPWATER HORIZON to be vessels.  *In re DEEPWATER HORIZON*, 808 F. Supp. 2d at 949-50 (citing *Robinson*, 266 F.2d at 779; *Demette*, 280 F.2d at 498 n.18; *Stewart*, 543 U.S. at 497).  The DEEPWATER HORIZON rig had dynamic positioning capabilities that served the same function as the INNOVATOR's mooring on location, *i.e.* to ensure that the rig remained stationary during operations.  *See U.S. v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 491 (5th Cir. 2014) (holding that the DEEPWATER HORIZON was a "stationary source" when on-site because the DEEPWATER HORIZON's thrusters and propulsion capabilities were used to hold the rig in place when on-site).  Like the DEEPWATER HORIZON, the INNOVATOR is also a mobile offshore unit and is marketed by Amerindo as being mobile.  The fact that the DEEPWATER HORIZON was found to be a vessel even when

attached to the seabed further supports the finding that the INNOVATOR, which is presently berthed a Gulf Marine's facility, is a vessel.

The Magistrate's Recommendation also does not discuss or address the recent case of *Louisiana International Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*,[17] which is instructive on the issue of vessel status in this case.  In *Louisiana International Marine, L.L.C.*, several parties asserted maritime lien claims against a semi-submersible drilling rig for the provision of various services, including towage of the rig as a "wet tow."  The rig was seized, and the seizure was challenged on a motion to vacate the arrest of the rig.  Although the issue in *Louisiana International Marine, L.L.C.* was framed as whether the rig was a "dead ship," the case is instructive because it addressed whether a semi-submersible similar in structure to the INNOVATOR was "practically capable of maritime transportation," as is required for a structure to be a vessel.[18]  The court cited to the fact that the rig was recently towed as a "wet tow" as evidence that the rig was indeed practically capable of such maritime transportation.  Based primarily on the recent towage of the rig as a "wet tow," the court found the rig to be "practically capable of maritime transportation" and thus a vessel.  *Id.* at *7.

Similarly, in this case, the INNOVATOR was recently towed as a "wet tow" to Gulf Marine's dock.  (R. Doc. 64-2, Ladd Declaration, ¶ 9).  Like the rig in *Louisiana International Marine, L.L.C.*, the INNOVATOR also had a line-handling crew and a pilot on board for portions of the tow to Gulf Marine's facility.  (*Id.*).  In addition, the INNOVATOR was recently

---

[17] *See La. Int'l Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*, No. 11-186, 2012 WL 1029934 (S.D. Tex. Mar. 9, 2012), *adopted La. Int'l Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*, No. 11-186, 2012 WL 1029703 (S.D. Tex. Mar. 26, 2012).

[18] Unlike the INNOVATOR, the semi-submersible drilling rig in *Louisiana International Marine, L.L.C.* had been cold-stacked for a decade and was partially dismantled with an equivocal intention to be scrapped. Generators had been removed from the rig, and it lacked lifeboats, navigational aids, and operational bilge pumps. It also was scheduled to undergo repairs before it could be placed back into operation.  It had less vessel features than the INNOVATOR, and yet was still determined to be a vessel.  2012 WL 1029934, at *7.

moved and shifted, using the line-handling crew on board the semi-submersible and a pilot as well.  (*Id.*, ¶ 13).  Like the rig in *Louisiana International Marine, L.L.C.*, the INNOVATOR was and is practically capable of maritime transportation.

Moreover, the INNOVATOR is indisputably a semi-submersible with all of the hallmarks of a vessel under established Fifth Circuit jurisprudence.  She has a steel hull with twenty-five (25) ballast tanks to insure its ability to float.  (*Id.*, ¶ 4).  She has the typical semi-submersible configuration with a watertight bulkhead and additional tanks for fuel, cement, water, and mud to support her function as a mobile drilling vessel.  (*Id.*).  Moreover, the INNOVATOR has the following objective vessel characteristics: Pontoon hull; Ballast tanks; Tow bridles; Towing lugs; Fender frames; Navigational lights; Automated Identification System (AIS); Sleeping quarters and accommodations for 98 people on board; Galley; Main Control Room; Lifeboats; Anchors; Hull Positions System; Ballast System; GPS Positioning System; Draft marks; Anodes; Diesel and gas turbine generators; Mooring system; and Winches.  (*Id.*, ¶ 6).  Amerindo documented the INNOVATOR with the National Vessel Documentation Center (*See* R. Doc. 64-1, Abstract of Title for the INNOVATOR), and the INNOVATOR is currently classed with the American Bureau of Shipping.  (R. Doc. 64-2, Ladd Declaration, ¶ 9).  The United States Coast Guard inspected the INNOVATOR and issued a Certificate of Inspection for the INNOVATOR.   Even though these characteristics are not dispositive, they lend weight to the finding that the INNOVATOR is a vessel, particularly under the procedural safeguards of Rule 56.

If the INNOVATOR were found not to be a vessel, it is questionable whether any semi-submersible rig could qualify as a vessel under *Lozman*, which would abrogate decades of Fifth Circuit jurisprudence.   All semi-submersible rigs require the assistance of tugs to move long distances and all semi-submersible rigs are attached to the seabed when on location.  In addition,

semi-submersible rigs do not have a primary function of transporting people or cargo.  Yet, even with these characteristics, semi-submersible rigs like the INNOVATOR have always been classified as vessels unless they are (1) permanently attached to the seabed and (2) require an exorbitant cost to move to another location.  The INNOVATOR is not permanently attached to the seabed and there is no evidence whatsoever as to the cost to move the INNOVATOR from her current location.   Under the long line of applicable Fifth Circuit jurisprudence, the INNOVATOR is a vessel.

