IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

|  |  |  |
|---|---|---|
| GULF MARINE FABRICATORS , LP | § | |
|     Plaintiff, | § | |
| | § | |
| VS. | § | C. A. No. 2:16-cv-00430 |
| | § | Rule 9(h) - Admiralty |
| THE ATP INNOVATOR, bearing IMO No. | § | |
| 742, her tackle, furniture, apparel, | § | |
| appurtenances, etc., *in rem*, and AMERINDO | § | |
| SERVICES LTD.  and BLUE SKY LANGSA | § | |
| LTD., *in personam*, | § | |
|     Defendants. | § | |

**CLAIMANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR REVIEW OF THE MAGISTRATE JUDGE'S
AMENDED MEMORANDUM AND RECOMMENDATION**

TO THE COURT:

COMES NOW Amerindo Services Ltd., solely in its capacity as claimant to the ATP INNOVATOR ("Amerindo" or "Claimant"), filing its Response to Plaintiff's Motion for Review of the Magistrate Judge's Amended Memorandum and Recommendation[1] [Dkt. No. 75] on "vessel" status, and respectfully would show:

**I.**

Like before, Plaintiff attacks every aspect of the Magistrate Judge's Amended Memorandum and Recommendation,[2] including the standard used by Magistrate Judge Ellington.  Amerindo

---

[1]      Magistrate Judge Ellington issued a Memorandum and Recommendation on October 11, 2017 [Dkt. No. 70], followed by an Amended Memorandum and Recommendation on October 20, 2017.  [Dkt. No. 71].

[2]      Plaintiff continues with the same substantive argument it has made all along, which is essentially that the INNOVATOR at one time was the ROWAN MIDLAND, a semi-submersible drilling rig, so the legion of Fifth Circuit cases holding semi-submersible drilling rigs to be vessels apply to the INNOVATOR.  Plaintiff makes this argument even though the INNOVATOR was converted from a drilling rig to an offshore production facility by January of

responds to the Plaintiff's attacks as follows:

**A.     The Magistrate Judge Applied the Correct Legal Standard.**

Plaintiff's first attack is on the legal standard applied by the Magistrate Judge.  Plaintiff argues that the Magistrate Judge's application of Rule 12(b)(1) instead of Rule 56 is incorrect, leading to an improper result.  Plaintiff's argument relies primarily upon one case, *Martin v. Fab-Con, Inc.,* 9 F.Supp. 3d 642 (E.D. La. 2014).  *Martin,* however, addresses the question of vessel status in conjunction with jurisdiction in a personal injury claim for negligence and unseaworthiness.  The underlying claims for negligence and unseaworthiness both require the existence of a vessel as a prerequisite to both claims' viability.  In the personal injury context, the vessel status question is intertwined with the merits of underlying cause of action.

Here, Plaintiff has asserted a claim for breach of contract, as the Magistrate Judge correctly points out.[3]  The merits of Plaintiff's claim relate to the existence of a contract, breach of the contract, and any damages flowing from the breach.  Plaintiff's asserted *in rem* claim is merely a procedural enforcement device created by Rule C of the Supplemental Rules for Admiralty or

---

2006, and was designed to remain in place and moored to the seabed for the life of the oil and gas field, and functioned in that capacity from March of 2006 until the United States ordered operations of ATP Oil & Gas Corporation shut-in on April 23, 2013 (*see* Dkt. No. 35-1), after which the INNOVATOR was towed to Ingleside, where the structure has remained, even after the sale of the structure to Amerindo in 2016.  Post-sale to Amerindo, the INNOVATOR has remained in Ingleside at Plaintiff's facility primarily due to depressed oil prices since the sale. Plaintiff's argument dismisses or ignores that a court in this very District previously held the post-conversion INNOVATOR was not a vessel in 2008.  *Case v. Omega Natchiq*, No. H-08-0835, 2008 WL 2714124 at *7 (S.D. Tex. July 10, 2008)(*see* Dkt. No. 35-2).

[3]     Magistrate Judge Ellington also points out, quite correctly, that the removal of the *in rem* enforcement mechanism from the case does not strip Plaintiff of its breach of contract claim, which still exits as to the *in personam* defendants who have appeared in the case.