In its Motion to Dismiss, Amerindo cites to a list of nine (9) items as support for its position on vessel-status.  (R. Doc. 62, pp. 2-3).  Four of the nine items relate to the lack of self-propulsion (i.e. lack of engines, thrusters, automated positioning of thrusters, or steering mechanism) and a fifth relates to the absence of a "raked bow."[19]  (*Id.*).  In *Lozman*, the Supreme Court made clear that while lack of self-propulsion "may be a relevant factor" to consider in determining vessel status, it "is not dispositive."   133 S. Ct. at 741 (citing *The Robert W. Parsons*, 191 U.S. 17, 31 (1903)).  In *Louisiana International Marine, L.L.C.*, the district court found a semi-submersible rig to be a vessel despite the lack of self-propulsion, thrusters, or steering mechanism.  2012 WL 1029934, at *4, *7.  Moreover, Amerindo's reliance on lack of self-propulsion ignores the plethora of objective vessel-characteristics cited above.  Like the dredge in *Stewart*, the INNOVATOR's primary purpose is not navigation or commerce; yet, like the dredge in *Stewart*, she has a hull, ballast tanks, navigational lights, crew quarters, and a galley.  (R. Doc. 64-2, Ladd Declaration, ¶¶ 4-6).  Similar to the dredge in *Stewart*, the INNOVATOR is a vessel; and at the very least, Gulf Marine presented sufficient evidence to

---

[19] The final four (4) items relate to the INNOVATOR's design and intended use, and they are discussed below.

establish genuine issues of material fact that preclude the granting of summary judgment in Amerindo's favor on the issue of vessel status.

Further, the Fifth Circuit has cautioned against rigid reliance on certain factors, including certain items cited by Amerindo and relied upon by the Magistrate, to determine vessel status. *Manuel*, 135 F.3d at 351-52 (citation omitted).  In *Manuel*, the Fifth Circuit found a floating workover rig to be a vessel, stating that characteristics like a "raked bow" are not to be applied mathematically and are only useful guides.  *Id.* at 351-52 (citation omitted).[20]  Similarly, like the rig in *Manuel* and the rig in *Louisiana International Marine, L.L.C.*, the INNOVATOR is a vessel under the General Maritime Law despite the absence of self-propulsion or a "rake bow." As set forth herein, the INNOVATOR is designed in a practical way to be towed from site to site with equipment and crew on board.  (R. Doc. 64-2, Ladd Declaration, ¶¶ 3-5).  As a semi-submersible, the INNOVATOR is not supported by resting on the seabed.  (*Id.*, ¶ 3).  Semi-submersible vessels like the INNOVATOR are able to transform from a deep to a shallow draft by de-ballasting (removing ballast water from the hull), thereby becoming surface vessels.  (*Id.*). When the INNOVATOR was towed to Gulf Marine's facility, she was moved from location to location in this configuration.  (*Id.*, ¶¶ 5-6, 9).  When she is towed to another site, she will also be moved in this configuration.  The INNOVATOR clearly has the design and practical capability to transport crew and equipment over water sufficient to qualify as a vessel for purposes of the CIMLA and General Maritime Law.  Accordingly, Amerindo's Motion to Dismiss should be denied.

---

[20] *See also Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621, 623 (5th Cir. 1955) ("The 'Carol Ann' was an artificial contrivance capable of being used as a means of water transportation. It was afloat. Before repairs, it was towed across the Gulf of Mexico; after repairs, it was towed from Port Arthur to Port Isabel, Texas. It had a deck; it had cabins, it had superstructure. It had no motive power of its own; no steering mechanism; but it definitely was capable of being used as a means of transportation under tow. Under the doctrine laid down in The Scorpio, supra, and many other cases, it is plain to us that the 'Carol Ann' was a 'vessel' subject to a maritime lien, enforceable by suit in rem.").

## IV.     CONCLUSION

The INNOVATOR is a semi-submersible production rig with vessel characteristics that are indistinguishable from the litany of similar structures found to be vessels under long-established Fifth Circuit precedent.   At the very least, Gulf Marine has presented considerable evidence to give rise to material issues of fact that should defeat Amerindo's Motion to Dismiss Arrest.   Accordingly, Gulf Marine respectfully objects to the Magistrate's Recommendation finding to the contrary, and Gulf Marine requests that the Court find that the Motion to Dismiss Arrest be denied.

Respectfully submitted,

*/s/ William C. Baldwin*

Lara D. Pringle (Texas Bar No. 24056164)
Jones Walker LLP
First City Tower
1001 Fannin Street, Suite 2450
Houston, Texas 77002
Telephone: (713) 437-1800
Facsimile: (713) 437-1810
lpringle@joneswalker.com

*Of Counsel:*
WILLIAM C. BALDWIN (#31613)
HANSFORD P. WOGAN (#34825)
Jones Walker LLP
201 St. Charles Avenue - 48th Floor
New Orleans, Louisiana 70170-5100
Telephone:     (504) 582-8315
Facsimile:     (504) 589-8315
wbaldwin@joneswalker.com
fwogan@joneswalker.com
***Attorneys for Gulf Marine Fabricators, LP***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of November, 2017, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.  I also certify that I have mailed this filing by United States Postal Service to any non-CM/ECF participants.

*/s/ William C. Baldwin*
_____