Maritime Claims & Asset Forfeiture Actions.[4]  Procedurally, an *in rem* action requires the existence of a maritime lien.  *Id*. at (C)(1)(a).  Whether a lien exists is a jurisdictional inquiry separate and apart from the merits of the underlying breach of contract claim.

Here, Plaintiff has asserted a maritime lien against the INNOVATOR pursuant to the Maritime Lien Act, 46 U.S.C. § 31301, *et seq*.  The statute states in part "a person providing necessaries to a vessel ... has a maritime lien on the vessel [and] may bring a civil action *in rem* to enforce the lien." 46 U.S.C. § 31342(a).  As a matter of jurisdictional inquiry, if the INNOVATOR is not a vessel, Plaintiff has no maritime lien under the Maritime Lien Act, and cannot bring a procedural action under Rule C.  The United States Supreme Court agrees, stating federal jurisdiction under the Maritime Lien Act turns on whether the property seized is a vessel, as that term is defined in 1 U.S.C. § 3.  *Lozman*, 133 S.Ct. at 745.

Because the question here is ultimately jurisdictional, Plaintiff must prove by a "preponderance of the evidence" that the Court has jurisdiction based upon the complaint and evidence.  *Ballew v. Cont'l Airlines, Inc*., 668 F.3d 777, 781 (5th Cir. 2012), citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  "A court can find that subject matter jurisdiction is lacking based upon: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ballew*, 668 F.3d at 781, quoting *Ramming v. United States*, 281 F.3d

---

[4]      One prominent maritime commentator has stated that an action *in rem* under Rule C is a procedure unique to American admiralty practice.  The procedural action may be brought only by a plaintiff that has a maritime lien against the property.  The action itself is a powerful procedural tool in the hands of the plaintiff.  The property ultimately can be sold at auction and proceeds paid to the plaintiff to satisfy a judgment.  2 T.J. Schoenbaum, *Admiralty and Maritime Law* § 21-3 at pp. 535-37 (5th Ed. 2011).

158, 161 (5th Cir. 2001).

In making her recommendation, the Magistrate Judge did precisely what she is supposed to do. She reviewed the Complaint, the briefs, the evidence submitted to the Court, and, according to Plaintiff's argument, decided disputed issues of fact. Plaintiff's argument that the Magistrate Judge improperly decided disputed issues of fact ignores the applicable standard stated above. Applying the requisite standard, the Magistrate Judge, for the reasons stated in her Amended Memorandum and Recommendation, has recommended a determination that the INNOVATOR is not a vessel for purposes of the Maritime Lien Act. This is a jurisdictional determination. For the foregoing reasons, Magistrate Judge Ellington applied the proper legal standard, so Plaintiff's first attack should be overruled. *Lozman*, 133 S.Ct. At 745; *Ballew*, 668 F.3d at 781.

**B.**     **The INNOVATOR is not a Vessel**.

Plaintiff mounts a three pronged attack to the Magistrate Judge's Amended Memorandum and Recommendation that the INNOVATOR is not a vessel.[5] Plaintiff argues, as it has previously, that the INNOVATOR is a vessel under *Stewart*,[6] under *Lozman*,[7] and under Fifth

---

[5]     Magistrate Judge Ellington has written a twenty-two (22) page detailed Memorandum and Recommendation, taking into account the arguments of the parties. [Dkt. No. 71]. The vessel status issue was fully briefed by each party, and this Court is well aware that the issue has been before the Court previously. The Magistrate Judge thoroughly discussed the history of the INNOVATOR, both factually and in terms of prior litigation, discussed the applicable legal principles, addressed the arguments of both parties, applied the facts to the law with detailed analysis, and recommends to this Court that a finding be made that the INNOVATOR is not a vessel. *Id.*

[6]     *Stewart v. Dutra Construction*, 543 U.S. 481 (2005). [Dkt. No. 75-1 at pp. 10 - 12].

[7]     *Lozman v. City of Riviera Beach, Fla.*, 133 S.Ct. 735 (2013). [Dkt. No. 75-1 at pp. 12 - 17].

Circuit law.[8]  For the following reasons, the Recommendation of Magistrate Judge Ellington is the correct decision, and Plaintiff's objections should be overruled.

1.      Plaintiff first argues that the INNOVATOR is a vessel under *Stewart*.  Plaintiff asserts that the INNOVATOR's ballasting and deballasting system to maintain draft is not substantively different than the anchor movement system used by SUPER SCOOP dredge in *Stewart*.[9]  This argument, that adjusting the ATP INNOVATOR up and down in draft through the ballast system is just like the moving of the SUPER SCOOP in *Stewart*, is a stretch of Herculean proportion.  *See Riley v. Alexander/Ryan Marine Servs. Co.*, 983 F.Supp.2d 884, 889 (S.D. Tex. 2013) for a discussion of movement versus transportation.  As is stated in *Lozman*, one primary key to the SUPER SCOOP being a vessel was the fact that the SUPER SCOOP **regularly**, or more specifically, every couple of hours, moved by means of anchors and cables while carrying equipment, machinery and a crew over water. 658 U.S. at 123-24.  In order to complete its dredging work, it had to move, and did move.  This is a far cry from adjusting operational draft on the ATP INNOVATOR, which does not move the structure to a different location, but simply keeps it level at the operational draft.  *See* Dkt. No. 62-1 at p. 18, ll. 2-18.  This very issue was addressed by Magistrate Judge Ellington, who stated, based upon the evidence submitted, that the ballast system on the INNOVATOR is used to maintain draft and keep the structure level, not as a means of self-propulsion like the SUPER SCOOP.[10]  The Magistrate Judge went to say that the

---

[8]      *See* Dkt. No. 75-1 at pp. 17 - 23.  In its "appeal," which are Rule 72 objections, Plaintiff essentially repackages its arguments that it made in its response to Amerindo's motion.

[9]      *See* Dkt. No. 75-1 at pp. 11 - 12.

[10]     *See* Dkt. No. 71 at pp. 11 - 14.

lack of self-propulsion is not dispositive of the vessel status question, although it weighs in favor of a finding that the INNOVATOR is not a vessel.  While Plaintiff may not like what the Magistrate Judge decided, it has pointed out no factual or legal basis from changing the decision.

2.      Plaintiff next argues that the INNOVATOR is a vessel under *Lozman*.  It essentially makes the same arguments here that it made in its Opposition to Amerindo's motion. Consequently, Amerindo responds the same way that it did before to these arguments.

As the Court appreciates, the issue of vessel status already has been before this Court. The Court allowed the Plaintiff to conduct jurisdictional discovery, which has been completed in the form of the deposition of Joseph Key, and requests for production to which Amerindo and Blue Sky Langsa Ltd. have responded.  Despite the fact that jurisdictional discovery was completed, the only new evidence Plaintiff attached to its Opposition, not attached to its prior Opposition, was (1) the deposition of Joseph Key, and (2) a third party stability report from Exmar Offshore dated March of 2007.[11]

With this limited new evidence, Plaintiff discusses several "facts" in its objections that it deems important to the Court's analysis of the vessel status issue.  Most, if not all, of these same facts were discussed in its Opposition.  By way of response to Plaintiff's arguments, on a vessel

---

[11]      Plaintiff cited to this third party stability report because the report utilizes the term "vessel" in parts of the report to describe the ATP INNOVATOR.  The purpose of the report was to determine the structure's stability for the addition of a third production module.  *See* Dkt. No. 64-5 at p. 7.  A stability assessment was required because the addition of the third module would change the structure's wind profile area and lightship weight.  *Id*.  It is important to note that the report also refers to the structure as a floating offshore installation, or FOI.  *Id*. at p. 43. Nevertheless, these statements by a third party contractor cannot establish whether the ATP INNOVATOR is a vessel.  *Martin v. Fab-Con, Inc.*, 9 F.Supp.3d 642, 650 (E.D. La. 2014) ("Vessel status is determined by the history of the contrivance, its use, purpose, and perhaps potential, not what the parties call it.")  In terms of assessing Exmar's statements, Exmar is not even a party.

status question, in cases where the structure is not permanently moored, which is the case here, *Lozman* instructs the lower courts that a structure is not practically capable of maritime transportation "unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *See Riley*, 983 F.Supp.2d at 889 n. 3, citing *Lozman*.  As to the latter, or carrying things over water, the United States Supreme Court gives guidance through its statement in *Lozman* that there is a line between items being transported from place to place (e.g. cargo) and items that are mere appurtenances to the structure that is relevant to the analysis.[12]  *Lozman*, 568 U.S. at 122; *see also Martin v. Fab-Con, Inc.*, 9 F.Supp.3d 642, 949 E.D. La. 2014).  From the foregoing, lower courts can understand that transporting the structure's equipment as opposed to cargo makes a difference to the analysis.[13]  As is clear from the holding in *Lozman*, the critical issues to be analyzed are (1) the physical characteristics of the structure,[14] and (2) its activities.[15]

---

[12]    This is important here because Joseph Key was asked several times about the ATP INNOVATOR transporting equipment during the wet tow from the Mississippi Canyon Block to Ingleside.  This equipment is aptly described as vessel appurtenances.  There was no other choice but to carry what was on board the structure to Ingleside.  The only alternative would have been to jettison all of the equipment to its ultimate burial ground in Davy Jones' locker, which is not a feasible alternative for obvious reasons. Plaintiff has not provided this Court with any evidence that the ATP INNOVATOR has ever carried any cargo from one location to another.

[13]    For example, in *Martin*, the fact that plaintiff failed to present any evidence that the barge (UNITY) ever transported cargo, as opposed to its own furnishings, or that it was designed to do so, was an important factor in distinguishing the UNITY from the SUPER SCOOP in *Stewart v. Dura Constr. Co.*, 543 U.S. 481 (2005).  *Martin*, 9 F.Supp.3d at 649.

[14]    The physical characteristics of the ATP INNOVATOR are as follows: (1) it has no engines for propulsion, so it must be towed (wet or dry) if it is to move from one location to another, (2) it has no thrusters to move it around, (3) it does not have a DGPS automated positioning system to maintain its position automatically through thrusters, (4) it has no rudder or steering mechanism, (5) its <u>primary</u> <u>purpose</u> is not to transport people or cargo over water, (6) it does not have a raked bow, (7) it is designed and intended to be on location at a producing oil

Despite conducting the allowed jurisdictional discovery, Plaintiff has failed to uncover any new competent evidence supporting its argument that the ATP INNOVATOR is a vessel.  Its inaccurate and/or incomplete allegations it has made of a future wet towing,[16] of U.S. Flag,[17] that

---

and gas field for a number of years, or as long as the field is operational, (8) once it is in place at an producing offshore oil and gas field, the job of the ATP INNOVATOR is to connect by pipe to various well heads to collect, process and separate oil and gas, and then transport the oil and gas by designated pipeline to the user located on shore, (9) it is held in place at the field by means of mooring lines anchored to suction piles embedded into the seabed, (10)while it has eight mooring winches, two in each corner, the structure does not carry any anchors; (11) it has obstruction lights, but no navigation lights, so navigation lights have to be supplied to the INNOVATOR for a wet tow, (12) it has no navigational computers, and (12) it has no bridge. *See* Dkt. No. 62 at Section II. Contrary to what Plaintiff alleges, the ATP INNOVATOR does not have an automated information system, or AIS. *See* Dkt. No. 62-1 at p. 82, ll. 18-21; p. 95, ll. 4-15.

[15]      The Court has fully described the activities of the ATP INNOVATOR in Dkt. Nos. 29 and 71.  In terms of the structure being moved three times post-conversion, it has only moved once voluntarily, when it was wet towed to the Mississippi Canyon Block to serve as an offshore production facility.  The second move (through wet towage) from the Mississippi Canyon Block to Ingleside was at the mandate of the United States.  The third move within Gulf Marine's facility was mandated by Gulf Marine.  The structure obviously will have to move from Ingleside to a work location.  This is why it is described as a Mobile Offshore Production Unit, or MOPU, on Amerindo's website.  This fourth, and most probably last move will be a voluntary move if it occurs, and most likely will be in the form of a dry tow, and not a wet tow.  Once it is moved onto location as a production facility, it most probably will stay there through the end of the structure's useful life.  *See* Dkt. No. 62-1 at p. 87, l. 14 - p. 89, l. 12; p. 93, ll. 14 - 22; p. 95, l. 22 - p. 96, l. 10.  Mr. Key's discussion of the website, and it describing the structure as a MOPU, is found at Dkt. No. 62-1 at p. 54, l. 23 - p. 55, l. 16.

[16]      The testimony from Joseph key is to the contrary.  He testified that if the structure is moved in the future, dry tow probably will be used.  Dkt. No. 62-1 at p. 95, l. 22 - p. 96, l. 10.  One reason a wet tow was used to move the unit from the Mississippi Canyon Block to Ingleside was because the weather would not allow a dry tow.  *Id*. at p. 95, l. 16 - p. 96, l. 14.  Mr. Key described the process for relocating at p. 91, l. 24 - p. 93, l. 25.

[17]      The evidence cited by Plaintiff at page 4 of its Opposition, which is Dkt. No. 64-4, does not say anything about flag.

the structure floats,[18] that it can move like the Super Scoop through adjusting ballast,[19] that it has

anchors,[20] that it has a hull positioning system,[21] that there are people on the structure during a

wet tow,[22] that its documented as a vessel and was classed by ABS,[23] and equipment is moved

during the wet tow[24] are not sufficient to establish the ATP INNOVATOR as a vessel.[25]   Further,

---

[18]     The structure certainly does float.  However, this, in and of itself, does not make it a vessel. *Lozman*, 568 U.S. at 126 (rejecting the anything that floats approach to vessel status).  It can be said that every structure that has been held not to be a vessel floats on water.  The ATP INNOVATOR must float to work in the depth of water where is has worked and where it is expected to work in the future.  Because it floats, it has to have a crew to keep it stabilized.  *See* Dkt. No. 62-1 at p. 97, l. 17 - p. 99, l. 3.

[19]     This argument, that adjusting the ATP INNOVATOR up and down in draft through the ballast system is just like the moving of the SUPER SCOOP in *Stewart*, is simply incorrect, as the Magistrate Judge concluded.  [Dkt. No. 71 at pp. 11 - 14].

[20]     Mr. Key testified that the ATP INNOVATOR does not have anchors.  *See* Dkt. No. 62-1 at p. 85, ll. 3-12.  When on location, the winch lines connect to suction piles that are secured to the seabed.  *Id*. at p. 92, ll. 4-16.

[21]     The ATP INNOVATOR does not have a hull positioning system.  *See* Dkt. No. 62-1 at p. 85, ll. 16-18; Dkt. No. 62-1 at p. 33 of 36, paragraph 5.

[22]     As Mr. Key testified, the U.S. Coast Guard requires a crew to be on board the structure during a wet tow for firefighting and environment purposes.  The Coast Guard also required the Pilots and the tow masters.  *See* Dkt. No. 62-1 at p. 88, l. 10 - p. 89, l. 2; p. 97, ll. 5-16.

[23]     Magistrate Judge Ellington addresses this at page 21 of the Amended Memorandum and Recommendation, and properly states that it does not matter what the parties call the object.  What matters is the structure's history, use, purpose and perhaps potential. [Dkt. No. 71 at p. 21].

[24]     As can be expected, all of the equipment, better described as appurtenances, moved with the structure in the wet tow mandated by the United States.  However, Plaintiff has not come forward with any evidence that the ATP INNOVATOR has ever transported cargo in the way that is required to establish vessel status, or that it is designed to do so.

[25]     Plaintiff's incorrect factual assertions are in line with its futile attempt to cite now to a post-*Lozman* case, which is *BW Offshore USA, LLC v. TVT Offshore A/S*, 145 F.Supp.3d 658 (E.D. La. 2015).  *See* Dkt. No. 75-1 at p. 16.  This case involved the BW PIONEER, which is

its protestation that if the Court holds the ATP INNOVATOR is not a vessel, it then will be

questionable that any semi-submersible drilling rig could qualify as a vessel has no merit.[26]  This

protest ignores the fact that the vessel status determination requires a case by case analysis, rather

than a decision based upon categories of structures.  It also ignores the significant, yet real

difference between the purpose, from a practical standpoint, of the ATP INNOVATOR, which is

an offshore production facility, and a drilling rig, which by its very nature is designed and built to

move from location to location to drill wells.  Contrariwise, the ATP INNOVATOR's purpose is

to serve as a production facility for the life of an offshore field, or life of the structure.  It is not to

move from one field to another on a regular basis.

Given the foregoing, Plaintiff has not pointed this Court to any competent evidence that

supports its position that the ATP INNOVATOR is a vessel under *Lozman.*  Magistrate Judge

Ellington discussed all of the issues in great detail, taking into consideration the arguments of the

parties, and correctly recommended to this Court that determination be made that the

INNOVATOR is not a vessel.

      3.     Plaintiff lastly argues that the INNOVATOR is a vessel under Fifth Circuit law.

---

what is known as a floating, production, storage and offloading unit (FSPO).  As a matter of
physical characteristics, the BW PIONEER is ship shaped, built on the base of a converted oil
tanker, maintained a full crew, flew the flag of Bermuda, has its own propulsion system, and
could and can detach itself from a well and relocate to another well in as little as six hours.  *Id.* at
663.  The Court found that not only was the BW PIONEER practically capable of maritime
transport, it was imminently capable of it.  *Id.*  The BW PIONEER was a vessel despite the fact
that it had been out of navigation since 2009, but was not permanently out of navigation, as it
could be more easily returned to navigation than a jack-up drilling rig.  *Id.* at 664.  Simply put,
the BW PIONEER is nothing like the ATP INNOVATOR.  For the Court's reference, true and
correct pictures of the BW PIONEER are found at Dkt. No. 65 -2, which can be compared to a
true and correct picture of the ATP INNOVATOR, which can be seen at Dkt. No. 65-3.

      [26]     *See* Dkt. No. 75-1 at p. 21.

These are the same arguments Plaintiff has made unsuccessfully on prior occasions. Most of these cases involve jack-up drilling rigs or semi-submersible drilling rigs. Plaintiff essentially argues there is "nothing that substantially distinguishes the INNOVATOR from the numerous semi-submersible rigs the Fifth Circuit has found to be vessels."[27] This is completely inaccurate, as it ignores the conversion of the structure from a drilling rig to a production platform designed to be permanently moored to the seabed, attached by production pipes to the well heads located in the oil and gas field for the life of the field, and also attached to the transportation pipelines that transport the oil and gas to various locations on the shore. It also ignores that the purpose of the INNOVATOR, as a production facility, will be the same as it was in the Mississippi Canyon block, which is to remain in place for the life of the field where the INNOVATOR will be located, which for all practical purposes means the remaining life of the INNOVATOR.[28]

The job of a drilling rig, whether semi-submersible or jack-up, is to move onto an offshore field location, drill an oil and/or gas well, and then, when that project is complete, move to another location and do it all over again. The rig is a means of transporting the drilling rig, drill pipe, drilling mud, personnel and other equipment critical to offshore drilling from one location to another. The job of the offshore production facility like the ATP INNOVATOR is

---

[27]     Dkt. No. 30-1 at p. 11.

[28]     Plaintiff argues that the INNOVATOR has the inherent capabilities of moving from job site to job site. This is an argument based upon what the structure used to be (a drilling rig), and not what it is now. There is no evidence in the record that the proposed purpose for the structure is to move from place to place. In fact, the evidence in the record is to the contrary, that the structure will move to one location and stay there for the life of the field or the INNOVATOR, whichever comes first, similar to the purpose of the INNOVATOR before the Department of the Interior shut in the INNOVATOR's operations in April of 2013, which led to the structure being towed to Ingleside in the first place.

quite different.  While the structure may have to be towed into position at the offshore oil and gas field,[29] once it is on location, the production facility is to remain there for the serviceable life of the field, which in all likelihood will be the remaining serviceable life of the INNOVATOR.  It will not move once it is on location.  Because of its intended purpose, the ATP INNOVATOR's function is far different than a semi-submersible or jack-up drilling rig that moves from location to location to drill wells.  This critical difference means the cases Plaintiff cites holding semi-submersible drilling and jack up rigs to be vessels have no application to this context.  Simply put, it is comparing apples to oranges.

Plaintiff cites *In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico*, 808 F.Supp. 2d 943 (E.D.La. 2011), in support of its argument above about semi-submersible rigs being held to be vessels.  Plaintiff criticizes the Magistrate Judge for not discussing the case.  As for the DEEPWATER HORIZON, this semi-submersible drilling rig had a dynamic navigational positioning system which utilized thrusters (propulsion) to maintain its position over the well.  It employed a satellite global positioning system device and complex thruster technology to stabilize itself.  The only connection the DEEPWATER HORIZON had

---

[29]     After the original conversion, the ATP INNOVATOR operated as a production facility on the Mississippi Canyon area of the Gulf of Mexico, off the Louisiana coast, connected to seabed and to oil and gas wells and pipelines.  It was taken out of service by ATP Infrastructure Partners LP (the owner) and/or ATP Oil & Gas Corp. (the operator) in 2014 and towed to Corpus Christi due to the ATP Oil & Gas Corp.'s financial difficulties following the drilling moratorium imposed after the DEEPWATER HORIZON oil spill.  The ATP INNOVATOR has been stacked or sitting idle in Ingleside ever since, but the purpose of the structure is the same as it was when it was operating as a deepwater production facility off the coast of Louisiana.  As is critical here, the ATP INNOVATOR is no longer a semi-submersible drilling rig, so cases involving semi-submersibles or jack-up drilling rigs have no application to the question of whether the ATP INNOVATOR, in its current state as an offshore production facility, is a vessel for maritime lien purposes.

with the seabed was a drill string connected to a blowout preventer, which was connected to the well head.  Significant to the District Court was the fact that ll of the parties except one (Cameron) agreed the DEEPWATER HORIZON was a vessel.  808 F.Supp.2d at 949-50. On the other hand, the INNOVATOR has no propulsion system, and certainly no navigational positioning system with complex thruster technology to hold it in position.  When on location, the INNOVATOR is permanently connected to the seabed by a series of anchors.  It also is connected by pipes to the well heads, and to pipelines to transport the oil and gas to shore.  Again, Plaintiff is trying to compare apples to oranges, which requires no discussion by the Magistrate Judge.  The lack of discussion speaks volumes, as this argument was addressed by her in her prior Memorandum and Recommendation, and the Magistrate Judge found that the case was not helpful as it did not consider *Lozman*.[30]

Plaintiff next criticizes the Magistrate Judge for not expressly discussing the case of *Louisiana Int'l Marine, L.L.C. v. The DRILLING RIG ATLAS CENTURY*, 2012 U.S. Dist. LEXIS 40781 (S.D. Tex. 2012).  The *ATLAS CENTURY*, however, follows the legion of Fifth Circuit cases regularly finding semi-submersible rigs to be vessels.  It is certainly correct to state that the Magistrate Judge does not expressly discuss this case by name in the Recommendation. There is no reason to do so.

In reading the *ATLAS CENTURY* case, which is pre-*Lozman*, it becomes apparent that there are multiple vessel status issues involved in the case, depending upon which entity was

---

[30]    *See* Dkt. No. 29 at p.10.

-13-

making a claim against the ATLAS CENTURY.[31]  In terms of the claims where the ATLAS

CENTURY was recommended by the Magistrate Judge in that case to be a vessel, those claims

involved the question as to whether the ATLAS CENTURY, a vessel as a semi-submersible

drilling rig, had been taken out of service or had become a dead ship, and thus was no longer a

vessel.  2012 U.S. Dist. LEXIS 40781 at **15-24.  This is an independent vessel status issue.

*See* T.J. Schoenbaum, *Admiralty and Maritime Law* § 3-6 at pp. 155-156 (5th ed. 2011)(another

difficult vessel status question is the dead ship question).  As is important to our case, when

discussing the issue of wet towing of the ATLAS CENTURY, the Magistrate Judge in that case

acknowledged that a number of courts have refused to confer vessel status upon floating

structures that were towed because those structures were permanently moored to the ocean floor.

2012 U.S. Dist. LEXIS 40781 at **21-23.  For the ATLAS CENTURY, on the other hand, there

was no evidence that the structure had ever been permanently moored at any time.  In fact, the

evidence was that the rig was highly mobile.  *Id*. at **23-24.

Unlike the ATLAS CENTURY, the INNOVATOR has been moored to the seabed on a

semi-permanent basis on the Mississippi Canyon block, as discussed by Magistrate Judge

Ellington, and the future purpose of the structure through Amerindo's intent[32] is for it to be

---

[31]     2012 U.S. Dist. LEXIS 40781 at **9-224.  Oddly enough, Plaintiff fails to discuss
the fact that the ATLAS CENTURY is found to be a vessel as to claims by certain entities, and
not to be a vessel as to claims by other entities.  *Id*.  The conflicting decisions are driven by and
based upon the facts that apply to the different claims being asserted.

[32]     While Plaintiff argues that Amerindo's intent should not be considered, the intent
of the owner in the *ATLAS CENTURY* case is center stage. The case states "the Fifth Circuit ..
recognizes a shipowner's intent may play a significant role in determining whether a structure
was 'permanently moored' and therefore not practically capable of use as a means of
transportation by water."  2012 U.S. Dist. LEXIS 40781 at *27, citing *De La Rosa v. St. Charles
Gaming Co.*, 474 F.3d 185, 187 (5th Cir. 2006).

-14-

moored to the seabed for the remainder of its useful life, once it is towed to an offshore field. Given the purpose of the INNOVATOR, to be permanently moored to the seabed and serve as a production facility for the life of the field, its purpose is different from that of the ATLAS CENTURY.[33]  Magistrate Judge Ellington correctly looked at and determined the relevant facts relating to functionality of the INNOVATOR, the facts pointing to the purpose of the INNOVATOR, and the applicable law post-*Lozman* to make her recommendation.  She correctly applied these facts to the law to make her recommendation that the INNOVATOR is not a vessel.

Contrary to Plaintiff's objections, the Magistrate Judge considered the cases cited by the parties, properly determined the applicable law, and then applied the facts before her to the applicable law in order to make her well reasoned Recommendation.  Because Magistrate Judge Ellington properly applies the law to the facts, the Plaintiff's objections should be overruled, and her Recommendation should be adopted by you.

WHEREFORE, PREMISES CONSIDERED, Amerindo Services Ltd., solely in its capacity as Claimant, prays: (1) the Court overrule the Plaintiff's objections to the Magistrate Judge's Amended Recommendation and Memorandum; (2) the Court issue an order holding the ATP INNOVATOR is not a vessel, (3) because the ATP INNOVATOR is not a vessel, the Court vacate the arrest of the ATP INNOVATOR, and (4) for such other relief to which it may be justly entitled.

---

[33]     The *ATLAS CENTURY* case teaches that the same structure can be a vessel and a non-vessel depending upon the facts that apply to the particular claimant.  The decision is factually driven.

Respectfully submitted,

By: /s/ Richard L. Gorman
          Richard L. Gorman
          State Bar No. 00784155
          Federal Bar No. 15685
          12335 Kingsride Ln. #354
          Houston, Texas 77024-4116
          Telephone: (832) 725-4026
          Facsimile: (713) 239-1020
          Email: rg@richardgormanlaw.com
          Attorney for Claimant
          Amerindo Services Ltd.

OF COUNSEL:

RICHARD GORMAN LAW

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November 2017, a copy of the foregoing was served on counsel fo record **By Notice of Electronic Filing**.

/s/ Richard L. Gorman
Of Richard Gorman Law

01879.response.11/16/17

-16-